## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:21-CR-566 (RCL)** |
| **DAVID NICHOLAS DEMPSEY,** | |
| **Defendant.** | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For over one hour, defendant David Dempsey viciously assaulted and injured police officers defending the Lower West Terrace Tunnel with a variety of implements he refashioned as weapons. He is among the few out of thousands of January 6 rioters who engaged in such protracted and vicious attacks. He also has a lengthy criminal record, with numerous convictions that far outstrip criminal history category VI,[1] the highest possible category. Accordingly, the government requests that this Court sentence Dempsey to 262 months of incarceration, followed by three years of supervised release, at least $2,000 in restitution, a fine, and a mandatory special assessment of $200. Such a sentence would represent the high end of the Guidelines range agreed to by the parties in the Plea Agreement, after a four-level increase under U.S.S.G. § 3B1.5 for Dempsey's use of body armor during his crimes of violence, which the parties agreed to litigate at sentencing. That recommendation is at the low end of the Guidelines range

---

[1] On August 2, 2024, the U.S. Probation Office filed an updated presentence report (ECF No. 67), indicating a change in Dempsey's criminal history score and category. For reasons explained herein, we respectfully disagree with this calculation. In any event, Dempsey's attempt to rewrite his criminal history, a week before his sentencing, does not change the danger he poses or the realities of his past misconduct.

calculated by the United States Probation Office, which applied the body armor enhancement *and* found that one of the assaults caused *serious* bodily injury. Because the plea agreement did not include the serious bodily injury enhancement, the government requests that it not be applied.[2]

## I.      INTRODUCTION

Dempsey was one of the most violent rioters, during one of the most violent stretches of time, at the scene of the most violent confrontations at the Capitol on January 6, 2021. Unlike other rioters who slowly pushed their way through the crowd towards the Capitol, Dempsey climbed atop his fellow rioters, using them like human scaffolding, thrusting himself to the front. Once he reached the mouth of the tunnel, Dempsey began a prolonged attack, fighting with his hands, feet, flag poles, crutches, pepper spray, broken pieces of furniture, and anything else he could get his hands on, as weapons against the police. Dempsey's violence reached such extremes that, at one point, he attacked a fellow rioter who was trying to disarm him.

At approximately 4:11 p.m., Dempsey unleashed a torrent of pepper spray directly at Metropolitan Police Department (MPD) Detective Phuson Nguyen, just as another rioter had compromised the detective's gas mask. The searing spray burned Detective Nguyen's lungs, throat, eyes, and face and left him gasping for breath, fearing he might lose consciousness and be overwhelmed by the mob.

---

[2] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Moments later, Dempsey struck MPD Sergeant Mastony's head with such ferocity using a metal crutch that it cracked the protective shield of his gas mask, causing Sergeant Mastony to collapse in a daze, his ears ringing. The blow cut Sergeant Mastony's head, caused significant bruising, and made Sergeant Mastony believe he had suffered a concussion.

Though Dempsey has pled guilty only for his assaults on Detective Nguyen and Sergeant Mastony, his violent assault on other officers defending the Capitol was relentless: swinging pole-like weapons more than 20 times, spraying chemical agents at least three times, hurling objects at officers at least ten times, stomping on the heads of police officers as he perched above them five times, attempting to steal a riot shield and baton, and incessantly hurling threats and insults at police while rallying other rioters to join his onslaught.

Dempsey's actions on January 6 were consistent with his earlier declaration, captured on video, of wishing to see political figures hanging from a noose, and also consistent with his documented history of political violence in California. Dempsey's extensive criminal history— which includes an assault with pepper spray at a political rally in 2019—is understated by criminal history category VI.

The government's recommended 262 months of incarceration for Dempsey's two convictions for violating 18 U.S.C. § 111(a) and (b) will adequately account for Dempsey's sustained violence against police officers protecting the Capitol following his stated hope of lynching members of Congress, the injuries he caused to MPD Sergeant Jason Mastony, Detective Phuson Nguyen, and others, Dempsey's prior political violence and extensive criminal history, and the urgent need to deter Dempsey and others from engaging in future political violence.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021, Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 47, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

### B.      Dempsey's Role in the January 6, 2021, Attack on the Capitol

Dempsey travelled from his home in California to Detroit, Michigan, by airplane on January 4, 2021. Dempsey joined two individuals in Detroit and travelled to Washington, D.C., via automobile on January 5, 2021.[3]

On the morning of January 6, 2021, Dempsey watched speeches at the rally near the ellipse. Dempsey wore a BulletSafe tactical vest, a black helmet, camouflaged cargo pants, a dark gray long sleeve shirt, sunglasses, and an American flag gaiter covering his neck, mouth, and nose. Dempsey gave an interview on video while standing in front of a wooden structure representing a hanging gallows, which was fitted with a noose and a sign stating, "This is Art."

---

[3] Dempsey's traveling companions have not been charged with any crimes. As set forth below, one of them, A.D., assisted Dempsey with getting a video temporarily removed from YouTube, but did not enter the Capitol building or assault police officers.



*Still from Exhibit 1 – Dempsey speaking in front of gallows.*

In the video recorded interview, Dempsey was asked, what he thought of "this work of art." Dempsey responded, in part:

> This isn't just art. This is necessary. Like I said, they say "we need to start arresting people, we need to start putting 'em behind bars." No, we don't need to waste the taxpayer dollars on these worthless cretins who are treasonous to our country. We need to decriminalize hemp and marijuana, turn all that shit into rope when we're done with it, and then string all these fuckin' worthless bastards up from the top of those [pointing to the gallows], these treelines, the rafters, the rooftops, the statues, I don't care where they go. String 'em up and string 'em up high. And let everybody know this is what happens when you are a treasonous piece of shit who doesn't belong in this fuckin' country and has this fuckin' country's worst objective at heart. So, I'm 100% with it. I say we should have been doing this a long fuckin' time ago. Them worthless fuckin' shitholes like fuckin' Jerry Nadler, fuckin' Pelosi, uh Clapper, Comey, fuckin' all those pieces of garbage, you know, Obama, all these dudes, Clinton, fuck all these pieces of shit. That's what they need [pointing to gallows]. They don't need a jail cell. They need to hang from these motherfuckers while everybody videotapes it and fuckin' spreads it on YouTube, Bitchute, or whatever fuckin' other social media there is. And they need it to get the point across, the time for peace talk is over. All that shit about being complacent, fuck all that shit. For four years, five years really, they've been fuckin' demonizing us, belittling us, hurting us, killing us, fuckin' doing everything they can to stop what this is [referring to the rally for former President Trump] and people are sick of that shit. You know, and uh, hopefully one day soon, we really have someone

hanging from one of these motherfuckers [pointing to the gallows] just like they do in them other countries.

Dempsey was initially identified by citizen sleuths who saw Dempsey in the background of another video without sunglasses and with the gaiter below his nose and mouth. This video was later posted on YouTube.[4]



*Dempsey in the Background of YouTube video with his face exposed.*

Dempsey marched with others to the U.S. Capitol building. A large crowd of rioters had gathered in front of an arched entrance to the Lower West Terrace doors, which, in the context of the January 6 attack, has colloquially become known as the "tunnel" at the U.S. Capitol, due to the partially constructed inaugural stage.

---

[4] In approximately April 2021, Dempsey instructed A.D. to contact the individual who posted the video on YouTube to take the video down or make it private to protect Dempsey from "leftist" attacks. The poster initially complied with A.D.'s request, but later made the video public again. In May 2022, Dempsey instructed A.D. to again contact the poster to remove or make the video private, but the poster declined to do so.

Dempsey joined the crowd pushing into the line officers defending the tunnel. At approximately 3:56 p.m., Dempsey climbed atop the shoulders, arms, and backs of other rioters to get to the front line.



*Still from Exhibit 2 – Dempsey climbing over rioters to reach the tunnel (clip time 1:53).*

Upon reaching the front, Dempsey threw a short pole-like object into the tunnel striking MPD Officer M.D. and shouted, "Fuck you bitch ass cops."



*Still from Exhibit 3 – Dempsey throwing pole at Officer M.D.*

Dempsey then grabbed a police riot shield and yelled at the officers, "You fuckin' pieces of shit … Come on f******."



*Still from Exhibit 3 – Dempsey holding police riot shield.*

At approximately 3:57 p.m., Dempsey attempted to throw a flagpole at officers in the tunnel, but his throw was inadvertently blocked by a police riot shield held by another rioter.

At approximately 3:58 p.m., Dempsey grabbed an officer's baton and unsuccessfully tried to pull it away from the officer.



*Still from Exhibit 4 – Dempsey grabbing police baton.*

Between approximately 3:59 p.m. and 4:00 p.m., using the tunnel's wooden frame for support, Dempsey began stomping on the officers at the front of the line. Dempsey twice stomped with one foot on the south side of the tunnel, striking an officer's shield. Dempsey stomped once in the middle of the tunnel, striking an officer's shield. Dempsey then used both feet to stomp on officers in the middle of the tunnel, and concluded with another single foot stomp in the middle of the tunnel, striking an officer's shield.



*Still from Exhibit 4– Dempsey stomping on officers.*

At approximately 4:01 p.m., Dempsey took a long pole from the crowd. At approximately

4:02 p.m., Dempsey swung the long pole at the officers in tunnel, striking their riot shields.



*Still from Exhibit 2 – Dempsey swinging pole at officers (clip time 8:04).*

At approximately 4:03 p.m., Dempsey stomped on a rioter who was trying to take the long pole away from him.



*Still from Exhibit 2 – Dempsey kicking rioter who was trying to take pole away from him (clip time 8:57).*

At approximately 4:07 p.m., Dempsey sprayed two separate bursts of pepper spray into the line of officers.



*Still from Exhibit 4 – Dempsey spraying officers.*

At approximately 4:07 p.m., a green plastic soda bottle containing an unknown milky substance, which another rioter threw towards the tunnel, landed near Dempsey. Dempsey picked up the bottle, removed the lid, and threw it at the officers in the tunnel. The liquid hit the officers in the tunnel, and notably, splashed onto a CCTV camera. That obscured the recording of the events in the tunnel, and hampered the government's investigation of the events at the tunnel.




*Dempsey with green bottle*          *Green bottle hitting an officer's helmet*



*View from CCTV camera after being splashed by liquid in green bottle thrown by Dempsey.*

At approximately 4:11 p.m., Dempsey sprayed pepper spray into the tunnel, striking MPD Detective Phuson Nguyen in the face and upper-body.



*Still from Exhibit 5 – Dempsey spraying Detective Nguyen.*

The pepper spray used by Dempsey was capable of inflicting serious bodily injury, and did, in fact, cause bodily injury to Detective Nguyen. Detective Nguyen suffered significant injury, including a choking feeling, burning of the eyes, throat, face, and skin, which burning sensation lasted for days and weeks afterward. Upon being sprayed by Dempsey, Detective Nguyen feared imminent death from suffocation and/or losing consciousness and being pulled out into the crowd.

At approximately 4:11 p.m., Dempsey threw the canister of pepper spray he had used against Detective Nguyen at the officers in the tunnel, presumably because he had emptied it against Detective Nguyen.

13



*Still from Exhibit 5 – Dempsey throwing can of pepper spray.*

Between approximately 4:12 p.m. and 4:13 p.m., Dempsey swung a metal crutch at the line of officers in the tunnel at least nine times, striking Sergeant Mastony in the head at least once and also on his arm. The crutch Dempsey used as a weapon was capable of inflicting serious bodily injury, and did, in fact, cause bodily injury to Sergeant Mastony. The crutch strike cut and bruised Sergeant Mastony's head, caused his ears to ring, caused him to collapse to the ground, and caused him to believe he had suffered a concussion.



*Still from Exhibit 5 – Dempsey swinging metal crutch.*

Starting at approximately 4:24 p.m., Dempsey swung a collapsible metal pole seven times at officers defending the tunnel, striking officers' batons, hands, arms, and helmets.



*Still from Exhibit 6 – Dempsey swinging pole (clip time.4:07).*

Between approximately 4:24 p.m. and 4:32 p.m., Dempsey removed the American flag gaiter he had been wearing and replaced it with a black and grey checkered gaiter.

At approximately 4:32 p.m., Dempsey threw a folded-up metal pole at officers, but missed as the pole stuck to the wooden frame of the tunnel. He then waved the crowd forward towards the tunnel and threw two objects at the officers.



*Dempsey throwing folded up pole at officers.*

 

*Dempsey throwing two objects at officers.*

At approximately 4:33 p.m., Dempsey swung a long wooden pole two times at officers in the tunnel. The first swing struck an officer's riot shield. The second swing hit an officer in the helmet. Dempsey then threw a pole at the officers.



*Still from Exhibit 7 – swinging wooden pole.*

At approximately 4:35 p.m., Dempsey yelled at the officers in the tunnel, "Pedophile supporting oath breakers, fuck you, fucking traitors … come out here."

At approximately 4:42 p.m., Dempsey retreated from the front of the crowd and enlisted the help of other rioters to rinse pepper spray from his eyes and face. During this time, Dempsey put a blue camouflaged t-shirt over his tactical vest, changed his gaiter, removed his helmet, and put on a black beanie hat.



*Dempsey receiving assistance from other rioters.*

At approximately 5:02 p.m., Dempsey returned to the front line and swung a flagpole at the line of officers in the tunnel, striking an officer's riot shield.



*Still from Exhibit 8 – Dempsey swinging pole.*

At approximately 5:03 p.m., Dempsey threw two objects, likely broken pieces of wood furniture, at officers in the tunnel.

 

*Stills from Exhibit 7 – Dempsey throwing objects at officers.*

### *Injuries*

Sergeant Mastony has declined to provide a victim impact statement in many other cases but did so here because "Dempsey is one of the most violent rioters [he] encountered on January 6th." Sergeant Mastony's statement recounts the injuries he sustained from Dempsey's violent assault as follows:

> Just after 4:00pm, I pushed my way to the front of the police line at the threshold of the tunnel. My helmet was knocked off, but I remained on the line. A rioter [later identified as Dempsey] swung an aluminum crutch down on my head with such force that it cracked the plastic face shield of my gas mask. I collapsed and caught myself against the wall as my ears rang. I was able to stand again and hold the line for a few more minutes until another assault by rioters pushed the police line back away from the threshold of the tunnel.

> Although battered and bruised, Sergeant Mastony valiantly returned to work the next day.

As a result of being hit in the head with the crutch, Sergeant Mastony had a large bruise and some

abrasions on his head. Sergeant Mastony told FBI agents that he believed he may have suffered a concussion.

MPD Detective Phuson Nguyen testified in *United States v. Kyle Fitzsimons*, 1:21-CR-158 (RC), about his experience being sprayed by Dempsey (Fitzsimons pulled on Detective Nguyen's gas mask right before Dempsey sprayed him). Detective Nguyen described his experience as follows:

> So when I went back to the -- the line, the second time, I have my -- the gas mask on and I have my helmet on. And the fighting, you know, continue[d]. And at some point, you know, one of the demonstrator[s] [was] trying to pull me outside. And luckily, you know, I -- I hold on to the metal rail by -- by the entrance. And with the assist of my colleague, they pull me back. And so I was successful to go -- go back in, but I was still in the front.
>
> And during the fighting, a person -- the demonstrator from the -- on the other side grab[bed] my mask, pull[ed] it while there's another guy be -- to -- to his right lean[ed] forward and spray[ed] me a face full of what I believe to be -- later to be bear spray. When he spray[ed] me --
>
> […]
>
> [AUSA Brasher] Q. Okay. Tell us -- you were about to say what happened once the -- you got sprayed with the bear spray.
>
> A. Right. So after I got spray[ed] -- and at the same time the person who pull[ed] my mask, let go of the mask, and then it snapped back into place and --
>
> Q. What did that feel like?
>
> A. At that point I was choking under the mask, and I was -- also got knocked down at the same time. And so at that point, I was choking, and I was trying to get up. I [was] panicking. It was so severe that I had to -- I have to -- I was choking. I [was] making that -- that sound (sound uttered by witness). So I have to -- I have to gather myself.
>
> At that point, I -- I have to break the seal to let some air in so that I can breathe. Because at that very particular point when -- when -- when I was choking and got knocked down, in my head, you know, I -- I thought that was -- I thought it was it for me, is that -- I thought that's, you know, where I'm going to die. And -- and in my head, you know, I was thinking about my family at that point before anything else.

And in my head, I was telling myself, if you want to see your family again, you need to gather yourself. And luckily, you know, I gathered myself and to break that seal. And with the help of my colleague behind me, they pull[ed] me up. And eventually, you know, I made my way back to the back.

Q. In addition to the trouble you had breathing, what did it feel like on your skin and in your eyes?

A. It was a burning. It's burning pretty much the whole day and weeks. Afterward, I made a mistake of, you know, taking a shower when I get home, and because -- to live with, when you take a shower, it -- it go[es] down your body and then it absorb[s] into your skin. And, basically, you know, my -- my hand was -- was tingling, burning for the next week or two afterward.

Exhibit 9 (Trial Tr. 16:5 to 18:10).

## III.    THE CHARGES AND PLEA AGREEMENT

On September 8, 2021, a federal grand jury returned an 11-count indictment against Dempsey charging him three counts of assault with a dangerous weapon, one count of assault, one count of civil disorder, one count of obstruction of an official proceeding, and additional counts under 18 U.S.C. § 1752 and 40 U.S.C. § 5104. ECF No. 6. On September 26, 2023, the United States Attorney charged Dempsey in a superseding information with two counts of Assaulting, Resisting, or Impeding Certain Officers using a Dangerous Weapon in violation of 18 U.S.C. § 111(a)(1) and (b). One count charged Dempsey's assault on Sergeant Mastony. The other count charged Dempsey's assault on Detective Nguyen. On, January 4, 2024, pursuant to a plea agreement, Dempsey pled guilty to both counts in the information.

## IV.    STATUTORY PENALTIES

Dempsey now faces sentencing on two counts of 18 U.S.C. § 111(a)(1) and (b). As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Dempsey faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100 for each count.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The Guidelines calculations in the PSR contains two differences from the Sentencing Guidelines calculation agreed to in the Plea Agreement. First, the PSR includes a four-level increase on each count pursuant to U.S.S.G. § 3B1.5(1) and (2)(B) "[b]ecause the defendant was convicted of a crime of violence and he used body armor during the commission of the offense," whereas the parties agreed to litigate the applicability of this enhancement at sentencing. Plea Agreement at ¶¶ 4(A).

**This Court should apply the body armor enhancement.**

Section 3B1.5 of the Sentencing Guidelines, titled, "Use of Body Armor in Drug Trafficking Crimes and Crimes of Violence," states:

> If--
>
> (1) the defendant was convicted of a drug trafficking crime or a crime of violence; and
>
> (2) (apply the greater)--
>
>> (A) the offense involved the use of body armor, increase by 2 levels; or
>>
>> (B) the defendant used body armor during the commission of the offense, in preparation for the offense, or in an attempt to avoid apprehension for the offense, increase by 4 levels.

As defined in the commentary, "body armor" is "any product sold or offered for sale, in interstate or foreign commerce, as personal protective body covering intended to protect against gunfire, regardless of whether the product is to be worn alone or is sold as a complement to another product or garment." U.S.S.G. § 3B1.5, cmt. n.1. Examples of body armor include bullet-proof vests, made of materials like Kevlar, some of which contain bullet-proof armored plates. See

https://en.wikipedia.org/wiki/Bulletproof_vest. A "crime of violence" "has the meaning" provided by 18 U.S.C. § 16. *Id*. "'Use' means (A) active employment in a manner to protect the person from gunfire; or (B) use as a means of bartering. 'Use' does not mean mere possession." *Id.*

The two-level enhancement applies if the "offense" involved the use of body armor; the four-level enhancement applies if the defendant personally used body armor. *United States v. Haynes*, 582 F.3d 686, 711–12 (7th Cir. 2009), *abrogated on other grounds, by United States v. Vizcarra*, 668 F.3d 516 (7th Cir. 2012) ("Section 3B1.5(2)(A) applies when the offense involved the use of body armor, for example, when a codefendant used body armor. Section 3B1.5(2)(B), however, applies when the defendant himself used body armor."); *United States v. Williams*, 974 F.3d 320, 379–80 (3d Cir. 2020) (four-level enhancement applied to defendants who wore bulletproof vests at drug-trafficking location; two-level enhancement applied to co-conspirators who were supplied with drugs by defendants who wore the vests).

A defendant "uses" body armor within the meaning of §3B1.5 when he wears it as protection against gunfire, regardless of whether gunfire is actually directed at the defendant and there is no *mens rea* requirement. *See United States v. Webster*, 102 F.4th 471, 489 (D.C. Cir. 2024). If the offense involved the use of body armor as protection against gunfire, the enhancement applies regardless of whether gunfire was actually directed at the wearer. *United States v. Johnson*, 913 F.3d 793, 803 (9th Cir. 2019) (enhancement properly applied where defendant was wearing body armor during a traffic stop while he possessed drugs; although mere possession is insufficient, "[t]here is no reasonable way to construe this language that would exclude wearing body armor from the definition of 'use.'"), *cert. granted, judgment vacated on other grounds*, 140 S. Ct. 440 (2019). Judge Contreras applied this reasoning when he applied the four-level enhancement in *United States v. McAbee*, 1:21-CR-35 (RC), where the defendant wore body armor

on January 6 while he assaulted officers outside of the tunnel *alongside Dempsey*. In applying the enhancement, the Court ruled: "It is reasonable to infer that wearing the body armor contributed to the offense in the sense that it would have emboldened McAbee to aggressively behave the way he did." *United States v. McAbee*, 1:21-CR-35 (RC), Sentencing Hrg. Tr. at 10.

So long as the defendant "used" the body armor to protect against possible gunfire, the enhancement applies, even if he also wore it for another ("dual") purpose, such as for display. *United States v. Barrett*, 552 F.3d 724, 727–28 (8th Cir. 2009) (defendant claimed he wore body armor as part of his Halloween costume); *Haynes*, 582 F.3d at 712 (district court "drew the reasonable inference that the body armor was being used for its primary purpose—for protection. The fact that the body armor may also have been used to identify the defendant officers as legitimate Chicago cops engaged in lawful police activity doesn't make the enhancement inappropriate.").

The tactical vest that Dempsey wore was made by BulletSafe and was sold or offered for sale, in interstate or foreign commerce, as personal protective body covering intended to protect against gunfire. Dempsey relentlessly attacked and viciously denigrated police officers in the tunnel who were armed with their service firearms. Although the officers in the tunnel did not discharge those firearms in self-defense against the onslaught, Dempsey certainly anticipated that they would. This Court should apply the four-level enhancement in calculating the applicable Guidelines range.

## Bodily Injury

Second, the PSR includes a five-level increase pursuant to U.S.S.G. § 2A2.2(b)(3)(B) on Count 2, finding that "Sergeant J.M. sustained serious bodily injury." PSR ¶ 72. In the Plea Agreement, however, the parties agreed to recommend a Guidelines calculation for Count 2 that

included only a three-level increase pursuant to U.S.S.G. § 2A2.2(b)(3)(B) based on Sergeant Mastony sustaining bodily injury. Plea Agreement at ¶¶ 4(A).[5] The government stands by that stipulation.

Accordingly, the correct Sentencing Guidelines are as follows:[6]

**Count One (Pepper Spray assault of Det. Nguyen)**

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2 (b)(2)(B) | Dangerous Weapon Used | +4 |
| U.S.S.G. § 2A2.2(b)(3)(A) | Bodily Injury | +3 |
| U.S.S.G. § 2A2.2(b)(7) | Convicted under 18 U.S.C. § 111(b) | +2 |
| U.S.S.G. § 3A1.2(a) & (b) | Victim Was Government Officer | +6 |
| U.S.S.G. § 3B1.5(1) | Use of Body Armor in Crime of Violence | +4 |
| | **Subtotal** | **33** |

**Count Two (Crutch assault of Sgt. Mastony)**

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2 (b)(2)(B) | Dangerous Weapon Used | +4 |
| U.S.S.G. § 2A2.2(b)(3)(A) | Bodily Injury | +3 |
| U.S.S.G. § 2A2.2(b)(7) | Convicted under 18 U.S.C. § 111(b) | +2 |
| U.S.S.G. § 3A1.2(a) & (b) | Victim Was Government Officer | +6 |
| U.S.S.G. § 3B1.5(1) | Use of Body Armor in Crime of Violence | +4 |
| | **Subtotal** | **33** |

| | | |
|---|---|---|
| U.S.S.G. § 3D1.4(a) | Different Victims, No Grouping, 2 Units | +2 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | –3 |
| | **Total** | **32** |

---

[5] *See also* Statement of Offense ¶ 26 ("The crutch used by Dempsey was capable of inflicting serious bodily injury, and did, in fact, cause bodily injury to Sergeant J.M., that is, as a result of being hit by the crutch, Sergeant J.M. suffered a significant injury to his head.").

[6] Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3.

The government calculates Dempsey's criminal history as category VI, and his total adjusted offense level, after acceptance of responsibility, as 32. Accordingly, Dempsey's Guidelines imprisonment range is 210 to 262 months' imprisonment.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Dempsey's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Dempsey launched a sustained attack against officers defending the Capitol, seriously injuring at least two of them, shortly after publicly stating his hope that several members of Congress be lynched. The nature and circumstances of Dempsey's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 262 months.

### B.     Dempsey's History and Characteristics

Dempsey is a former construction worker and fast-food restaurant employee. PSR ¶¶ 142-145. As documented in pages 14 to 26 of the PSR, unlike the vast majority of January 6 defendants, Dempsey has a very significant history of arrests and convictions, including for three burglaries and one assault. That history weighs heavily in favor of a lengthy period of incarceration:

- In 2009, Dempsey pled no contest to Burglary, 2nd Degree in Los Angeles, California. Dempsey was sentenced to 16 months confinement and $695 in restitution. Dempsey violated his parole and finished his sentence in custody. PSR ¶ 90. Dempsey should receive three criminal history points for this conviction.

- In 2012, Dempsey pled no contest to Conspiracy and Grant Theft in Burbank, California. Dempsey was sentenced to 16 months custody. PSR ¶ 91. Dempsey should receive three criminal history points for this conviction.

- In 2014, Dempsey pled no contest to Burglary, Second Degree, and two counts of Transport or Sell Narcotics or Controlled Substance in Los Angeles, California. Dempsey was sentenced to consecutive sentences of 8, 16, and 60 months on those counts. PSR ¶ 92. Dempsey should receive three criminal history points for this conviction.

- In 2017, Dempsey pled no contest to Evade Peace Officer, Disregard Safety in Van Nuys, California. After Dempsey broke into and stole property from a cellphone store, he fled the scene in a vehicle. When the police attempted to stop him, he pulled over and stuck his upper body out of the driver's side window, pretending to cooperate. He then sped off, in excess of 100 miles per hour, running multiple stop signs and red lights. Dempsey was sentenced to five years custody and $300 restitution. PSR ¶ 94. Dempsey has correctly been assessed three criminal history points for this conviction.

- In 2020, Dempsey pled no contest to Burglary Second Degree in Van Nuys, California. Dempsey received a three-year suspended sentence, with three years probation with 200 days of jail time. Dempsey violated his probation and an arrest warrant remains pending. PSR ¶ 93. Dempsey should receive two criminal history points for this conviction.

- In 2021, Dempsey pled nolo contendere to Assault with a Caustic Chemical in Los Angeles California. Dempsey received a two-year suspended, with two-year probation with 200 days of jail time. Dempsey violated his probation by committing the assaults at the Capitol on January 6, 2021. PSR ¶ 95. Dempsey has correctly been assessed two criminal history points for this conviction.

- Dempsey also has 12 adult or juvenile criminal cases that did not receive any criminal history points that include, among other things, burglary in 2005 and 2006, vandalism in 2003 and 2005, force or assault with a deadly weapon in 2007 (dismissed due to delay in bringing the case), and battery in 2009. *See* PSR ¶¶ 87, 88, 89, 99, 100, 101, 102, 103, 104, 105, 106, 107.

This Court should pay particular attention to Dempsey's Assault with a Caustic Chemical in 2021. PSR ¶ 95. On October 19, 2019, individuals gathered near the Santa Monica Pier to peacefully demonstrate against then-President Trump. The peaceful protest turned violent as Dempsey took a canister of bear spray from his pants and dispersed it at close range against several

27

protesters. The incident was captured on video, ominously foreshadowing Dempsey's assault on

Detective Nguyen on January 6. https://www.youtube.com/watch?v=FPMCkdD54VA.



*Still from Exhibit 10 – Dempsey spraying peaceful protesters.*

## **Uncharged Political Violence**

Dempsey's history and characteristics also include three documented instances of vicious

political violence that, for various reasons, did not result in any criminal charges.

### June 2, 2019, Assault in Los Angeles

On June 2, 2019, Dempsey attended a political rally in Los Angeles. Dempsey attacked a

counter-protestor, punching him and viciously hitting him over the head with a skateboard.



*Still from Exhibit 11 – Dempsey hitting counter-protester with a skateboard.*

The FBI investigated this assault because it occurred on federal property, but Dempsey has not been charged.

<u>August 14, 2020, Assault in Tujunga, California</u>

On August 14, 2020, Dempsey assaulted an attendee at a political protest with the same skateboard that he used in his June 2 assault.



*Still from Exhibit 12 – Dempsey hitting protester with a skateboard.*

Dempsey was not charged for this assault.

<u>August 22, 2020, Assault in Beverly Hills, California</u>

On August 22, 2020, Dempsey assaulted an attendee at a political protest. Dempsey wrestled a protester to the ground and sprayed him at close-range with pepper spray. While the victim was still on the ground, Dempsey repeatedly hit the individual in the head with a metal bat.



*Still from Exhibit 13 – Dempsey spraying protester.*



*Still from Exhibit 13 – Dempsey hitting protester with metal bat.*

The victim made an initial complaint to the Beverly Hills police department and offered to provide additional video footage to the police regarding the attack. The police never received the additional footage and Dempsey was not charged with any crimes arising from this attack.

Dempsey's history and characteristics, including his history of arrest and conviction for a violent assault and his extremely inflammatory and violent rhetoric on January 6, where he called for the public lynching of his political opponents, weigh heavily in favor of a lengthy term of incarceration.

### Dempsey's Post-Conviction State Court Litigation

On the date that the government filed this memorandum, the U.S. Probation Office updated its calculation of Dempsey's criminal history, indicating that his criminal history score was not 17 as originally calculated, but was actually 6. *Compare* ECF No. 65 ¶ 98 *with* ECF No. 67 ¶ 96. This drastic last-minute change was made because Dempsey—in between plea and sentencing—sought to have several convictions set aside under California Penal Code § 1203.4, a statute designed to restore certain civil rights to convicted felons. Although Dempsey has repeatedly sought to delay his sentencing in this case to seek that relief in the California courts, defense counsel did not provide the government or the Probation Office with any documentation regarding the nature or status of the state court litigation until she provided *partial* documentation yesterday evening. In any event, under well-established law, nothing about Dempsey's post-conviction litigation in California changes the calculation of his criminal history under the Sentencing Guidelines, which was correctly calculated as 17 points, yielding criminal history category VI.

Only a formal expungement could potentially impact Dempsey's criminal history; having a prior conviction set aside would not impact his criminal history score. *United States v. Benton*, 98 F.4th 1119, 1129–30 (D.C. Cir. 2024) ("Under the Sentencing Guidelines, sentences for expunged convictions are not counted in the computation of criminal history. A conviction set aside for reasons unrelated to innocence or errors of law is counted.") (cleaned up); U.S.S.G. § 4A1.2 n.10 ("A number of jurisdictions have various procedures pursuant to which previous

convictions may be set aside or the defendant may be pardoned for reasons unrelated to innocence or errors of law, e.g., in order to restore civil rights or to remove the stigma associated with a criminal conviction. Sentences resulting from such convictions are to be counted. However, expunged convictions are not counted. §4A1.2(j).").

Courts across the country routinely hold that relief granted under California Penal Code § 1203.4 does not qualify as an "expungement" for purposes of calculating a defendant's criminal history under the Sentencing Guidelines. *See, e.g., United States v. Hayden*, 255 F.3d 768, 774–75 (9th Cir. 2001) ("A conviction set aside pursuant to California Penal Code section 1203.4 is not 'expunged' under Sentencing Guideline § 4A1.2(j). Therefore, the Municipal Court orders setting aside Hayden's state convictions do not entitle Hayden to a recalculated criminal history score or a recomputed federal sentence."); *Valentine v. United States*, 221 F.3d 1346 (8th Cir. 2000) (same); *United States v. Powell*, No. 04-CR-00514-WYD, 2010 WL 3958711, at *9 (D. Colo. Oct. 8, 2010), *aff'd*, 433 F. App'x 693 (10th Cir. 2011) ("The practical effect of the application of this California statute was to restore various civil rights and to terminate court jurisdiction over the cases. A 'set aside' under Section 1203.4 did not expunge or nullify the convictions."); *United States v. Ricks*, No. CR 15-00132 SOM, 2024 WL 1701113, at *2 (D. Haw. Apr. 18, 2024) ("Section 1203.4 dismissals appear to fall within convictions countable under [§ 4A1.2] Comment 10."); *United States v. Anderson*, No. CIV A 506CV10DCB, 2006 WL 3511441, at *3 (S.D. Miss. Dec. 5, 2006) ("Because the petitioner's prior California conviction was set aside [under § 1203.4] and not expunged, it was properly included in the petitioner's criminal history computation."); *Sherpa v. United States*, No. 00CR47(MBM), 2002 WL 1145413, at *1 (S.D.N.Y. May 30, 2002) ("[T]he relief Sherpa apparently has obtained under California law [§ 1203.4] does not expunge his conviction, in the sense of making it as if that conviction had never occurred, within the

meaning of the Sentencing Guidelines."); *United States v. Myers*, No. CR. A. 95-153, 2001 WL 815591, at *2 (E.D. La. July 19, 2001) (convictions set aside pursuant to § 1203.4 can be used to enhance a federal sentence).

These conclusions are necessitated by the fact that Section 1203.4 is not a true expungement statute. It contains several limitations and, most importantly, specifically provides that "in any subsequent prosecution of the defendant for any other offense, the prior conviction may be pleaded and proved and shall have the same effect as if probation had not been granted or the accusation or information dismissed." Cal.Penal Code § 1203.4(a)(1). Thus, it does not matter whether a court order states that a prior conviction is "dismissed" or "deemed to have never occurred," or whether a plea of guilty or no contest is withdrawn under Section 1203.4. *United States v. Stoterau*, 524 F.3d 988, 1001 (9th Cir. 2008) ("[C]onvictions set aside pursuant to Cal.Penal Code § 1203.4 are not 'expunged' for purposes of U.S.S.G. § 4A1.2(j)" and even if a diversionary state disposition deems an offense "to have never occurred," the disposition may still apply to a defendant's criminal history score for federal guidelines purposes); *Milan v. United States*, 57 F. Supp. 3d 571, 582–83 (E.D. Va. 2014) (defendant's conviction set aside under § 1203.4 still counted for purposes of the criminal history calculation, even though state court order stated, "ordered that the plea, verdict, or finding of guilt [in each case] be set aside and vacated and a plea of not guilty be entered and that the complaint be, and is hereby, dismissed.").

In rejecting attempts to do what Dempsey has attempted here, the Ninth Circuit has called out defendants' actions as having the "odor of gaming the federal sentencing system." *United States v. Alba-Flores*, 577 F.3d 1104, 1111 (9th Cir. 2009) (describing an Eighth Circuit case where the defendant "scuttled off to state court to get his probation terms reduced" and a Tenth Circuit case where a defendant "scurried off to state court to have his term of probation reduced

retroactively" when both were faced with federal sentencing consequences). This is precisely what Dempsey has done in this case. He has scurried off to California state court in an attempt to undo his atrocious criminal history because he is faced with the impending consequences of his actions on January 6.

But the gamesmanship in this case is even more pronounced, as it does not appear—at least on the face of the statute—that Dempsey would have been eligible for the relief he apparently obtained in California. This is because Section § 1203.4(a)(1) allows previously convicted individuals to withdraw their guilty pleas, or to have their convictions set aside, and to have their cases dismissed only if they meet certain conditions, i.e., "if they are not then serving a sentence for an offense, on probation for an offense, *or charged with the commission of an offense*." (emphasis added). Cal.Penal Code § 1203.4(a)(1); *see United States v. Taylor*, No. 118CR00076JLTBAM, 2022 WL 1665134, at *8 (E.D. Cal. May 25, 2022) (holding trial counsel was not ineffective for failing to seek relief under § 1203.4 because "Most notably and indisputably, Movant could not have petitioned to expunge her prior convictions while under the charge for the commission of her federal crimes"); *see also, Hampton v. United States*, No. 2:00CR94-SA-DAS, 2017 WL 5502942, at *6–7 (N.D. Miss. Nov. 15, 2017) (holding defendant, who was serving a federal sentence, provided "provided false information on his [§ 1203.4] application" by checking a box indicating that he was "not serving a sentence for any offense, on probation for any offense, or charged with the commission of any offense"). Without having seen Dempsey's filings on these petitions in California, the government is left to guess exactly how

such relief was sought, let alone granted, when Dempsey has been charged with the commission of offenses in this case August 25, 2021.[7]

Thus, the changes in the criminal history calculation in the revised PSR are based off a faulty premise: the belief that Dempsey is no longer convicted of his prior offenses because his pleas have been withdrawn and the charges dismissed pursuant to Section 1203.4. This is incorrect and this Court should not be swayed by Dempsey's attempt to minimize or rewrite his extensive criminal history through reliance on procedures designed to help convicted felons—who, unlike Dempsey, have served their time, complied with the terms of their probation, and who are not currently facing charges—find housing and employment.

### C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Dempsey's criminal conduct on January 6 was the epitome of disrespect for the law and an attack on the foundation of American democracy. As this Court pointedly explained in another January 6 case:

> There can be no room in our country for this sort of political violence. [T]hose who think political ends justify violent means seek to replace persuasion with intimidation, the rule of law with 'might makes right.' Violence risks begetting a vicious cycle that could threaten cherished conventions and imperil our very institutions of government. In that sense, political violence rots republics. Therefore, January 6 must not become a precedent for further violence against political opponents or governmental institutions. This is not normal. This cannot become normal. We as a community, we as a society, we as a country cannot condone the normalization of the January 6 Capitol riot.

*United States v. Johnatakis*, 1:21-CR-91 (RCL), ECF No. 272. *See also United States v. Cronin*, 1:22-CR-233 (ABJ), Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political

---

[7]  The government has requested such discovery in advance of sentencing, and to this date, has still not received any such filing(s).

protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.     The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[8] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, as noted above, January 6, 2021, was not Dempsey's first foray into political violence. Dempsey had previously assaulted peaceful protestors on at least three separate occasions. Opposed to their message, Dempsey sprayed multiple people with bear spray and beat them with a baseball bat and a skateboard.

Second, Dempsey has shown no remorse for his actions on January 6, and any show of remorse at his sentencing hearing should be met with great skepticism. *See United States v. Matthew Mazzocco*, 1:21-CR-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide

---

[8] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

Dempsey's history of political violence, before and during January 6, 2021, highlights the need for a lengthy sentence to deter him from future political violence.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted

disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013). "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Here, "uniquely serious" accurately captures both Dempsey's conduct on January 6 and his history of criminal conduct, including prior political violence. Although hundreds of rioters have been sentenced thus far for their participation in the Capitol breach on January 6, 2021,[9] no other defendant presents anything close to the same combination of aggravating circumstances here. First, Dempsey has an extensive criminal history, as well as multiple uncharged yet documented instances of calculated political violence. Second, Dempsey prepared extensively to engage in political violence at the Capitol. He came dressed in a tactical vest, helmet, and camouflaged cargo pants. Third, Dempsey promoted the use of violence on January 6, beginning

---

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

*before* any barricade at the barrier was breached and *continuing* to encourage violence against officers through a demonstrably heinous attack on law enforcement. He assaulted and injured police officers with a variety of implements he refashioned as weapons. Finally, Dempsey personally engaged in sustained violence against police officers defending the Lower West Terrace Tunnel. Other cases that include a fraction of this conduct are described below; however, Dempsey's unique combination of criminality commands a sentence within the Guidelines range. Any disparity with these sentences is entirely warranted based on Dempsey's history and conduct.

Dempsey's conduct and criminal history is comparable to that in *United States v. Peter Schwartz*, 1:21-CR-178 (APM). There, a jury convicted Schwartz of three counts of violating 18 U.S.C. § 111(b), among other charges. Armed with a wooden tire knocker, Schwartz and his then-wife made their way to the thick of the violence and aggressively participated in the effort to overwhelm the police line on the Lower West Terrace. It was Schwartz who threw a chair at the line of officers, creating an opening in the police line in the northwest corner of the terrace that enabled hundreds of rioters to flood the Lower West Terrace as overwhelmed officers were forced to retreat. He then stole chemical munitions, including pepper spray, that had been left behind by the fleeing officers and use that pepper spray as a weapon to attack those same officers as they desperately tried to escape the growing and increasingly violent mob. He later made his way up to the inaugural stage and entered the tunnel, where a line of officers spent hours defending the tunnel entrance from a mob determined to force their way into the Capitol building. While inside, Schwartz worked with his codefendants to again spray the line of officers inside with pepper spray.

The Court calculated Schwartz's total adjusted offense level as 34, and his criminal history as category VI. Schwartz racked up numerous convictions for drugs, weapons, and violence over the last three decades, and on January 6, he was on probation in at least one other case involving

both assaultive conduct and illegal firearms possession. Unlike Dempsey, however, Schwartz had not previously engaged in political violence. The Guidelines range was 262 to 327 months, and Judge Mehta varied downwards to be consistent with what he described as a variance of "40 percent from the bottom of the Guidelines" that he applied in *United States v. Webster*, 1:21-CR-208 (APM), and that Judge McFadden applied in *United States v. McCaughey*, 1:21-CR-40 (TNM). *See United States v. Schwartz*, 1:21-CR-178 (APM), Sentencing Hrg. Tr. at 63-64. The government respects but disagrees with that reasoning. The Court should not apply such a downward variance, or a vary downward at all, given Dempsey's significant impact on individual officers, coupled with his political violence and persistent criminal conduct prior to January 6.

In *United States v. Christopher Quaglin*, 1:21-CR-40 (TNM), following a stipulated bench trial, Judge McFadden convicted the defendant of one count of violating 18 U.S.C. § 111(b) and three counts of violating 18 U.S.C. § 111(a)(1), among other charges. Quaglin assaulted police officers for an hour and a half on the West Front, attacking police officers repeatedly. He choked one officer to the ground, he pulled away a bike rack forcefully from an officer, he pushed, hit, swatted, and rammed into more than a dozen officers. He berated officers and yelled violent threats at them. Quaglin then followed the officers to the tunnel where he engaged in prolonged violence. He forcefully yanked a shield away from an officer, causing the officer to fall on the ground. He stole a police shield and used it to assault officers. He sprayed chemical irritants in the faces of officers. He only left the tunnel once he was pushed out.

Before January 6, Quaglin prepared for "WAR" and encouraged many others to come to DC. He wore tactical gear and encouraged others to do the same. He was prepared for violence. And after January 6, he continued to boast and brag about his conduct, both blaming officers for the riot while simultaneously taking pride in his actions and conduct.

41

The Court calculated Quaglin's total adjusted offense level as 35 and his criminal history as category I. The Guidelines range was 168 to 210 months. Judge McFadden granted a significant downward variance and sentenced Quaglin to 144 months of incarceration. Judge McFadden stated he varied downward solely because the government's recommended sentence of 168 months would create a sentencing disparity. The Court noted the following as aggravated factors: the prolonged attack, the use of weapons, that the defendant disarmed police officers, that the defendant attacked a high ranking USCP official, and the defendant's utter lack of remorse. While a recitation of the facts of Quaglin's case makes him appear similar to Dempsey on the surface, there are two things that set Dempsey apart. First, footage of Dempsey's assaults against police officers on January 6 reveal violent, brutal, and effective blows, even when compared to those around him who were also actively assaulting police officers. The Court's sentence should take into account this qualitative difference. Second, Dempsey's criminal history category of VI, the highest, is significantly worse than Quaglin's criminal history category of I, the lowest. This Court should impose a significantly higher sentence here than Judge McFadden imposed on Quaglin.

In *United States v. Daniel Rodriguez*, 1:21-CR-46 (ABJ), the defendant pled guilty to 18 U.S.C. § 371, 18 U.S.C. § 1512(c)(2), 2, 18 U.S.C. § 1512(c)(1), and 18 U.S.C. § 111(a)(1), (b). Rodriguez conspired for weeks to travel across the country to stop the official proceeding on January 6, 2021, battled members of law enforcement on the steps of the Capitol, obstructed justice by conspiring with others to get rid of key evidence from January 6, and most significantly, tased MPD Officer Michael Fanone in the neck. After another rioter wrapped his arm around Officer Fanone's neck and dragged him out of the tunnel and into the riotous mob, Rodriguez reached his arm toward Officer Fanone, placed the device on the side of his neck, and deployed the taser. Officer Fanone then jerked his head back, recoiling from the shock, and pulled his face away from

Rodriguez briefly. Despite Officer Fanone's efforts to get away, Rodriguez deployed the taser again, placing it on the back of Officer Fanone's neck. The contact left visible scouring on the officer's neck.

The Court calculated Rodriguez's total adjusted offense level as 30 and his criminal history as category I. The Guidelines range was 97 to 121 months. Judge Jackson sentenced Rodriguez to 151 months of incarceration, varying slightly upward. The grouping analysis on which the parties agreed, and which the Court adopted, was such that the assault conviction grouped with the obstruction conviction as a special offense characteristic. Despite adopting this analysis, Judge Jackson stated that she tended to agree with the Probation Office's grouping calculation that broke the assault out into its own group, since it involved a distinct victim. This grouping calculation would have resulted in a total offense level of 32, instead of 30. The Court's sentence of 151 months of incarceration would have been at the top of the Guidelines range, had it used that calculation.

While Rodriguez's engagement with Officer Fanone is vicious and heinous, Dempsey's criminal history involving political violence and prolonged assaultive conduct, while wearing body armor, showcases a level of ferocity that meets a stiffer sentence and one calibrated to the guidelines.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[10] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. Although the victims in this case suffered bodily injury, they did not incur any medical expenses as a result of Dempsey's assaults. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Dempsey must pay $2,000 in restitution, which reflects in part the role Dempsey played in the riot on January 6.[11] Plea Agreement at ¶ 9(h). As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.*) Dempsey's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 186.

---

[10] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[11] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   FINE

Dempsey's convictions for violations of 18 U.S.C. § 111(a)(1) and (b) subject him to a statutory maximum fine of $250,000 for each count. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider Dempsey's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The Sentencing Guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023). The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994). "In assessing a defendant's income and earning capacity, the court properly considers whether a defendant can or has sought to 'capitalize' on a crime that 'intrigue[s]' the 'American public.'" *United States v. Seale*, 20 F.3d 1279, 1284–86 (3d Cir. 1994).

Here, Dempsey has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The Guidelines fine range here is $35,000 to $350,000. U.S.S.G. § 5E1.2(c).

A fine is appropriate in this case. As noted in paragraph 149 of the PSR, and looking most recently at his GiveSendGo page, Dempsey has raised over $20,300 in an online campaign created by his brother. Dempsey occasionally calls in to the nightly "vigil" held outside the D.C. jail and requests donations through his GiveSendGo website.[12] Dempsey should not be able to use his own

---

[12] *See* https://www.youtube.com/live/ZQxHql2QJC8?si=bV8zaLK2qaxyShcz&t=4684.

notoriety gained in the commission of his crimes to "capitalize" on his participation in the Capitol breach in this way.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of to 262 months of incarceration followed by three years of supervised release, at least $2,000 in restitution, a fine, and a mandatory special assessment of $200.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY: */s/ Douglas B. Brasher*
DOUGLAS B. BRASHER
Texas State Bar No. 24077601
Assistant United States Attorney (Detailed)
1100 Commerce Street, Third Floor
Dallas, TX 75242
(214) 659-8604
douglas.brasher@usdoj.gov

*/s/ Carolina Nevin*
CAROLINA NEVIN
Assistant United States Attorney
NY Bar No. 5226121
601 D Street, NW
Washington, DC 20530
(202) 803-1612
carolina.nevin@usdoj.gov