## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 1:21-cr-00566-RCL-1** |
| | ) | |
| **DAVID NICHOLAS DEMPSEY,** | ) | |
| *Defendant*. | ) | |

## DEFENDANT DEMPSEY'S MEMORANDUM IN AID OF SENTENCING

David Nicholas Dempsey, by and through his undersigned counsel, respectfully files this Memorandum in Aid of Sentencing. Mr. Dempsey comes before this Court humbled, contrite, and extraordinarily remorseful for his actions which have brought him before it upon accepting responsibility and entering a plea of guilty to two counts of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a) and (b). *See generally* PSR.

Based upon his personal history and characteristics, the nature and circumstances of the offense, and other mitigating circumstances, Mr. Dempsey respectfully requests that the Court impose a sentence of seventy-eight months' imprisonment as such a sentence would be "sufficient, but not greater than necessary" to achieve the legitimate purposes of sentencing. 18 U.S.C. § 3553(a).

## I. OVERVIEW OF JANAURY 6

On January 5, 2021, Mr. Dempsey traveled with A.D. (a friend of Mr. Dempsey's) and T.A. (a family friend of A.D.) to Washington, D.C., for then-President Donald J. Trump's speech at the Ellipse that was set to take place the following day. Mr. Dempsey traveled to D.C. to perform

a flag drop[1]—something they had both routinely performed at rallies—during then-President Trump's speech. *See* Exhibit A1; Exhibit A3; Exhibit B1.

On January 6, 2021, Mr. Dempsey, A.D., and T.A. attended then-President Trump's speech, with several flags in tow. *See* Exhibit A1; Exhibit A2; *see also* Exhibit A3. During the speech, they performed a flag drop from a tree lining the Ellipse.[2]

After the speech ended, Mr. Dempsey and A.D. walked around the National Mall and surrounding area, taking in the extraordinary sight that was the sea of people in the nation's capital, exchanging small talk and pleasantries with strangers passing them by, and enjoying each other's company. Eventually, Mr. Dempsey and A.D. saw countless individuals walking and standing on Capitol premises, including the inauguration stage. Mr. Dempsey and A.D. saw an opportunity to do another—a more epic—flag drop. *See* Exhibit A1. They entered the restricted Capitol grounds around 2:40 p.m.

Once they reached the stage, the pair hung a large Trump flag. *See* Exhibit A1; Exhibit A2; Exhibit A4. But Mr. Dempsey's and A.D.'s excitement was short-lived. Indeed, shortly thereafter, when a bloodied elderly couple crossed their path, although confusing and surprising, it became apparent to Mr. Dempsey and A.D. that the interactions between law enforcement and the crowd had become hostile and violent. *See also* Exhibit A1. A switch flipped in Mr. Dempsey, and they made their way down towards the tunnel. *See id.*

Starting at around 3:55 p.m., for a total of approximately 27 minutes, Mr. Dempsey engaged or attempted to engage with law enforcement at the archway of the tunnel.

---

[1] A flag drop is where a person, usually from a high elevation, unrolls and then affixes or otherwise hangs a flag to a tree or other structure to allow the flag to wave freely.

[2] Counsel spoke with the attorney of Ryan Nichols, who relayed that he had viewed a GoPro video observing a flag drop, which we understand was this flag drop. Mr. Nichols' attorney recalled but has not been able to since locate the video. Counsel will provide a PDF of her email exchange with Mr. Nichols' attorney should the Court wish to review it before making a determination in Mr. Dempsey's case.

While he now understands his conduct was unjustifiable under any circumstance and does not attempt to excuse his conduct, he ultimately reacted in anger towards what he believed at the time to be members of law enforcement abusing their power to hurt innocent people, as he was missing the larger context given the timing of his arrival at the Capitol. *See* Exhibit B1. What he anticipated to be a lighthearted day consisting of a rally and a flag drop turned into a tragic day in our nation's history and an extremely regrettable day in Mr. Dempsey's life. *See id.* Indeed, it is a day which Mr. Dempsey wishes he could take back and change. *See id.*

## II.   MR. DEMPSEY'S BACKGROUND

### A.  Family History



Mr. Dempsey is ▮▮ years old. *See* PSR at 3. In ▮▮▮▮▮▮, he was born in ▮▮▮▮▮▮▮▮, to the union of ▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮. *See id.* at ¶ 111. Mr. Dempsey is one of six siblings across three separate fathers: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

*See id.* at ¶ 114.

About a year or so after he was born, Mr. Dempsey and his respective siblings were ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See id.* at ¶ 115. From this point on, Mr. Dempsey lacked any sense of normalcy in his upbringing and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ultimately, all of his siblings eventually ended up ▮▮▮▮▮▮▮▮▮▮▮. *See id.*

Shortly after being ▮▮▮▮▮▮▮▮▮▮▮▮▮ Mr. Dempsey separated from his siblings; he and a number of his siblings would cross paths throughout the several years ▮▮▮▮ ▮▮▮▮▮▮▮ *See id.* ▮▮▮▮▮▮▮▮▮▮▮, he and his siblings ▮▮▮▮▮

██████████████████████████████████████████████████

█████████████████████████████████████████████, respectively. *See id.* ████

████████████████████████████████████ *See id.* In fact, ██████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████. *See*

*id.* And, ████████████████████████████████████████████

███████████████████████████████████████. *See id.*

    █████████████████████████████████████████

████████████████. Indeed, █████████████████████████

███████████████████████████████. *See id.* ██████████████

██████████████████████████████████████████████████

████████████████████████████. *See id.* ███████████████

██████████████████████████████████████████████████

████████████. *See id.*

 During his childhood, there were short stints of time where Mr. Dempsey ████████

████████ or stayed with his grandparents. *See id.* at ¶ 116. These short stints with his

grandparents were the only times during which Mr. Dempsey felt any safety and sense of family

during his upbringing. █████████████████████████████████████

████████████████. *See id.* at ¶ 115. The absence of his parents in his childhood strained their

respective relationships; but, in adulthood, Mr. Dempsey has become close with his father and

has built a loving relationship with his mother.

### B.  Education and Employment History

Despite his unfortunate upbringing, Mr. Dempsey was a talented and intellectually curious student. Mr. Dempsey's academic prowess earned him the title of salutatorian at his middle school graduation as well as honor roll status the last half of middle school and frequently in high school. *See* PSR at ¶ 137. These qualities also led to him pursue and acquire both a high school diploma and a General Education Diploma ("GED"). *See id.* at ¶ 139.

In 2012, he enrolled at Pierce College in San Fernando Valley, California. Though, excited to learn, he lacked the ambition and follow through he now possesses. *See id.* at ¶ 137. Eventually, he left college following the death of the person to whom he was closest and his "saving grace," his grandfather, ██, because he lost his desire to try given how devastated he was by his grandfather's death and because he had to address a parole violation that resulted from going to a friend's apartment while a legally owned and registered firearm was present in a closet, unbeknownst to Mr. Dempsey. *Id.* at ¶¶ 116, 137.

Mr. Dempsey obtained a number of professional credentials since leaving college. For example, he earned his scissor lift and forklift licenses. He also graduated from massage school. *See* PSR at ¶ 137. Other specialized training and skills include masonry and firefighting (wildland).

Moreover, since his arrest in the instant case, Mr. Dempsey has enrolled in college courses through a program offered at the Central Treatment Facility ("CTF").[3] *See id.* at ¶ 139. He has also completed numerous courses through another program on his tablet: (1) anger management; (2) antidiscrimination law: a primer for small businesses; (3) a student guide to narcotics anonymous; (4) becoming a world-famous mentor; (5) blended learning; (6) budgeting: capital budget analysis;

---

[3] Mr. Dempsey is enrolled in courses such as the following: Diversity, Equity, and Inclusion, Biology, Women and Gender Studies, and Business Mismanagement.

(7) business ethics: ethical decisions; (8) business problem solving: critical thinking and information analysis; (9) chainsaw safety; (10) cognitive awareness; (11) conflicts of interest: corrections; (12) contentious relationships; (13) correcting performance problems: addressing behavioral problems; (14) critical thinking and decision making; (15) disaster medical operations; (16) disaster preparedness; (17) diversity equity and inclusion training; (18) domestic abuse; (19) education compliance; (20) fire evacuation training; (21) firefighter life safety initiatives: how can we make it better; (22) fire prevention and fire protection; (23) firefighter rehab operations; (24) fire safety and utility controls; (25) incipient stage fire extinguisher education; (26) life search and rescue operations; and (27) making your home a safer place.[4] *See id.*; Exhibit F1; Exhibit F2. Mr. Dempsey is continuing his intellectual pursuits by writing a paper for publication on attorneys and blind justice. And, he has read a number of books/materials while awaiting the resolution of this case.[5]

Mr. Dempsey has engaged in various employment opportunities over the years that have benefitted from his diverse skillset. *See, e.g.*, *id.* at ¶¶ 141-45. In fact, in his first job, where he worked with his grandfather's company, he learned many important life skills, including trade and

---

[4] Despite counsel's efforts spanning many months, counsel has not been able to acquire an updated transcript of courses or course certificates for recently completed courses from CTF. Counsel will provide a copy of communications to the Court upon request.

[5] This list includes the following: (1) William Goldman, "The Princess Bride"; (2) Shane Smith, "Greenhouse Gardener's Companion"; (3) Eric Metaxas, "7 Men and the Secret of their Success"; (4) Tucker Max, "I hope they serve beer in Hell"; (5) Maya Angelou, "Letter to my Daughter"; (6) Ken Kasey, "One flew over the Cuckoo's Nest"; (7) "The Xerces Society's Guide: Attracting Native Pollinators"; (8) Cass R. Sunstein, "#Republic"; (9) Rebecca Solnit, "Men Explain Things to Me"; (10) Edward Dowden, "A History of French Literature"; (11) C.J. Box, "Breaking Point"; Dante Alighieri, "Inferno"; (12) A.J. Russel, "God Calling"; (13) George R.R. Martin, Game of Thrones series; (14) "Holy Bible; (15) Hope Jahren, "Lab Girl"; (16) Charles Dickens, "Great Expectations"; (17) Adam Corolla, "In Fifty Years We'll All Be Chicks"; (18) Dr. Sedrik Shaul, "Nootropics: All You Need To Know"; (19) Terry Goodkind, "Sword of Truth" series; (20) "The Complete Idiot's Guide To Learning Latin"; (21) Mel Bartholomew, "Square Foot Gardening"; (22) Robert Hieronimus, "America's Secret Destiny"; (23) Jack Carr, "True Believer"; (24) Roy Masters, "How To Conquer Negative Emotions"; (25) R.O.B. Manley, "Honey Farming"; (26) "The Constitution"; and (27) "The Declaration of Independence."

leadership skills, which have allowed him to thrive in various positions and continue to do so. *See id.* at ¶ 145.

However, when he was in between jobs, he had difficulty obtaining employment at times because of his prior convictions, many of which are now dismissed and/or sealed/expunged.

At present, Mr. Dempsey operates in a position of trust as a detailee at CTF. He is the de facto lead on that detail. Given Mr. Dempsey's love of wildland firefighting and his hope to give back to the community and serve as a role model for his daughter, he aspires to return to that profession upon release.

**C.  Medical History**

██████████████████████████████████████████████████

████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████

**D.  Mental Health History**

█████████████████████████████████████████████████

███████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████ ████████████

████████████████████ ████████████ ██████████ ██████████

████████ ████████████████████████ ████████████████████

███████████████████████████. His efforts have significantly paid off. His outlook has shifted. ████████████████████████████████████████████ He has developed a deeper understanding of himself. And, perhaps most importantly, for the first time,

Mr. Dempsey believes he is deserving of more out of life than he has previously allowed himself to have.



## III.     THE LEGAL FRAMEWORK OF AN ADVISORY GUIDELINES' RANGE

While this Court must still correctly calculate the guideline range, *see Gall v. United States*, 552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, *see id.* at 51; *see also Nelson v. United States*, 555 U.S. 350, 352 (2009), but as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). The Court must "consider all of the § 3553(a) factors," *Gall*, 552 U.S. at 49-50, "make an individualized assessment based on the facts presented," *id.*, and explain how the facts relate to the purposes of sentencing. *See id.* at 53-60; *see also Pepper v. United States*, 131 S. Ct. 1229, 1242-43 (2011). The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough*, 552 U.S. at 101; *Pepper*, 131 S. Ct. at 1242-43.

In order to ensure that the guidelines are truly advisory and constitutional, this Court has the authority to disagree with a guideline as a matter of policy. Because "the Guidelines are now advisory . . . , as a general matter, courts may vary [from Guidelines ranges] based solely on

policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101-02 (internal punctuation omitted) (citing *Rita v. United States*, 551 U.S. 338, 351 (2007) (holding that district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations").

Additionally, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Permitting sentencing courts to consider the widest possible breadth of information about a defendant "ensures that the punishment will suit not merely the offense but the individual defendant." *Pepper*, 131 S. Ct. at 1240 (citing *Wasman v. United States*, 468 U. S. 559, 564 (1984)).

In this regard, "the district court's job is not [even] to impose a reasonable sentence. Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)." *United States v. Foreman*, 436 F.3d 638, 644, n.1 (6th Cir. 2006). Accordingly, "if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher." *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006).

## IV.     THE APPLICABLE U.S. SENTENCING GUIDELINES

According to the plea agreement in this matter, the parties agree to the application of the

following Sentencing Guidelines sections:

**Count One (Pepper Spray)**
| | |
|---|---|
| U.S.S.G. § 2A2.2 – Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) – Dangerous Weapon Used | +4 |
| U.S.S.G. § 2A2.2(b)(3)(A) – Bodily Injury | +3 |
| U.S.S.G. § 2A1.1(b)(7) – Convicted Under 18 U.S.C. § 111(b) | +2 |
| U.S.S.G. § 3A1.2(a) & (b) – Victim Was Government Officer | +6 |

**Count Two (Aluminum Crutch)**
| | |
|---|---|
| U.S.S.G. § 2A2.2 – Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) – Dangerous Weapon Used | +4 |
| U.S.S.G. § 2A2.2(b)(3)(A) – Bodily Injury | +3 |
| U.S.S.G. § 2A1.1(b)(7) – Convicted Under 18 U.S.C. § 111(b) | +2 |
| U.S.S.G. § 3A1.2(a) & (b) – Victim Was Government Officer | +6 |

**Grouping**
| | |
|---|---|
| U.S.S.G. § 3D1.4 – Different Victims, No Grouping, 2 Units | +2 |

**Acceptance of Responsibility**
| | |
|---|---|
| U.S.S.G. §3E1.1(a) – Acceptance of Responsibility | -2 |
| U.S.S.G. §3E1.1(b) – Acceptance of Responsibility | -1 |
| **Total Offense Level** | **28** |

*See* PSR at 5, 37.

As explained below, Mr. Dempsey requests that this Court treat him as a Criminal History

Category I. However, without the Court's determination that three convictions are not to be

counted in the criminal history computation, Mr. Dempsey has a criminal history score of five,

and, accordingly, is a Criminal History Category III. A total offense level of 28 combined with

his Criminal History Category III produces a Guidelines' range of 97 to 121 months of

incarceration.

## A.      Criminal History Computation

**Case Number** ███████████[6,7]

Consistent with U.S. Probation's position in the PSR, ███████████ is not countable because the entire action was dismissed and subsequently expunged/sealed. *See* Exhibit D1; PSR at ¶ 90.

As shown in the Court's Orders and Mr. Dempsey's filing that were provided to the government and U.S. Probation on August 1, 2024, the plea was withdrawn, a plea of not guilty was entered, verdicts or findings of guilt were set aside and vacated, and the entire action was dismissed[8] and then subsequently expunged/sealed.

While it is Mr. Dempsey's position that application of California Penal Code § 1203.4 should be treated as an "expungement" for purposes of the U.S. Sentencing Guidelines and that a *dismissed* case is not countable under any circumstance,[9] the determination that ███████████ is not countable need not rest on the application of Section 1203.4 or his position about dismissals. See also PSR at ¶ 94 (indicating the case was dismissed in the context of another case, pursuant to Section 1385(b)). Indeed, as mentioned, the action was also expunged/sealed

---

[6] As a preliminary matter, to clear up any confusion that might be caused by U.S. Probation's and/or the government's nonspecific references to "burglary," Mr. Dempsey has only been charged with second degree commercial burglary and/or conspiracy to commit second degree commercial burglary. Counsel will provide the Court with the charging documents and/or the detailed criminal history records for each case upon request.

[7] Mr. Dempsey incorporates by reference all his objections to the draft PSR, not all of which were referenced or implemented in the PSR. *See* ECF No. 61-1.

[8] While it does not matter for purposes of the computation, undersigned counsel's understanding is that the action was dismissed *with* prejudice.

[9] As an example, it cannot be that a case dismissed via a prosecutor's power to terminate the case *nolle prosequi* would be counted, which is what Section 1385(a) codifies. *See People v. Sidener,* 58 Cal. 2d 645, 648 (1962), *overruled on other grounds by People v. Tenorio,* 3 Cal. 3d 89, 473 P.2d 993 (1970); *People v. Superior Ct. (Romero)*, 13 Cal. 4th 497, 917 P.2d 628 (1996), *as modified on denial of reh'g* (Aug. 21, 1996). *See also United States v. Hidalgo,* 932 F.2d 805, 807 (9th Cir. 1991) ("[I]t appears elementary to us that when the verdict of guilty was vacated and set aside and the information dismissed as to [the] conviction, that conviction no longer exists. . . . Therefore, there is nothing to count for purposes of calculating defendant's criminal history."); *id.* (also finding it significant that courts call relief pursuant to a respective statute "expungement"); *United States v. Bays*, 589 F.3d 1035, 1039 (9th Cir. 2009) (explaining that, "[i]n *Hidalgo,* we found that the conviction was expunged because the guilty verdict was vacated and the underlying information was dismissed").

pursuant to California Penal Code §§ 851.91 and 851.92.[10],[11] *See also United States v. Alba-Flores*, 577 F.3d 1104, 1108 (9th Cir. 2009) ("We made that plain when we pointed out that: '[t]o "expunge" is "to erase or [to] destroy," and an "expungement of record" is "[t]he removal of a conviction (esp. for a first offense) from a person's criminal record."'").

Should the Court, however, given any significance to the government's argument as to California Penal Code § 1203.4, Mr. Dempsey would ask for a chance to brief or argue this issue prior to or at sentencing, respectively. He would request the same if the Court declines to preclude the government from advancing arguments about the effect of Section 1385(a) and/or Sections 851.91 and 851.92, which is requested below.

Despite providing the Court's detailed Orders to the government ahead of its sentencing submission, the government failed to address the effect of Sections 851.91 and 851.92, and, instead, supplied the Court with perplexing and otherwise entirely inappropriate mischaracterizations about defense counsel's conduct, among other things. *Compare, e.g.*, ECF No. 69 at 34-35 (baselessly accusing defense counsel of unethical conduct by the mere fact that relief was *granted* under Section 1203.4 and misrepresenting that defense counsel did not provide the government with filings or otherwise sufficient documentation of the requested and granted relief), *with* Exhibit D1 (showing that counsel did not apply for relief under Section 1203.4 and that the Court checked off the box to afford relief under Section 1203.4).[12] Because the

---

[10] For instance, under the U.S. Sentencing Guidelines, where, as here (where the verdicts or findings of guilt were set aside and vacated, for example), a defendant was arguably "subsequently found innocent," his conviction has been expunged. *See also People v. Sidener*, 58 Cal. 2d at 648 (providing that Section 1385(a), which permits courts to order a criminal action dismissed, allows for dismissal of the entire case, including allegations that the defendant has previously been convicted of a felony).

[11] In California, expungement/sealings under the provisions applied in Mr. Dempsey's case are only available in instances where a conviction does not result. In D.C., a case that does not result in a conviction can be expunged/sealed using a similar statute.

[12] Mr. Dempsey will gladly provide any and all post-conviction filings to the Court upon its request. As a note, the government makes a number of what appear to be personal attacks on defense counsel. Because the attacks are baseless, defense counsel is opting not to acknowledge them beyond simply stating that the claims are

government did not address Sections 851.91 or 851.92, Mr. Dempsey would ask the Court to treat his arguments as conceded by the government and preclude the government from future argument as to the provision's effect on Mr. Dempsey's criminal history calculation. *See McClanahan v. Dep't of Just.*, 712 F. App'x 6, 8 (D.C. Cir. 2018) (citing *N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007) (party forfeits argument by failing to brief it or by mentioning it only "in the most skeletal way" (internal quotation omitted)).

**Case Number** █████████

Consistent with U.S. Probation's position in the PSR, ███████ is not countable. *See* PSR at 92. As shown in the Court's Orders that were provided to the government and U.S. Probation on August 1, 2024, pursuant to California Penal Code § 1385(a), the provision that prosecutors and courts can rely on to dismiss a case at any juncture, including to *nolle prosequi* an action pretrial, the plea was withdrawn, the conviction was vacated, the sentence of probation was vacated, and the entire action was dismissed.[13] *See* Exhibit D2. Such an action by the Court is sufficient to render ███████ uncountable.

But if there is any question, the Court afforded Mr. Dempsey other relief as well. For instance, it also afforded relief under California Penal Code § 1203.4, which provided another avenue to withdraw the plea, enter a plea of not guilty, set aside and vacate the verdicts or findings of guilt, and the dismiss the action. *See id.* Further, the Court expunged/sealed the action pursuant to California Penal Code §§ 851.91 and 851.92. *See id.*

---

mischaracterizations, are entirely untrue, and/or are otherwise misleading. Should the Court wish the parties to engage further on this, defense counsel would be more than happy to discuss any of these false accusations on the record. Further, defense counsel suggests that the government perform a closer review of the parties' email exchanges over the past week or so, including the August 1, 2024 email sent pursuant to the government's request made only a week prior, where defense counsel attached *post-conviction filings and court orders*, all of which refer directly to the statutes under which relief was granted and/or sought, respectively, and show that defense counsel did not, in fact, seek relief pursuant to Section 1203.4.

[13] While it does not matter for purposes of the computation, undersigned counsel's understanding is that the action was dismissed *with* prejudice, as this was the relief requested and the signed Order states as much. *See* Exhibit D2.

Again, despite providing the Court's detailed Orders to the government ahead of its sentencing submission, the government failed to address the effect of Section 1385(a) and/or Sections 851.91 and 851.92. Because the government did not address Section 1385(a), Section 851.91, or Section 851.92, Mr. Dempsey would ask the Court to treat his arguments as conceded by the government and preclude the government from future argument as to the provision's effect on Mr. Dempsey's criminal history calculation. *See McClanahan*, 712 F. App'x at 8 (citing *N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (providing that arguments made summarily or not raised are forfeited)).

## Case Number LA091526-01

Consistent with U.S. Probation's position in the PSR, LA091526-01 is not countable. *See* PSR at ¶ 93; ECF No. 61-1 at ¶ 25. As shown in the Court's Order that was provided to the government and U.S. Probation on August 1, 2024, pursuant to California Penal Code § 1473, California's habeas statute, the plea was withdrawn, the conviction was vacated, the sentence was vacated, and the entire action was dismissed. *See* Exhibit D3. Dismissed actions are not countable.[14]

Relatedly, because this conviction is not "otherwise countable," it cannot serve as a basis to apply U.S.S.G. § 4A1.1(e), if such provision was, in fact, applicable here. While probation recognizes the dismissal in Paragraph 93, it mistakenly failed to acknowledge it in Pages 47 and 48. The PSR also does not reflect that the bench warrant was recalled; though, this is readily apparent upon review of the Court's Order. *See* Exhibit D3.

---

[14] Because of the government's curious position that a case can be dismissed and still counted, Mr. Dempsey filed a Petition to Seal, pursuant to California Penal Code §§ 851.91 and 851.92. The respective court is dark until August 11, 2024, but defense counsel anticipates it will be successful, as there is no arguable bar to the requested relief. If Mr. Dempsey's other arguments do not demonstrate to this Court that this action should not be counted in his criminal history computation, Mr. Dempsey would ask the Court to not count this action given his pending motion.

But even if it was countable, the government still applied the wrong Guidelines' provision and therefore imparted too many points to this action. *See* ECF No. 69 at 27. Because Mr. Dempsey received a fully suspended sentence, the correct provision is U.S.S.G. § 4A1.1(c), which only provides for one point. As a condition of his probation, Mr. Dempsey had to serve 200 days in county jail, *see* Exhibit D5; this is irrelevant in determining his "sentence of imprisonment." In any event, for these 200 days, Mr. Dempsey was given 200 days of credit for the 100 days he served in custody prior to the resolution of this case, plus 100 days of good time credit. *See id.*

Indeed, for Second Degree Commercial Burglary, a defendant can only receive a prison term of either 16 months or three years. *See* Calif. Pen. Code § 459. Mr. Dempsey ultimately received a fully suspended prison sentence of three years, which would be the "sentence of imprisonment" for our purposes. *See* U.S.S.G. § 4A1.1(a)(3) ("A conviction for which the imposition or execution of sentence was totally suspended or stayed shall be counted as a prior sentence under [Section] 4A1.1(c).").

The government failed to address these arguments, which were provided in Mr. Dempsey's PSR objections, *see* ECF No. 61; ECF No. 61-1, and were provided for in the Court's Order, they should therefore be treated as conceded by the government and the government should be precluded from addressing such arguments in the future. *See McClanahan*, 712 F. App'x at 8 (citing *N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (providing that arguments made summarily or not raised are forfeited)).

**Case Number GA086322-01**

As set forth in the Court's Order provided to the government and U.S. Probation on August 1, 2024, pursuant to California Penal Code § 1170.18, the Court recalled Mr. Dempsey's sentence and resentenced him to a term of summary probation on May 16, 2024.

Mr. Dempsey would ask the Court to not count this conviction given his pending petition requesting to dismiss the action pursuant to Section 1385(a) that was filed on May 2024 and followed up with a Motion to Expedite Order on Petition for Relief Pursuant to Section 1385(a).[15,16,17] Alternatively, consistent with U.S. Probation's position in the PSR, only one point should be assigned, as Mr. Dempsey was resentenced on May 16, 2024 to only summary probation and no term of imprisonment. *See* Exhibit D4; PSR at ¶ 91.

These arguments were contemplated in Mr. Dempsey's PSR objections, *see* ECF No. 61; ECF No. 61-1, and in the Court's Order provided by defense counsel but were not addressed by the government. Accordingly, these arguments should therefore be treated as conceded by the government and the government should be precluded from addressing such arguments in the future. *See McClanahan*, 712 F. App'x at 8 (citing *N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (providing that arguments made summarily or not raised are forfeited)).

---

[15] Counsel has asked for various updates as to the filing's status, however, the judicial clerk for the Court has stated that it cannot provide an update over the phone and has required counsel's presence. Counsel has asked an attorney who lives in the Los Angeles area to go to the courthouse this week to further inquire.

[16] Because of the practices of this particular judge, the Court required Mr. Dempsey to submit filings one at a time and in a particular order, delaying things significantly and causing Mr. Dempsey to resubmit various filings. The Court indicated, however, that Mr. Dempsey should refile his 1385(a) Petition after receiving relief pursuant to Section 1170.18; his May 2024 submission complies with the Court's instruction. Accordingly, this is the last step in the process that Mr. Dempsey has been patiently waiting for, and the Court's direction implies that relief will be granted under Section 1385(a).

[17] Mr. Dempsey acknowledges how courteous this Court has been in allowing him to have time to get most of his post-conviction matters resolved. In order to prevent additional delay, Mr. Dempsey did not seek an additional continuance but would ask the Court to consider the unique circumstances in GA086322-01, LA085370 (discussed below), and SA101609 (discussed below) and the fact that he cannot appeal his sentence in the instant case, even if the post-conviction is ultimately granted at a later date, when making a determination on his criminal history computation, including regarding his request for expungement by this Court (discussed below).

**Case Number LA085370**

Counsel submitted filings pursuant to Section 17(b), Section 1385(a), and Section 1473.7 of the California Penal Code. Per Chamber's instructions counsel set a hearing without Mr. Dempsey present, since his presence counsel be waived. At the hearing, the Court indicated, among other things, it would not rule on the filings without Mr. Dempsey present to be cross-examined. Despite the fact that relief was available under these sections and the prosecution did not contest granting relief, Counsel made a judgment call to not have Mr. Dempsey engage in testimony prior to his sentencing in the instant case. Counsel plans to refile after Mr. Dempsey's sentencing in the instant case. Based on the equities, we would ask that this Court not count this action in Mr. Dempsey's criminal history computation or, at least, utilize it as a basis for concluding his criminal history is overstated and vary downward.

**Case Number SA101609**[18,19,20]

Prior to his sentencing hearing in his federal case, Mr. Dempsey will submit his appeal of the denial of his request for habeas relief in this action because, among other things, the habeas court failed to address certain arguments made and issues raised that could have reasonably afforded the requested relief, including on constitutional bases such as ineffective assistance of counsel and the involuntariness of the plea.[21]  For instance, because bear spray does not qualify as

---

[18] This is the Santa Monica case the government refers to in its sentencing submission. *See* ECF No. 69 at 27.
[19] Except for the point as to law enforcement's decision not to charge, all of the arguments in the Uncharged Allegations subsection (see below) are also applicable to Mr. Dempsey's SA101609 case.
[20] The government asks the Court to pay particular attention to this case. However, the Court should view the evidence for itself, as it is clear Mr. Dempsey was acting in defense of others and/or self. *See* Exhibit A1; Exhibits H1; Exhibit H2; Exhibit H3; Exhibit H4. It is also of note that, per the representation of Michael Malak (prior counsel), bear spray is not illegal for anyone over the age of 18 to carry in California.
[21] Other examples of arguments not addressed at all or adequately includes the argument that the government engaged in prosecutorial misconduct amounting to a due process violation and ineffective assistance of counsel for the public defender's failure to provide undersigned counsel with Mr. Dempsey's case file despite her repeated attempts to acquire it for purposes of the habeas petition (this was after counsel informed the public defender that one of the anticipated habeas grounds was ineffective assistance of counsel based on his failure to advise Mr. Dempsey of the harms associated with pleading despite knowledge of a likely charge for his conduct on January 6 and his failure to obtain a global resolution in light of the impending charges). Of additional note, as will be addressed in his appellate

"tear gas" for purposes of the respective statute, given the statute's carveout for environmental poisons, or pesticides, Mr. Dempsey's public defender—who, like his predecessor attorney in that case, believe that Mr. Dempsey is innocent of the offense on the basis of self-defense and defense of others, *see* Exhibit H3; Exhibit H4—failed to provide constitutionally effective counsel and by advising Mr. Dempsey to pled nolo contendere to Use of Tear Gas, without the public defender first researching or advising Mr. Dempsey of this vindicating defense. *See In re Williams*, 1 Cal. 3d 168, 460 P.2d 984 (1969) (holding that a public defender who failed to research facts and law of a decision barring prosecution of that statute or to discuss this defense to the statute with petitioner, but who permitted petitioner to plead guilty to that statute of which he could not have been found guilty, *did not provide petitioner with effective assistance of counsel*); *see also id.* at 989 (citations omitted) ("'Counsel by advising his client to plead guilty cannot be permitted to evade his responsibility to adequately research the facts and the law.' We further noted, 'Counsel is particularly qualified to make such a recommendation (as to a bargain plea) because it is he, not his client, who possesses the skills to analyze the nature of the charges, to evaluate the evidence, and to make informed recommendations.' We concluded: 'Deprivation of the right to counsel at the pleading stage because of incompetency can well constitute a deprivation of due process.'"). Accordingly, we would ask that the Court not count this action in the criminal history computation (i.e., that it afford the action zero criminal history points).

Even if the Court decides to count this as a prior conviction for the computation, the government and U.S. Probation Office applied the wrong Guidelines' provision and therefore imparted too many points for this action. The government and U.S. Probation mistakenly submit

---

habeas filing, the government in Mr. Dempsey's habeas matter made material misrepresentations to the habeas court on several occasions, including offering sworn declarations of two of the main FBI agents that investigated Mr. Dempsey's January 6 case, in which they might have made material omissions (depending on whether it was intentional and whether the declarations were pre-drafted by the DA's Office as opposed to the agents).

that Mr. Dempsey was placed on probation for two years with 200 days in custody. However, as explained below, Mr. Dempsey was placed on two years of probation, but the custody was not part of his probation; it was pretrial custody plus good time. *See* Exhibit D5.

Prior to the resolution of the case and before posting bail, Mr. Dempsey spent 100 days (and earned 100 days of good time credit); as the Court knows, this is irrelevant in determining his "sentence of imprisonment." Because Mr. Dempsey received a fully suspended sentence of two years (with credit for the 200 days, should the prison sentence ever be executed), *see id.*, the correct provision would be U.S.S.G. § 4A1.1(c), which only provides for one point. Indeed, the two-year suspended sentence would the "sentence of imprisonment" our purposes. *See* U.S.S.G. § 4A1.1(a)(3) ("A conviction for which the imposition or execution of sentence was totally suspended or stayed shall be counted as a prior sentence under § 4A1.1(c).")).

The government failed to address this argument, which was provided in Mr. Dempsey's PSR objections, *see* ECF No. 61-1 at 8-9; ECF No. 61-1, and it should therefore be treated as conceded by the government and the government should be precluded from addressing such argument in the future. *See McClanahan*, 712 F. App'x at 8 (citing *N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (providing that arguments made summarily or not raised are forfeited)).

***Federal Court's Power to Expunge Convictions***

If the Court still believes any of the convictions are to be counted in the criminal history computation under the bases provided in Mr. Dempsey's arguments above, Mr. Dempsey would ask the Court to expunge his respective convictions and any related records. A federal court may order expungement, even for an unrelated state matter, where it is required or authorized by statute or "in the exercise of [its] inherent equitable powers." *Doe v. Webster*, 606 F.2d 1226,

1230 (D.C. Cir. 1979); *see id.* at 1230 n.8 ("The power to order expungement is a part of the general power of the federal courts to fashion appropriate remedies to protect important legal rights."); *Menard v. Saxbe*, 498 F.2d 1017, 1023 (D.C. Cir. 1974) ("The judicial remedy of expungement is inherent and is not dependent on express statutory provision, and it exists to vindicate substantial rights provided by statute as well as by organic law[.]"). "Expungement, no less than any other equitable remedy, is [an equitable remedy] over which the [court] exercises considerable discretion." *Chastain v. Kelley*, 510 F.2d 1232, 1236 (D.C. Cir. 1975). Federal courts have ordered expungements pursuant to their inherent equitable power in instances where probable cause is absent and special circumstances are present, flagrant violations of the Constitution are present, or other unusual and extraordinary circumstances[22] are present. *See Doe*, 606 F.2d at 1230; *see also id.* at 1231 ("The general rule . . . [is that] expungement of an arrest record is appropriate when serious governmental misbehavior leading to the arrest, or unusually substantial harm to the defendant not in any way attributable to him, outweighs the government's need for a record of the arrest."); *United States v. Woods*, 313 F. Supp. 3d 197, 199 (D.D.C. 2018) (citation omitted) (emphasis added) ("Expungement is justified when the movant can show that she has suffered a harm rising to the level of extraordinary *or* unusual circumstances, and that the need to prevent such harm outweighs the government's interest in maintaining criminal records."). The breadth of a federal court's discretion to order expungement can be gleaned from the fact that they may grant expungements even in instances where the respective harm is

---

[22] According to the D.C. Circuit, examples of extraordinary circumstances include criminal records arising from prosecutions marred by entrapment, incorrect legal advice, misleading law enforcement testimony or incorrect legal advice or predicated on a statute subsequently declared unconstitutional. *See Doe*, 606 F.2d at 1230 n.11 (citing cases); *see also* (citing *United States v. Kalish*, 271 F.Supp. 968 (D.P.R.1967) (arrest for refusal to step forward to report for induction into the armed forces based on the advice of counsel); *and then citing United States v. Hudson*, No. 49590-74 (D.C. 1975), *aff'd sub nom.*, *District of Columbia v. Hudson*, No. 9312 (D.C. App. July 19, 1979) (arrest for murder later determined that cause of death was suicide)); *Woods*, 313 F. Supp. at 199 (politically or racially motivated arrests).

imminent or where the record of conviction is simply "prejudicial without serving any proper purpose." *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 538 (D.C. Cir. 2015) (citation omitted).

In light of the representations above under each of Mr. Dempsey's California cases, it is clear that his cases would qualify for relief through the Court's exercise of its discretion.[23]

**Uncharged Allegations**

The government submits that the uncharged alleged conduct should be considered by the Court as examples of Mr. Dempsey's purported inclination to engage in "political violence." The government's position is curious for various reasons. To start, the government submits that three alleged instances at rallies or protests, in and of themselves (i.e., without *any* evidence of political motive), demonstrate his supposed propensity to engage in political violence. Mr. Dempsey has been to over 100 rallies and protests. However, the government can only point to three alleged instances. The government makes an insufficient showing of political motive; indeed, if there was an actual political motive, the government should have offered evidence for context, like social media or phone messages or witness statements to show that such a motive exists. But no such evidence exists.[24] Instead, evidence shows to the contrary, as discussed below.

---

[23] Also of note is the fact that the government instructed that if Mr. Dempsey did not enter the plea agreement on January 4, 2024, it was going to withdraw the plea. Counsel had asked the government to hold the plea in abeyance or utilize a similar procedure to allow sufficient time for the resolution of post-conviction litigation and to prevent a court from declining to afford Mr. Dempsey his respective requested post-conviction relief in light of the federal plea's entry. But the government declined, understanding these potential unequitable consequences. Given this Court has graciously granted both of Mr. Dempsey's requests for continuances of his sentencing hearing to allow for more time for post-conviction litigation to resolve, we did not want to further delay the case where this Court could, itself, afford Mr. Dempsey relief, for example. Additionally, for GA086322-01, the Court should have ruled on the Peition by now, so the circumstances are highly unusual.

[24] While not directly relevant to the three alleged incidents, Mr. Dempsey's comments at the gallows early in the day on January 6 (prior to 11am) do not meaningfully inform any understanding of his motive in the instant case or otherwise. Mr. Dempsey is a rather hyperbolic speaker at times, and when asked about the gallows, which had a sign on it that said, "This is Art," Exhibit A8, Mr. Dempsey spoke about how treason would be treated at the time of the Founding Fathers. He provided examples of who he believed would be deemed treasonous; the names he stated had, unequivocally, nothing to do with the certification of the election. In any event, while his opinion might be controversial, it is not criminal or indicative of the intent behind any of his conduct. The government's discovery

Despite the duty of candor owed to the Court, among other applicable ethical duties and obligations, the government makes what is, at base, a disingenuous argument. Indeed, in negotiating Mr. Dempsey's plea deal, the government—Andrew Floyd,[25] to be exact—acknowledged that the confidential human source ("CHS") who brought about these allegations was deemed by the government to be noncredible.[26] Relatedly, AUSA Floyd also acknowledged the doxing efforts that left-wing extremists had been engaging in for years against Mr. Dempsey in an attempt to disrupt his life and bring about legal troubles.[27] These doxing efforts are very real and are supported by the government's own discovery and by sworn declarations submitted by Mr. Dempsey's prior counsel in relation to his SA101609 habeas matter.

Additionally, in all of these instances, there is evidence to that conflicts with any suggestion of wrongdoing by Mr. Dempsey or others. For instance, there is evidence to show that the person purported to be Mr. Dempsey was not the instigator, and, instead, was acting in self-defense or defense of others. *See* Exhibit G6 (showing the individual with a skateboard in Tujunga, California, acting in response to someone being assaulted); Exhibit G5 (explaining the police determined it was mutual combat); Exhibit G7 (showing Individual 1 in Los Angeles, California, assaulting Individual 2 (including trying to take his flagpole from his hands), Individual 3 (person with a skateboard) acting in response to Individual 1 attacking Individual 2,

---

clearly provides for a conclusion consistent with the truth, which the government ignores but which we embrace. Further, it is counsel's recollection (which is perhaps mistaken) that the government tried to charge Mr. Dempsey with threats for his protected speech and that such an endeavor was unsuccessful.

[25] As this Court knows, AUSA Floyd is one of the January 6 unit supervisors.

[26] During defense counsel's conversation with AUSA Floyd, during which each of the uncharged incidents were discussed, among other things, AUSA Floyd only discussed the credibility as to this CHS, suggesting his information provided the basis of the allegations for each of the incidents. There have been a number of instances that the CHS has been determined to be incorrect, attributing conduct to Mr. Dempsey of one or more tall, lanky masked individuals. Counsel will gladly provide the court with these documents upon request.

[27] These are the same doxing efforts discussed or observed in defense exhibits. *See, e.g.*, Exhibit A1. To defense counsel's knowledge, the government has not provided any proof beyond a self-serving statement by A.D. that Mr. Dempsey directed her to ask someone to remove a video of him. Moreover, as A.D. repeatedly acknowledges, if such an instance occurred, it was because a fear of doxing, not to evade law enforcement. *See* Exhibit A1; Exhibit H2; Exhibit H3.

and Individual 4 stepping in to also help Individual 2)[28]; Exhibit G4 (showing an individual, who does not have tattoos on his knees or legs, unlike Mr. Dempsey (who has had tattoos on his knees and legs since 2009, *see, e.g.*, Exhibit G10), engaging in the alleged conduct in Beverly Hills, California). There is also evidence that false reports were made in these cases by the purported victims/eyewitnesses. *See, e.g.*, Exhibit G9; see also Exhibit H3.[29]

Further, the government's own discovery is directly at odds with its representations to the Court. *See, e.g.*, Exhibit A1 (▮▮▮▮ stating to the FBI that it was not Mr. Dempsey who engaged in a respective act(s) while stating that he was involved in the Santa Monica incident). Accordingly, some of the government's representations are troubling, to put it lightly. For instance, the government tries to claim Mr. Dempsey is the perpetrator in the Beverly Hills incident while also having the discovery materials specifically negate that possibility. *See* Exhibit G2; Exhibit G3; Exhibit G4. Specifically, the FBI stated in a report that it identified Mr. Dempsey as someone other than the perpetrator at the protest (who is present within the videos at the same time as the perpetrator) based on an in-person identification of both him and the perpetrator. *See id.* The person the FBI identified Mr. Dempsey as in its report does not engage in any violence, as the video shows. *See* Exhibit G4.

Additionally, it is our understanding that each of these instances was looked into by the respective local authorities, who ultimately declined to prosecute. *See, e.g.*, Exhibit G5; Exhibit G8.

To be clear, Mr. Dempsey has never engaged in violence motivated by politics, as he is an openminded person who has and would never use physical force to solve a difference in

---

[28] The sound in Exhibit G7 cuts out when the videographer praises Individual 4: "Hey good shit bro. Fuck that guy. Fuck that mother fucker, bro. Tryna [sound cut]."
[29] There was at least one other skateboard attack that law enforcement concluded was not attributable to Mr. Dempsey despite initial accusations of such.

political opinion or as a means to an end for a political belief he holds. *See, e.g.*, Exhibit B3; Exhibit J. Accordingly, a review of the respective videos and other information that defense counsel provided for each incident will conclusively show that Mr. Dempsey has not engaged in any "calculated" political violence. The Court will quickly realize why the omitted the information that it did; the government's arguments are not based in reality.

In sum, the government's position is baseless, and the Court should not afford it any credence.

***Overstated Criminal History***

Mr. Dempsey's criminal history, particularly as proposed by the government, is plainly overstated—as can be gleaned from the above-mentioned information and as follows— warranting a downward variance.

The majority of Mr. Dempsey's prior convictions—those for nonviolent theft—derived from the fact that he ▮▮▮▮▮▮▮ did not have the means to obtain necessary resources to survive. His juvenile prior convictions were a function of his ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ While the circumstances do not make his conduct right, they certainly provide crucial context as to how to view Mr. Dempsey and his previous conduct.

Of additional significance, all of Mr. Dempsey's prior convictions involved factual and other circumstances that normally would afford much more lenient charges. He was, undeniably, overcharged in each instance. For instance, Mr. Dempsey could have been charged with Petty Theft (misdemeanor) for stealing an iPod shuffle from a nail salon, for example, but he was charged with Second Degree Commercial Burglary (felony).

Lastly, the government confuses what the proper request is for a when it believes a criminal history might be understated; the correct request is a variance, not a change in criminal history category.

### B.  Inapplicability of the Serious Bodily Injury Enhancement

The Court should not apply the serious bodily injury enhancement provided for in U.S.S.G. § 2A2.2(b)(3)(B), as it is inapplicable and would result in disparate treatment.

In order for a defendant to be deemed to have used a dangerous weapon under U.S.S.G. § 2A2.2(b)(2)(B), there must be a showing that the instrument was, in relevant part, "an instrument capable of inflicting death or serious bodily injury." U.S.S.G. § 1B1.1, Application Note 1(E). Similarly, in order to apply any subpart of U.S.S.G. § 2A2.2(b)(3), there must be a showing that bodily injury resulted from the conduct; per this provision, "bodily injury" means "any significant injury; *e.g.*, an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." U.S.S.G. § 1B1.1, Application Note 1(B). Accordingly, the language in Mr. Dempsey's plea, like most if not all other January 6 pleas contemplating a Section 111(a) and (b) charge, provides that the aluminum crutch was "capable of inflicting serious bodily injury, and did, in fact, cause bodily injury to ███████, that is, as a result of being hit by the crutch, ███████ suffered a significant injury to his head." Mr. Dempsey's representation does not, thus, warrant the application of U.S.S.G. § 2A2.2(b)(3)(B); it simply provides what is necessary for the application of two enhancement provided for in the plea agreement.

Further, the evidence in this case does not warrant the application of U.S.S.G. § 2A2.2(b)(3)(B). "Serious bodily injury" is defined as "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1, Application Note 1(M). When Mr. Dempsey assaulted ███████ he was unsteadily

balancing on someone's shoulders. Thus, the swing that made contact had diminished force. Moreover, when such contact was made, it was made with the rubber end of the crutch, which also likely minimized the severity of any injury. This is not to say ███████ was not injured; Mr. Dempsey does not dispute that. This is simply to say that it is unlikely, if not infeasible, that *serious* bodily injury occurred.[30] To be sure, undersigned counsel understands that ███████ stayed on the line in the tunnel. Counsel also understands that ███████ did not take any time off work or seek any medical treatment for his injury. ███████ failed to even report his injury. *See* Exhibit A7; *see also* Exhibit A8 ("All of CDU 42 had injuries of some kind. (14) platoon members had some specific more serious injury for which they sought medical treatment."). Although Sargent J.M. stated that, upon being hit he believed he might have had a concussion,[31] it appears his concern subsided.

Application of U.S.S.G. § 2A2.2(b)(3)(B) is also unwarranted in light of similar cases. We are unaware of many January 6 where the serious bodily injury enhancement has been applied. And, where it has been applied, it has been in the context of injuries where medical attention was sought and required. For instance, in *United States v. Daniel Rodriguez*, No. 1:21-cr-00246-ABJ, the defendant's use of an electroshock weapon led the officer to lose consciousness and suffer from a heart attack, requiring hospitalization. *See* ECF No. 160; Jaclyn Diaz, "Jan. 6 rioter who used a stun gun on Officer ███████ sentenced to prison," NPR (June 21, 2023), https://www.npr.org/2023/06/21/1183558868/jan-6-rioter-sentenced-officer-████████;

---

[30] ███████'s helmet was knocked off just prior to Mr. Dempsey's assaultive conduct. *See* Exhibit A6. However, before Mr. Dempsey's assaultive conduct, ███████ chose not to put his helmet back on in the fear that it would be taken by rioters. *See id.* While Mr. Dempsey does not intend to place any blame on ███████ it would not be particularly fair to attribute any possible intensification of injury that might have resulted from Sargent J.M.'s decision not to wear his protective gear. But, as Mr. Dempsey, of course, acknowledges, ███████ had every right to do what made the most sense in the moment to cope in the stressful setting of the tunnel.
[31] The government appears to misinterpret ███████'s statement. *See* ECF No. 69 at 3.

*United States v. Justin Jersey*, 21 Cr. 35 (RC) (applying the enhancement where the government advocated for it because the laceration to his head *required staples to close*).

Notably, in *United States v. Daniel Gray*, No. 1:21-cr-00495-ABJ, ECF No. 101 at 20, the government did not rely on the officer's *concussion diagnosis* for the request for the application of the enhancement. Instead, it relied on the fact that the officer, who was pushed down a staircase, still "suffers from post-traumatic stress disorder and continues to receive physical therapy for a pinched nerve."

In any event, it's arguably double or triple counting, respectively, to use the aggravated assault enhancement in conjunction with the "serious bodily injury" enhancement, since, as provided in the Guidelines, "aggravated assault" means "a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (*i.e.*, not merely to frighten) with that weapon [or] (B) serious bodily injury[.]" U.S.S.G. 2A2.2, Application Note 1. If the Court determines the enhancement applies, it should accordingly vary downward and/or give it not weight.

## C. Inapplicability of the Body Armor Enhancement

The U.S. Sentencing Guidelines sets forth a sentencing enhancement that a court can apply if (1) a defendant is convicted of a crime of violence and (2) the offense involved the use of body armor (two points) or the defendant used body armor during the commission of the offense, in preparation for the offense, or in an attempt to avoid apprehension for the offense (four points). *See* U.S.S.G. § 3B1.5. Application Note 1 sets forth the definitions of terms used in this enhancement. For instance, "body armor" is defined as "any product sold or offered for sale, in interstate or foreign commerce, as personal protective body covering intended to protect against gunfire, regardless of whether the product is to be worn alone or is sold as a complement to another product or garment." U.S.S.G. § 3B1.5, Application Note 1. Additionally, "use" is defined as "active employment in a manner to protect the person from gunfire" or "use as a means

of bartering." *Id.* "Use" does not include "mere possession (*e.g.*, 'use' does not mean that the body armor was found in the trunk of the car but not used actively as protection)." *Id.* Similarly, "used" is defined as "put into 'use' as defined [in Application Note 1]." *Id.*

### Government's Insufficient Argument and Showing

The government contends that the vest Mr. Dempsey wore was body armor. But it relies on a *belief* that it *might* be; in other words, it relies on conjecture.[32] Indeed, the government cannot and does not show that it is body armor. To be sure, the government did not analyze or test the vest found in the search. (Notably, upon defense's analysis of the vest, using artificial intelligence, it appears to perfectly match a stab-proof vest.[33]) The government has no record of purchase of the vest (which also speaks to the fact that Mr. Dempsey, who counsel understands received it from a friend, had no way to know if the vest was bulletproof as compared to stab-proof or otherwise). The government did not even offer *proof* of its claim that the vest was purportedly from the brand BulletSafe or argue that there is any significance to such claim. For instance, the government does not argue or attempt to make any showing that the vest has any logo to show it was made by BulletSafe or that BulletSafe exclusively makes bulletproof vests. The Court should find that the government is precluded from doing so at this juncture, as the government has waived/forfeited any respective argument since it had the opportunity to advance these arguments in its initial filing but failed to do so. *See McClanahan*, 712 F. App'x at 8

---

[32] The government relies on *United States v. McAbee*, 1:21-CR-35-RC. However, unlike in *McAbee*, the government here fails to provide any information to establish that the item is in fact body armor. *See id.*, ECF No. 429 at 7. Also unlike in this case, government in McAbee showed that the defendant planned to engage in violence on January 6, even discussing the different weapons he planned to bring (including a magazine) and that he knew it was a bulletproof vest. *See id.* McAbee also attacked Officer B.M. when he was dragged out of the tunnel and tried to pull Officer Wayte outside the tunnel. *See id.* at 12, 14. He was also an active sheriff's deputy. *See id.* at 35. To put it simply, the facts are sufficiently different than those in Mr. Dempsey's case.

[33] Should the Court allow the government to proceed with his arguments on body armor beyond the arguments and evidence already submitted, Mr. Dempsey would ask that he be allowed to submit subsequent arguments and evidence as well.

(citing *N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (providing that arguments made summarily or not raised are forfeited)).

Moreover, as discussed below, the government's cited cases from the Seventh and Eighth Circuits do not actually support its position. They support Mr. Dempsey's, as those cases involve circumstances recognized where one can reasonably expect gunfire, such as where the defendant is armed with firearms or where the defendant engaged in robbery or drug transactions.

The government also cites *United States v. Webster*, 102 F.4th 471 (D.C. Cir. 2024), in support of its position. However, if relied upon at all,[34] *Webster* should be limited to its facts. Moreover, the government's reading of Webster is not entirely accurate or helpful to the government. For instance, the government submits that *Webster* concluded that no *mens rea* is required. But *Webster* left this possibility open, saying, instead, that if there is a *mens rea*, it is "an intent to avoid injury, not intent to commit a crime of violence." *Id.* at 489. While Mr. Dempsey submits that both *mens reas* are required and that the former *mens rea* must relate to an expectation about gunfire, it is perhaps irrelevant since *Webster* is factually distinct from the case here (as an example, Webster was a police officer and used his own police vest), *see id.*,

---

[34] If the Court believes *Webster* changed the legal landscape, we would ask, out of fairness, that the Court not apply *Webster* or that the Court give the body armor enhancement no weight and/or vary downward. Webster was decided after Mr. Dempsey pled. The ability to argue the body armor enhancement and one versus two counts of Section 111(a) and (b) were terms the parties negotiated specifically, given that these terms (even alone) made Mr. Dempsey's plea offer substantially different from any other January 6 defendant's. AUSA Brasher did not get supervisory approval on the one count. But undersigned counsel was able to negotiate with AUSA Floyd (one of the unit supervisors) to allow Mr. Dempsey to litigate the body armor enhancement, as the law was favorable to him then, defense counsel was not aware of any body armor case on appeal (even through research), and, among other things, there was no indication that Mr. Dempsey intended to use the vest against gunfire or contemplated that there would be gunfire or even law enforcement engagement. If the government knew about *Webster* at the time of the plea, that would suggest that the government did not intend for Mr. Dempsey to actually obtain any benefit of the negotiated bargain; this would be inconsistent with due process. *See, e.g.*, *Santobello v. New York*, 404 U.S. 257, 262 (1971) ("[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.")); *see id.* at 265 (Douglas, J., concurring) ("*Walker v. Johnston*, clearly held that a federal prisoner who had [been] tricked by the prosecutor through misrepresentations into pleading guilty [would have had] his due process rights [offended].").

*generally*). And, in any event, the government made no showing as to any fact in Mr. Dempsey's case.

Further as to *Webster*, Mr. Dempsey submits that if the Court reads *Webster* to suggest that simply engaging with officers would be sufficient to warrant a reasonable expectation as to gunfire, our position is that, consistent with other courts, the protective purpose would have to be prefaced on a reasonable expectation that wearing it would protect the individual from gunfire, not stabbing, pushing, punching, or the like, and that the circumstances under which someone wears it is a crucial factor. Again, in light of the shortcoming of the government's argument, the outcome remains the same.

Lastly as to the government's reliance on *Webster*, Webster did not dispute that he wore body armor while participating in the Capitol riot. *See id.* at 489. Accordingly, any analysis aside from whether the crime was a crime of violence, which Mr. Dempsey is not contesting here, should not meaningfully inform the Court's determination as to Mr. Dempsey's enhancement inquiry.

### Additional Analysis

Even if the Court concludes that the vest Mr. Dempsey wore was "body armor" for purposes of the enhancement, the Court should not apply the enhancement because the circumstances in which the vest the warn are insufficient to trigger the enhancement's application. Consistent with every court to address the issue, the application of the body armor enhancement is extremely fact specific. Jurisprudence on this issue highlights patterns that are informative and that demonstrate that the circumstances in this case are insufficient to warrant application. The enhancement applies in cases where the conduct at issue necessarily warrants a gun battle with law enforcement. *See also United States v. Gahagen*, 44 F.4th 99, 110 (2d Cir. 2022), *cert. denied sub*

*nom. Sainfil v. United States*, 215 L. Ed. 2d 287, 143 S. Ct. 1069 (2023) (explaining that the analysis happens in the context of what a reasonable person would understand; explaining that if one of the defendants has an AK-47 and they are robbing a bank during the workday, "a reasonable person would understand under those circumstances that there may be gunfire involved, either by a security personnel with the bank or by one or more of the co-conspirators"). For instance, the enhancement applies in cases that relate to drug sales, which makes sense in light of the jurisprudence that recognizes the relationship of drugs and guns (i.e., where there are drugs, you can expect there to be guns). *See, e.g.*, *United States v. Johnson*, 913 F.3d 793 (9th Cir. 2019), *vacated* 140 S.Ct. 440, 205 L.Ed.2d 250, *on remand* 963 F.3d 847, on remand 979 F.3d 632 (concluding court did not abuse its discretion when it decided to increase narcotics defendant's base offense level by four levels for "us[ing] body armor" during the commission of his offense based on evidence that, at time of his arrest with cocaine base, heroin, marijuana, and oxycodone on his person, and with a loaded handgun, hydrocodone, plastic bags, scales, and concentrated cannabis in car that he had been driving, he was wearing body armor); *United States v. Haynes*, 582 F.3d 686 (7th Cir. 2009), *opinion amended on denial of rehearing* 353 Fed.Appx. 58, 2009 WL 4111477, *certiorari denied* 131 S.Ct. 634, 562 U.S. 1079, 178 L.Ed.2d 510, *post-conviction relief* denied 2011 WL 6058584, *post-conviction relief denied* 2020 WL 1445606, *certificate of appealability denied* 2020 WL 9311958. Further, the enhancement applies in cases involving armed robbery, because, again, the natural expectation from having a firearm during the commission of a felony is the expectation that a firearm can be used against you, per use of force law and policies. *See Gahagen*, 44 F.4th at 110; *United States v. Shamah*, 624 F.3d 449, 458-60 (7th Cir. 2010).

Mr. Dempsey has gone to over 100 rallies and protests, few of which broke out into violence (to no fault of Mr. Dempsey). In most of these instances, law enforcement was not present at any point.[35] And, in none of these instances was a firearm used by law enforcement or otherwise; use of a firearm in such a setting is certainly not the norm. Indeed, one does not expect to be met with gunfire at a rally, protest, or even a riot, especially when deadly force is not used or an individual does not, himself, bring and brandish a firearm. Riot squads (and law enforcement personnel assigned to a riot or a situation that could arise to the level of a riot) are equipped with less than lethal weapons to address unruly crowds, even when various forms of lethal force are used by crowd members. To this point, law enforcement assigned to crowd control at riots or otherwise are not typically equipped with firearms.

No circumstance would warrant the use of lethal force against Mr. Dempsey. Mr. Dempsey did not use lethal force. He did not have a gun. He was not engaging in illicit drug activity. Accordingly, he cannot expect to have been met with gunfire by officers. He also did not expect to be met with gunfire by counterprotestors. While he has seen counterprotestors engage in violence, it is far out of the norm for anyone to use a firearm. Further, the plan for the day was to go to the speech, engage in a flag drop, and then leave. *See* Exhibit A1; Exhibit A3; Exhibit B2. Mr. Dempsey could not, therefore, be said to have worn the vest to protect himself against gunfire. And, the government makes no argument or showing that Mr. Dempsey's conduct or the larger context would have created a situation where gunfire from law enforcement or otherwise would have been expected or appropriate. The government therefore failed to make an adequate showing for purposes of the enhancement. And, it should be precluded from advancing any such argument or evidence now. *See, e.g.*, *McClanahan*, 712 F. App'x at 8

---

[35] Notably, on January 6, Mr. Dempsey did not even realize police were present until he asked the bloodied individuals that were walking past him what happened to them.

(citing *N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (providing that arguments made summarily or not raised are forfeited)).

Further, last year (and then twice, recently), defense counsel asked the government to provide her with all evidence (including analyses or determinations made by the FBI or otherwise) relevant to the allegation that Mr. Dempsey wore body armor. The government, only weeks ago, provided a single image of the vest they found in a search of ████'s home. For this reason alone, the government should be precluded from admitting any other evidence or making any separate argument as to their claim. *See, e.g.*, *McClanahan*, 712 F. App'x at 8 (citing *N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (providing that arguments made summarily or not raised are forfeited)).

Mr. Dempsey wore an outfit that he thought, by the intense look of it, would prevent counterprotestors from trying to fight him. *See* Exhibit A1. Mr. Dempsey can only be said to have arguably anticipated hand to hand defense with a counterprotestor or perhaps knife violence. *See id.*; Elizabeth Elizalde, "Proud Boys surround man with knife at violent DC Trump rally," NY POST (Dec. 13, 2020), https://nypost.com/2020/12/13/one-person-stabbed-during-massive-proud-boys-brawl-in-dc/. To be sure, he is not, for instance, alleged to have worn any plates to protect him against gunfire. As is also clear, he had absolutely no intention of engaging physically with law enforcement. *See* Exhibit A1; Exhibit B1.

While it is our position that the body armor enhancement is inapplicable in this case, even if the Court believes it would be applicable, the Court should decline to apply the enhancement because doing so would allow for disparate treatment of Mr. Dempsey, as compared to other similarly situated defendants. Mr. Dempsey's analysis is discussed under the Avoiding Unwarranted Sentencing Disparities subsection below.

However, if the Court determines the enhancement applies, it should accordingly vary downward and/or give it not weight.

## V.   18 U.S.C. § 3553(a) FACTORS

As the Court is well aware, the Sentencing Guidelines are not mandatory, and while the Court must consult the Guidelines and take them into account at sentencing, *see United States v. Booker*, 125 S. Ct. 738, 767 (2005), Section 3553(a)(1) provides a "broad command to consider 'the nature and circumstances of the offense and the history and characteristics of the defendant.'" *Gall*, 552 U.S. at 50 n. 6. The command is consistent with the Supreme Court's observation that "the punishment should fit the offender and not merely the crime." *Pepper*, 131 S. Ct. at 1240 (citing *Williams v. New York*, 337 U.S. 241, 247 (1949)). It is similarly consistent with Congress' express directive that "[n]o limitation shall be placed on the information" a sentencing court may consider "concerning the [defendant's] background, character, and conduct." *Id.* (citing 18 U.S.C. § 3661).

### A.  The Nature and Circumstances of the Offense

**Regrettable Conduct**

On January 6, 2021, in reaction what he understood at the time was senseless violence, Mr. Dempsey engaged in reprehensible assaultive conduct against members of law enforcement. He can and does only blame himself. *See id*. And "[t]he gravity of the choices that [he] made on January 6 is not lost on [him]." *Id.*

As soon as the adrenaline wore off, Mr. Dempsey was in shock, consumed by sadness, and struck with deep remorse; he began to search within himself to try to understand how he could possibly behave in such a manner and why this transpired. *See* Exhibit A1; Exhibit B1. Even now, years later, Mr. Dempsey is filled with regret. *See* Exhibit B1. ███████████ the thought

that he "wrongfully caused someone else harm or to fear for their safety" devastates him. *Id.* Moreover, he is "disappointed that [his] conduct that day was not consistent" with his respect and admiration for law enforcement. *Id.* And, he is heartbroken that, on that day, he "failed [his] daughter." *Id.* To put it simply, Mr. Dempsey is "highly distraught by [his] actions" and wishes he "could go back in time and make much better decisions that day." *Id.*

But regardless of how painful it is for him to think about, Mr. Dempsey "do[es] not want to forget why [he] is here. [He] want[s] to remember what [led to this] so [he] can thwart any situations like this one from [ever] taking place [again]." *Id.* He is "no longer indifferent." He "no longer want[s] to make excuses for [his] conduct." *Id.* He no longer wants to take life for granted. *See id.* And, ███████████████████████████████████████████████ ███████████████████ *See id.*

Mr. Dempsey is looking forward to the future and will not allow his past to hold him back any longer. *See id.* He is determined to finally give himself a chance at life and to "continue on [his] path towards righteousness." *Id.* He "will not allow [himself] to undo all the progress [he has] made or to allow this lesson to be lost on [him]." *Id.* To be sure, Mr. Dempsey is ready to be the man that he, his family, his friends, and society deserve. *See id.*

**Coming to the Aid of Others**

Mr. Dempsey engaged in regrettable conduct on January 6 that he wishes he could take back, *see id.*, but he also was responsible for some good that say. While walking on the National Mall, Mr. Dempsey gave his sweater to a child who was cold. But his good deeds did not stop there.

At approximately 4:31 p.m., Mr. Dempsey came to the aid of Officer ███ when Officer ███ was pulled out of the tunnel by other members of the crowd. *See* Exhibit A5 (starting at

timestamp 02:58). Concerned for Officer ████'s wellbeing, Mr. Dempsey approached Officer

████, verbalized that he was there to help ████ and tried to calm ████ *See id.* During the course of

this interaction, Mr. Dempsey helped to steady Officer ████ by holding ████ shoulder, gently patted

████ arm for comfort, served as a barrier between ████ and merciless crowd members, and helped

guide ████ to safety. *See id.* Mr. Dempsey was upset on January 6, but he did not want anyone to

actually get hurt, *see* Exhibit B1, especially those, even officers, who he saw as defenseless. *See*

*also* Exhibit B5 ("Ever since we were kids David has always stuck up for the victims, the

disadvantaged, and the underdog. . . [He has] a sensitive heart for those who he believes have been

bullied or victimized.").

Not long after, Mr. Dempsey waived people over to help someone from the crowd that was

injured or offered assistance if someone seemed injured or needed aid. *See, e.g.*, Exhibit A9.

### B. Mr. Dempsey's Personal History and Characteristics[36]

<u>Overview</u>

While Mr. Dempsey's traumatic past does not negate the impropriety of his conduct on

January 6, 2021, it certainly provides important context. To put things simply, Mr. Dempsey had

a difficult life from an early age. Mr. Dempsey's mother was not involved in his or his siblings'

upbringings; Mr. Dempsey only recalls three times, at most, when he saw his mother during his

childhood. Around the age of two, Mr. Dempsey's father went to prison. *See id.* ████████████

████████████████████████████████████████████████ ████████

████████████████████████████████████ ████████████████

---

[36] In addition to Mr. Dempsey's letter to the Court, 13 of Mr. Dempsey's loved ones submitted
letters of support on Mr. Dempsey's behalf. All 14 letters are consistent with a lesser sentence,
consistent with the determination in *United States v. Agustin Vinas*, 2024 WL 3249629, No. 23-
1446 (1st Cir. 2024).

████████████████████████████████████████████████████████████

████████████████████████████████████████████             *See id.*

      █████████████████████████████████████████████████████████

██████████████████████████████████████████████████   He struggled obtaining employment

because, at the time, he had a prior conviction for stealing an iPod shuffle out of a nail salon as a

teenager; he applied to countless jobs, and, each time, he would get rejected. █████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████ █████████████████████████████

████████████████████████████████████████████████████████████

██████████████

     For most of his life, neither the criminal justice system nor his loved ones showed Mr.

Dempsey much-needed grace, even in the moments he needed it most. For instance, it is

undersigned counsel's understanding that the District Attorney's Office waited to charge Mr.

Dempsey LA091526-01 until he finished his sentence in the preceding case, thereby enhancing

the collateral consequences of the instant conviction and depriving Mr. Dempsey of the possibility

of a concurrent sentence. As another example, while on probation in his first case, his probation

officer refused to transfer his probation to Colorado because, as undersigned counsel understands,

Mr. Dempsey was unable to pay the fines in that case, despite the fact that Mr. Dempsey had

provided proof to Probation that he would be living with his family and had secured a job to support

himself. Feeling he had no other option, Mr. Dempsey went to Colorado and thrived there.

Although his probation officer violated him for what undersigned counsel understands was failure to appear just months into moving to Colorado, Mr. Dempsey had no choice but to return to Colorado, as this was the first time he had been able to get on his feet in the way he had always dreamed. While Mr. Dempsey's time in Colorado brought him so much hope and joy, in Colorado, Mr. Dempsey also faced some of the most devastating moments of his adult life. There, he felt the pain of losing his maternal grandfather—the person with whom Mr. Dempsey was closest and considered his "saving grace"—to cancer. And, he went on to face even more heartache.

Mr. Dempsey has lived with great pain from the hardships he has faced. For so long,  But, recently, he has made great strides at forgiving himself—something he struggled to even believe he was capable of up until the past few months. Until recently, Mr. Dempsey believed that he did not deserve a good life ▮ In addition to the heart-breaking circumstances he faced, at times, he found himself self-sabotaging to avoid the anguish of trying and failing or facing the unknown. However, his mindset and his path forward look much different than they did.

Regardless of all the obstacles in his life, Mr. Dempsey is hopeful for and working towards a better future. Mr. Dempsey, who has always wanted to be a father, has turned his life around significantly on the whole—for himself, his significant other, and their young daughter. For instance, he completed the requisite training for work as a wildland firefighter so he could obtain employment. And, he enrolled in talk therapy and has completed a number of behavioral

modification courses, *see* Exhibit F21. In October 2023, for example, he completed an anger management course. *See* Exhibit F2. He also wants to use what he has learned to help others, and he has made dedicated efforts to do so as a Residential Mentor in CTF's Mentorship Program. *See* Exhibit E1. He intends to continue to give back to his community however he can, including by once again serving as a wildland firefighter. *See* Exhibit B1. In sum, Mr. Dempsey is determined to grow as a person on every level and build the life he now knows he deserves—to the benefit of himself, his loved ones, and society as a whole. *See id.*

**From His Loved Ones**

Mr. Dempsey's life has been defined by hardship, adversity, and improving his life and the lives of others. Mr. Dempsey's loved ones speak with one voice as they talk about a man who shines brightly among others and is funny, talkative, smart, positive, reliable, open-minded, genuine, loyal, compassionate, kind-hearted, fun-loving, and well-intentioned. *See, e.g.*, Exhibits B2; Exhibit B3; Exhibit B4; Exhibit B5; Exhibit B6; Exhibit B7; Exhibit B8; Exhibit B9; Exhibit B10; Exhibit B11; Exhibit B12; Exhibit B13; Exhibit B14. Indeed, to those who get to know Mr. Dempsey on any sort of personal level, his many great qualities are hard to miss. In short, the more one gets to know Mr. Dempsey, the more good one sees.

Although Mr. Dempsey has "experienced some incredibly tough times throughout his life," he "has managed to persevere and not let any shortcomings affect his character." Exhibit B2. To start, Mr. Dempsey is an "empathetic family man," Exhibit B5, "a caring[,] loving[,] and loyal friend," Exhibit B4, and someone who goes "out of his way to help others," Exhibit B2, including strangers and animals, *see* Exhibit B5; Exhibit B12. "He is the kind of man that will give you his last dollar if you were down on your luck." Exhibit B5. He also "lives by a moral code of never harming an innocent person and taking it upon himself to protect those who are innocent, even at

his own expense." Exhibit B6. Additionally, he has a keen ability to peacefully deescalate situations where he also brings everyone together. *See* Exhibit B3. Accordingly, Mr. Dempsey has aptly been "dubbed the 'Golden heart' by his close friends and family." Exhibit B6; *see* Exhibit B11.

Mr. Dempsey is someone who has been there unwaveringly and in a way that has inspired hope for those he loves "through some of the hardest times of [their lives]." Exhibit B4. ██████ ██████, Mr. Dempsey's dear friend of around 24 years, remembers "a time in [██] life that [██] was in and out of the hospital [over a significant amount of time due to] an infection that [inhibited his ability] to walk." *Id.* It was a particularly terrifying time for ██████████ because it took a while for doctors to diagnose ████ *See id.* Mr. Dempsey "was always there [visiting ██████████ and keeping [████] positive [despite ████████████'s fear that he] was going to die." *Id.* Mr. Dempsey also took it upon himself to make sure ██████████ was going to all of ██ doctor's appointments. *See id.* Mr. Dempsey was ██████████'s source of "hope when [██████████] had none." *Id.* ██████████ looks back on this period of ██ life as a time "where [██] feel[s] like [Mr. Dempsey] saved [██] life." *Id.*

██████████ remembers yet another moment where Mr. Dempsey helped ██ through what seemed like the impossible. There was a point where ██████████ fell into a severe depression and began using drugs to "numb [the] pain and forget." *Id.* Again, Mr. Dempsey was there for ██—"not judging or putting [██] down for [██] pour decisions [but] instead encouraging [██] to get sober and reminding [██] that [██ has] so much to look forward to in life[,] and that [██ is] a good man[,] and that this is not who [██ is]." *Id.* With Mr. Dempsey by his side, ██ "went to rehab and turned [his] life around." *Id.* Indeed, ██████████, who now "work[s]

in treatment helping others get clean, like [Mr. Dempsey] had done for [███] five years ago," credits Mr. Dempsey as being "a big part" of ███ turning ██ life around. *Id.*

He "always lends a hand without being asked to do so." PSR at ¶ 118. For instance, during a family trip to the beach, when ███ ██████ elderly father was having trouble standing up in and getting out of the water each time he wanted to get back onto the beach, Mr. Dempsey raced over each time to assist him so he could fully enjoy the ocean without being limited. *See* Exhibit B5.

Mr. Dempsey has even dedicated himself to a career of helping others. As a wildland firefighter, he has helped in "fighting record breaking fires, pulling people from fires, saving many lives by his direct hands." Exhibit B5. But is most important job is, arguably, his job as a father. See Exhibit B1. Mr. Dempsey is a "caring, loving, gentle, and an all-around outstanding father" to his daughter, ████████. Exhibit B5; *see also* Exhibit B4; Exhibit B9; Exhibit B12. Mr. Dempsey "show[s] her the love and attention every daughter needs and craves from her father." Exhibit B5. She is "his world." *Id.* Telling of their special relationship, ████████ recounted that "seeing [Mr. Dempsey] with his daughter and the bond they shared made [Mr. Hughlett] feel like fatherhood was something [he] wanted too" and contributed to his decision to have a child. Exhibit B4; *see also* B5.

A common thread among most of the letters of support submitted on Mr. Dempsey's behalf is the fact that his little girl's life is being negatively impacted in light of his physical absence because his presence is so meaningful. *See, e.g.*, Exhibit B9 ("[H]is daughter is really missing a good energy by not having her dad in her life."). To be sure, "███ does not remember many experiences or loving memories with David [predating the arrest in this case], as his arrest occurred

---

[37] ████████ is Mr .Dempsey's significant other and the mother to their daughter.

when she was very young. [H]er only memories with David are experienced over the phone, which can be detrimental to her upbringing and future perspective of her father." Exhibit B2. ██████ hopes Mr. Dempsey will be afforded "a second chance at showing his daughter just how much he loves her and misses her." *Id.*

In addition to being "the kind of father that was present, nurturing, and supportive to his daughter," Exhibit B5, he is an "amazing uncle" to his niece, Exhibit B12, and the children of his close friends, *see* Exhibit B5. He is "the fun[-]loving, silly uncle that would take the kids to the park and play in the jungle gyms with them." *Id.* He is "also the first one to make you laugh." Exhibit B6. But he also imparts important lessons. For instance, "[h]e always always tells [his niece] to stay in school, get good grades, do good, and stuff like that because he wants [her] to be better than he was. He [also] tells [her] to stand up for ourselves and each other and that family is important." Exhibit 8.

While Mr. Dempsey has made mistakes in his life, his loved ones assure that "he's done much more good than he than he has gotten into trouble." Exhibit B5. And, in recent years, Mr. Dempsey has "really turned his life around," Exhibit B10, and "'straightened his act out' because of his daughter." PSR at ¶ 118. He is "in the process of changing his life so that he can be a productive dad, a better partner with ██████ and a functional part of our family." Exhibit 10.

His loved ones assure the Court that Mr. Dempsey is worthy of grace. They "believe [Mr. Dempsey] had innocent and pure intentions on [January 6] and cellular behavior of childhood trauma caused the fight or flight response." Exhibit B3. Knowing him best, they can assure the Court that he "is the farthest thing from a violent person" and "[i]t is in his heart to be an amazing human being." *Id.* They also know that Mr. Dempsey knows his conduct is wrong, but that he has

grown from this experience to where he will "[n]ever engage in this type of behavior again." Exhibit B14.

Even ████████████ who has resented Mr. Dempsey since his arrest until recent months, "strongly believe[s] that [Mr. Dempsey] is a changed man"—something she never believed with any certainty before. Exhibit B2. But she has "come to see how much [he] has changed and how much he continues to desire to grow and continues to take steps to grow, both for himself and our family." *Id.*

"Upon his release, Mr. Dempsey will be met with a wonderful support system from the ones that love him and will be determined to continue to do better for himself upon realizing how valuable he is in [their] lives." Exhibit B2.

### C.  Mr. Dempsey Poses Little Risk of Recidivism[38]

Of all the purposes of sentencing, the need to protect the public from further crimes of the defendant is one of great practical concern. In addition to serving as a meaningful warning to others who consider engaging in similar acts, a sentence of 78 months' imprisonment (which would be Mr. Dempsey's longest prison term) will certainly ensure Mr. Dempsey's future compliance with the law. However, Mr. Dempsey is already at a place where he wants to comply with the law because he wants a better life for himself and those he cares about and wants to be a consistent contributing member of society.

---

[38] As a preliminary matter, the government states that the breach of the Capitol was an act of domestic terrorism. *See* ECF No. 69 at 37. Whether someone engaged in an act of domestic terrorism is a fact-specific inquiry. So, while the government's claim is certainly true for some January 6 defendants, it is not true as it relates to Mr. Dempsey.

Although the government has not argued for the application of the terrorism enhancement, and therefore should be deemed to have waived/forfeited that argument should it try to raise it later, *see, e.g.*, *McClanahan*, 712 F. App'x at 8 (citing *N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (providing that arguments made summarily or not raised are forfeited)), we would note that such an enhancement is wildly inappropriate here, as already alluded to, and that its application would also result in disparate treatment. Indeed, no court has imposed the terrorism enhancement to a person similarly situation to Mr. Dempsey.

Since 2016, Mr. Dempsey has not engaged in the type of conduct that plagued his past and are predominately a result of his circumstances ███████. He made a dedicated change in his life when he had his daughter. And, the growth he has achieved while awaiting sentencing in his current case has realigned him and allowed him to have the means to effectuate his goals, which include being the father to his daughter that Mr. Dempsey never had. *See* Exhibit B1.

Moreover, the circumstances of January 6 are so unique and Mr. Dempsey's immediate and sustained remorse is so vivid that the Court should rest assured that Mr. Dempsey will never again engage in such conduct. Despite the government's baseless arguments, Mr. Dempsey does not have any history of violence (of any sort) that should warrant concern from the Court. Except on January 6, Mr. Dempsey has engaged in violence only in limited instances and such instances were solely in the context of defense of self/others, like where a man was being carjacked at knifepoint, *see* Exhibit B6. Mr. Dempsey's commitment to a better life, aversion to violence, good intentions, and respect for differing viewpoints, officers, and law and order, among other things, will all ensure Mr. Dempsey will not find himself in a similar situation or commit another crime.

Mr. Dempsey has made sincere and extraordinary strides to better himself. He has taken steps far outside of his comfort zone in order to overcome what has limited him in the past and to also broaden his horizons. He has found inspiration in the many—many—educational opportunities he has engaged in. *See, e.g.*, Exhibit F1. Further, through ██████, he has come to understand himself more deeply and has learned various tools to carry him through the tough moments that he, like all of us, will face in life. Additionally, through his roles as a Residential Mentor, *see* Exhibit E1, and a detailee in a position of trust, *see* PSR at ¶ 151, he has shown his ability to be responsible and his commitment to giving back. Mr. Dempsey wants to be a better

man and has taken so many meaningful steps to be and stay on that path; Mr. Dempsey is *truly* exceptional in this regard.

In addition to what has already been described about Mr. Dempsey's character demonstrating his ability to reform, the U.S. Sentencing Commission has also objectively quantified his limited likelihood of recidivism. For example, the Sentencing Commission's study shows that recidivism rates decline relatively consistently as age increases. *See* U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 12 (May 2004) [hereinafter Measuring Recidivism]. As another example, the Sentencing Commission has found, among other things, that there is a very low recidivism rate for individuals who have committed a crime of violence. *See* Measuring Recidivism at 32. Additionally, even if the Court declines to afford full effect to Mr. Dempsey's post-conviction efforts and requests, we would ask the Court to consider the fact that "[t]here is no correlation between recidivism and Guidelines' offense level. Whether an offender has a low or high guideline offense level, recidivism rates are similar." *Measuring Recidivism* at 15.

### D.  Avoiding Unwarranted Sentencing Disparities

An additional factor to consider is the "need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Despite its best efforts, the government has been inconsistent with its plea offers and sentencing recommendations for similarly situated January 6 defendants. Sentences should not vary drastically simply because of a discrepancy in plea offers.

Treatment of similarly situated defendants in the federal court supports Mr. Dempsey's request for the Court to impose a sentence of 78 months' imprisonment. For instance, based on the total offense level of twenty-eight and a Criminal History Category III, Mr. Dempsey's

Guidelines' range would be 97 to 121 months of incarceration. Looking at cases with similar circumstances, Mr. Dempsey's requested sentence is appropriate. *See, e.g.*, Table A1.

In support of its sentencing request, the government relies on arguments which have already been addressed and extinguished (e.g., criminal history, uncharged allegations of political violence, political violence at the Capitol, promotion of violence on January 6 prior to engaging with law enforcement on January 6). They also try to knock him for wearing an outfit of the exact same ilk that he has worn to various other protests/rallies, which, almost exclusively, did not involve violence by any side. *See, e.g.*, Exhibit G11 (FBI report denoting that CHS reports that both individuals are believed to be Mr. Dempsey on January 6 and at a peaceful rally/protest). Indeed, the government provides a faulty suggestion that there is some significance to Mr. Dempsey wearing motorcycle gloves, camouflaged cargo pants, an airsoft helmet (which looks intense but is highly penetrable and is insufficient for even a blunt force injury). As the Court can glean from Mr. Dempsey's letters of support, which indicate he is very intelligent: Mr. Dempsey is not foolish enough to think he could go up against law enforcement or, more outrageously, take over the Capitol, in in what he was wearing or without bringing a weapon of any sort.

In any event, the facts here speak for themselves. Despite the government's contention that Mr. Dempsey disarmed officers, the government offers no proof, nor can it. *See also McClanahan*, 712 F. App'x at 8 (citation omitted). And, as mentioned above, Mr. Dempsey was off balance most of the time he was engaging with officers in the front of the tunnel, if not using his offhand (left hand). So, claims of "violent, brutal, and effective blows" are simply *claims*.

Mr. Dempsey's conduct is serious, but it is not "uniquely serious," as the government contends. *See* ECF No. 69 at 39. Most notably, Mr. Dempsey, unlike most others that day, helped an officer. *See* Exhibit A5.

Further, Mr. Dempsey interacted with law enforcement for a total of 27 minutes. In comparison, Peter Schwartz and Mark Ponder engaged with law enforcement over a significant period of time. Mark Ponder even returned to the chaos after being arrested and released after no police transport was available.

Mr. Dempsey never expressed an intent to enter the Capitol, obstruct Congress, or otherwise stop the certification process. *See* Exhibit A1; Exhibit A3 (providing that A.D. and David brought a huge Trump flag, that, while in the car on the way to D.C., A.D. and David talked about doing a flag drop in D.C., and that there was no other plan aside from attending the rally). As the government represented in *United States v. Sabol*, No. 1:21-cr-35-RC, ECF No. 449 at 33, "[where a defendant has] obstructive intent[,] his conduct [is] more egregious than other defendants who were convicted only of violations of Section 111." The government's recommended sentence in is not commensurate with this notion. Indeed, the government's recommended sentence exceeds even the sentences imposed for the leaders of conspiracies to overthrow the government and/or overturn the election through a largescale, coordinated violent attack. *See United States v. Stewart Rhodes*, No. 1:22-cr-15 (18 years)[39]; *United States v. Enrique*

---

[39] Rhodes stated that they were willing to die in a "guerilla war" to achieve goal of halting the transfer of power after the 2020 Presidential Election. He called for a "bloody civil war" and stated to the Oath Keepers that Congress would not listen until they entered the Capitol with "rifles in hand." Rhodes' actions precipitated that violent riot and attack on the Capitol. These defendants, led primarily by Rhodes, Meggs, and Watkins, pushed the idea among Oath Keepers members and others that with a large enough mob, they could intimidate Congress and its Members and impose the conspirators' will rather than the American people's: to stop the certification of the next President of the United States. To support their operation, they amassed an arsenal of firearms across the Potomac River and led a conspiracy that culminated in a mob's attack on the Capitol while our elected representatives met in a Joint Session of Congress. Rhodes, Harrelson, Watkins, Caldwell, Vallejo, and many co-conspirators exploited their military training and experience to help lend legitimacy to the cause and hone the group's tactics, to include using military-style gear, marching in "stack" formations, and preparing an armed Quick Reaction Force ("QRF") staged outside D.C. to support the mission. Many of the defendants—including Rhodes, Meggs, Harrelson, Hackett, Moerschel, Caldwell, and Vallejo—and their co-conspirators traveled across the country and surrounded the nation's capital with rifles, handguns, ammunition, and other weapons in preparation for their operation. From January 1 through 5, 2021, alone, including on his way to D.C., Rhodes purchased or arranged to purchase tens of thousands of dollars' worth of firearms and related tactical equipment, including 2 rifles, 15 magazines, 4 cases of ammunition, 10 sights, 2 optics, optic plates, 2 bipods, 1 scope leveling kit, 2 scope mounts, 1 sling, 2 mounts, 1 gun maintenance kit, 2 uppers for rifles, 2 triggers, a ladder rail panel, charging handles, 2 night vision devices, 1 night vision weapon compatible sight, and other related equipment.

*Tarrio*, No. 21-cr-175-TJK (22 years). Both Rhodes and Tario went to trial and lost. They did not accept responsibility for their actions, in stark contrast to Mr. Dempsey.

Additionally, in another case that highlight's the government's disparate treatment of Mr. Dempsey, Scott Fairlamb recorded a video about his intent to storm the Capitol and then entered the Capitol with a police baton that he stole from officers; he entered the Senate Wing one minute after it was breached, screaming at the officers and armed with a police baton which he brandished.

Similarly, Joshua Lollar entered the Capitol before 3 p.m. Before entering the Rotunda, Lollar put on his gloves, gas mask, and a vest. And, while in the Rotunda, he was among the frontlines of rioters who were repeatedly pushing against law enforcement; he tried to move forward past the line of officers and ignored commands by officers to leave. On social media, Lollar posted on videos of him inside the Capitol with commentary of "busting in" and "it's about to get spicey boy." In the audio, he stated "we shut it down" and "patriots got inside and shut the vote down."

Relatedly, Mr. Dempsey did not bring any weapons or dangerous items with him. *See* Exhibit A3. All objects used at the tunnel incident were either handed to him by other protestors, taken from other protestors, tossed forward by the crowd, or picked up off the ground, for example. *See, e.g.*, Exhibit A3. Mr. Dempsey did not steal any of the officer's belongings (compare with Sills (stole baton), Schwartz (stole chemical munitions), and Fairlamb (stole baton)). He did not drag anyone out of the tunnel (compare with Denney, for example, who swung his fist at an officer and grabbed the officer in an attempt to pull him down the stairs) to expose them to the masses or intentionally pass back items to the crowd (compare with Judd, Manley, and Thompson).

Mr. Dempsey only engaged in violence after saw people being injured by law enforcement, in stark contrast to the cases listed below. *See* Exhibit A1. Many other defendants, including those with lower sentences than even Mr. Dempsey seeks, prepared for what many of these individuals have referred to as "war." *See, e.g.*, Rhodes (entire intention was to wage violence); Schwartz; Sills; Lollar (engaged in violence to advance within the Capitol, brought a backpack, gloves, a gas mask, a tan tactical vest, an AR-15 semi-automatic rifle, and his conceal carry permit). In *United States v. Schwartz*, No. 1:21-CR-00178-APM (D.D.C.), for instance, Peter Schwartz received a sentence of 170 months' imprisonment following a jury trial where he was convicted of 11 counts, including three counts of 18 U.S.C. § 111(a) and (b) and one count of 18 U.S.C. §§ 111(a) and (b), 2. Armed with a wooden tire knocker that he brought from home, Schwartz and his then-wife, Shelly Stallings, made their way to the thick of the violence and aggressively participated in the effort to overwhelm the police line on the Lower West Terrace ("LWT"). Schwartz threw the "first" chair at the line of officers, creating an opening in the police line in the northwest corner of the terrace that enabled hundreds of rioters to flood the LWT as overwhelmed officers were forced to retreat. He then stole chemical munitions, including pepper spray, that had been left behind by the fleeing officers and used that pepper spray as a weapon to attack those same officers as they desperately tried to escape the growing and increasingly violent mob.

Schwartz later made his way up to the inaugural stage and entered the tunnel, where a line of officers spent hours defending the tunnel entrance. While inside, Schwartz worked with codefendants Markus Maly and Jeffrey Brown to again spray the line of officers inside with pepper spray.

Even after participating in four separate assaults on officers, Schwartz was still armed and ready for "war," holding his wooden tire-knocker aloft as he exited the tunnel and ultimately the Capitol Grounds before returning to Pennsylvania.

After leaving Capitol grounds, Schwartz bragged to multiple people about his participation in the violence that day. In three different text messages to three different people, Schwartz boasted about how he had thrown the "first" chair at officers and gleefully described how he had stolen police munitions to use against them. By Schwartz's own admission, he viewed himself as being at "war" that day, stating in a Facebook post on January 7, 2021, "What happened yesterday was the opening of a war. I was there and whether people will acknowledge it or not we are now at war."

Despite the fact that, on January 6, Schwartz was on probation in at least one other case involving both assaultive conduct and illegal firearms possession, for his conduct, the government requested only a slightly higher sentence than what they request here: 294 months' imprisonment. At the time of his sentencing, Schwartz was a Criminal History Category VI for his 38 convictions (which, of course, did not include his dismissed, etc., actions, which the Court did not count).

Another more egregious case is *United States v. Rodriguez*, No. 1:21-CR-00246-ABJ (D.D.C.). In *Rodriguez*, the defendant was found guilty by a jury of five counts, including one count of 18 U.S.C. § 111(a) and one count of 18 U.S.C. § 111(a) and (b). Rodriguez, the administrator of a Telegram chat group titled PATRIOTS[45] MAGA Gang, spent weeks preparing to violently disrupt the Electoral College certification. At the Capitol, he deployed a fire extinguisher towards the police line in the tunnel, participated in a coordinated effort to break through that line, and shoved a wooden pole at officers. Then, he brandished a taser, which was

given to him by another member of the crowd, at the officers. At 3:15 p.m., Rodriguez participated in another effort to break through the police line, culminating in Officer M.F. being pulled off of the line by Albuquerque Head. As Head pulled Officer M.F. down the LWT steps, Rodriguez pushed the taser into Officer M.F.'s neck; Officer M.F. required immediate hospitalization, because, in addition to suffering a burn on his neck, he lost consciousness and suffered from a heart attack. Rodriguez also entered the Capitol building via a broken window on the north side of the Tunnel, tried to smash another window to make an entry point for other rioters, and entered several offices, where he rifled through bags and desks. Later, Rodriguez instructed others to delete videos they had taken at the Capitol specifically so that they could not be used as evidence. Rodriguez, who had a total offense level of 30 and was a Criminal History Category I, had a Guidelines' range of 97 to 121 months' imprisonment. For his conduct, he received a sentence of 150 months' imprisonment. The government requested 168 months.

**Unwarranted Disparities in Plea Offers**

Many of the cases with far lower sentences and more favorable plea offers than that proposed by the government involve assaultive conduct readily comparable to Dempsey (e.g., Palmer, Wilson, Thompson (aside from large speaker, which is more egregious), Languerand (aside from large speaker, bringing a firearm, and bragging about the assaults, which creates more egregious circumstances), and Manley). While he did not obtain a comparable plea offer, he should receive a comparable sentence.

***Body Armor Enhancement***

Mr. Dempsey was the first individual charged in relation to January 6 who was required to plead pursuant to an agreement that provided any mention of such enhancement. Indeed, in the over 50 cases from January 6 where body armor was worn by a respective defendant, the plea

agreement did not provide for the application of the body armor enhancement in any capacity (i.e., even via argument), regardless of the severity of the conduct or the charge(s) to which each respective defendant pleaded guilty.

To counsel's knowledge, in all Section 111(a) and (b) plea agreements where the body armor enhancement could have, arguably, been provided for, the plea agreement did not provide for the application of the body armor enhancement in any capacity. *See United States v. Donald Hazard*, No. 1:22-cr-00117-RDM-1; *United States v. Daniel Ray Caldwell*, No. 1:21-cr-181-1; *United States v. Manley*, No. 1:21-cr-00691-TSC-1; *United States v. Samuel Lazar*, No. 1:21-cr-00525-ABJ-1; *United States v. Thomas Ballard*, No. 1:21-cr-00553-RJL-1.

Moreover, many January 6 defendants have been allowed to plead guilty to offenses other than Section 111(a) and (b) (so the government did not apply the body armor enhancement), even where the body armor enhancement could have, arguably, been appropriate. As undersigned counsel understands, the government has only sought the application of the body armor enhancement in a handful of January 6 cases; a plea agreement was not effectuated in any of these cases. In other words, aside from Mr. Dempsey's case, the government has only sought the application of the body armor enhancement following a trial. Indeed, it is counsel's understanding that Mr. Dempsey's case is the first in which the government is seeking to apply the body armor enhancement where a plea agreement was entered.

Interestingly, the government did not seek to apply the body armor enhancement even in some of the most egregious cases where it would have been arguably applicable, such as in Stewart Rhodes' case, where he was found guilty of seditious conspiracy, which was, at least as argued and alleged in that case, a crime of violence.[40]

---

[40] 18 U.S. Code § 2384 reads: "If two or more persons in any State or Territory, or in any place subject to the jurisdiction of the United States, conspire to overthrow, put down, or to destroy by force the Government of the United States, or

In light of the above, it would be inequitable to apply the enhancement in this case but not others where a plea agreement has been entered.

### Other Disparate Aspects of the Plea

Mr. Dempsey was also the first defendant required to plead to two counts of Section 111(a) and (b). Since then, to counsel's knowledge, the only other case where a defendant was required to plead to two counts of 18 U.S.C. § 111(a) and (b), has been *Julian Khater*, No. :21-cr-00222-RJL (D.D.C.), which provided for the same sentencing enhancements as contemplated in Mr. Dempsey's plea agreement. The government recommended a sentence of 90 months' imprisonment. The district court ultimately sentenced him to 80 months' imprisonment.

Mr. Dempsey was also required to plead under other disparate circumstances. For instance, Many January 6 defendants were allowed to plead guilty to offenses other than Section 111(a) and (b) (so the government did not, and the court could not, apply the body armor enhancement), even where the body armor enhancement could have, arguably, been appropriate. As another example, in a number of instances, defendants were allowed to plead under Section 111(a) where their conduct was arguably more egregious than Mr. Dempsey's and others who pled guilty to two counts of Sections 111(a) and (b). For example, Joshua Hernandez pled guilty to one count of Section 231(a)(3) and one count of 111(a). *See United States v. Hernandez*, No. 1:22-cr-42-CRC. He was sentenced to 24 months of imprisonment after the Court declined to apply the dangerous weapon enhancement for Mr. Hernandez's use of a flagpole to hit an officer in the head. *See id.* In addition to his assaultive conduct, Mr. Hernandez climbed through a window to enter the Capitol, where he infiltrated the Speaker's Conference Room and Senate Gallery, struck a door in the

---

to levy war against them, or to oppose by force the authority thereof, or by force to prevent, hinder, or delay the execution of any law of the United States, or by force to seize, take, or possess any property of the United States contrary to the authority thereof, they shall each be fined under this title or imprisoned not more than twenty years, or both."

hallway with his flagpole, and attempted to enter where congressional staff were barricaded in an office.

Mr. Dempsey's sentencing request is further supported by Howard Richardson's case. *See United States v. Richardson*, No. 1:21-cr-721-CKK. Mr. Richardson pled guilty to one (1) count of Section 111(a) for his conduct on January 6, which included bringing a long, metal flagpole and using it to strike an officer three times (only stopping after it broke on the third hit) and using an enormous metal Trump sign as a battering ram against officers. *See id.* During his plea hearing, Mr. Richardson made false representations to the Court. *See id.* Additionally, while he awaited sentencing, Mr. Richardson was arrested for aggravated assault and lied to the local police about his conduct. *See id.* Despite his reprehensible conduct in the aftermath of January 6 and the fact that he was on bail for Illegal Possession of a Firearm, Mr. Richardson was ultimately sentenced to 46 months' imprisonment, the government's recommended sentence. *See id.* Mr. Dempsey's offensive conduct involved a hollow aluminum crutch that he was handed when he was caught up in an emotional episode. Mr. Dempsey did not arrive at the Capitol intending to hurt anyone. Moreover, he did not infiltrate the Capitol.

Even where defendants assaulted more than one victim, because of the six level-increase in cases where defendants were required to plead to Section 111(a) and (b), *see* U.S.S.G. §§ 2A2.2(b)(2)(B), 2A2.2(b)(7), a calculation which arguably constitutes triple-counting, defendants received drastically lower sentences where they were allowed to plead guilty to only Section 111(a). For instance, Mark Leffingwell pled to one count of Section 111(a) where he punched two (officers a total of three times. *See United States v. Leffingwell*, No. 1:21-cr-5-ABJ. He was sentenced to six months of incarceration where the government requested 27 months. *See id.*

Ricky Willden, a member of the Proud Boys, was sentenced to 27 months of incarceration following his guilty plea to one count of Section 111(a). *See United States v. Willden*, No. 1:21-cr-423-RC. On January 6, 2021, Mr. Willden, who was wearing goggles that he brought with him, assaulted numerous officers with a chemical irritant, subsequently threw the emptied canister at officers, and entered the Capitol. *See id.* Following the day's events, Mr. Willden deleted messages and videos from Facebook. *See id.* Despite his conduct, Mr. Willden was not required to plead to the more serious offense Section 111(a) and (b) and did not receive the dangerous weapon enhancement. *See id.*

Additionally, given that assault charges do not group, and, therefore, at least a two-level increase in such cases would be required, defendants such as Mr. Leffingwell, Mr. Sanford, and Mr. Willden received a true benefit of the bargain in being allowed to plead to only one count. Mr. Dempsey did not receive a similar benefit or consideration.

A sentence of 78 months is also appropriate given the sentences rendered where more than one officer was assaulted. *See, e.g.*, *United States v. Leffingwell*, No. 1:21-cr-5-ABJ. For example, Robert Sanford, who had a Guidelines' range of 63 to 78 months received a 52-month sentence after pleading guilty to one count of Section 111(a) and (b). Mr. Sanford struck three officers in the head with a fire extinguisher and threw a traffic cone at officers. *See United States v. Sanford*, No. 1:21-cr-86-PLF.

Robert Gieswein entered a plea guilty to two counts charging 18 U.S.C. § 111(a). *See United States v. Gieswein*, No. 1:21-CR-00024-TNM (D.D.C.). On January 6, Gieswein, who was wearing body armor throughout the day, joined others in the Capitol's West Plaza in "pushing on a barricade held by police that they were using to set a line between themselves and the rioters." He also "threw a water bottle at a line of police officers." Gieswein again joined members of the

crowd as they pushed up the "stairs under the Inauguration scaffolding that led from the West Plaza to the Upper West Terrace." Gieswein "was one of the first rioters to enter" the Capitol after it was breached at 2:13 p.m. He climbed through a Senate Wing window that another individual smashed in with a stolen riot shield. He then "sprayed an aerosol irritant at three members of the U.S. Capitol Police, who were attempting to prevent the crowd from further advancing towards the Capitol building." Gieswein sprayed "his aerosol substance" at other officers, including one who was injured. Inside the Capitol's Rotunda, Gieswein "participated with other rioters in pushing against a group of police officers who were trying to prevent the rioters from advancing up a hallway that led to Speaker Pelosi's office." Gieswein also got into a "scuffle" with officers, and "attempted to punch" one of them, as they tried to arrest him. On January 5, the day prior, Gieswein gave an interview on January 5, during which he endorsed "anti-Semitic conspiracy theories." The government recommended a sentence of 60 months' imprisonment. He was ultimately sentenced to 48 months' imprisonment.

Logan Barnhardt was sentenced below his Guidelines range to 36 months of incarceration, following his guilty plea to one count of Sections 111(a) and (b), 2. *See United States v. Barnhardt*, 1:21-cr-00035-RC-6. As co-defendant Jack Whitton was attacking an officer, Mr. Barnhardt climbed over a banister and went up a set of steps towards the officer in the Tunnel Archway. *See id.* Mr. Whitton grabbed the officer first by his baton and then by the helmet and the neck of his ballistic vest. *See id.* As he did this, Mr. Barnhardt grabbed the officer's neck and torso and dragged him in a prone position from the police line, out of the Archway, and down a set of stairs. *See id.* Several minutes later, Mr. Barnhardt returned to the Archway, where others were assaulting the line of officers by slamming riot shields into them, striking them, and throwing objects at them. *See id.* There, he joined others in charging against the police line and pushed other people from

behind, supporting them, and propelling them forward into the line of officers. *See id.* Mr. Barnhardt then approached the line of officers wielding a flagpole and used it to strike the officers. *See id.* In the plea agreement, the parties agreed to a Guidelines' calculation that did not include the dangerous weapon enhancement. *See* ECF No. 234.

Justin Jersey was sentenced to 51 months of incarceration after entering a guilty plea to one count of Sections 111(a) and (b), 2. *See United States v. Jersey*, 1:21-cr-00035-RC-9. As part of his sentence, Mr. Jersey was ordered to pay more than $32,000 for the serious bodily injury caused by his actions. *See id.* Mr. Jersey charged at the line of officers protecting the entrance to the Tunnel; this set into motion a large-scale assault on multiple officers, including direct violence from Mr. Jersey. *See id.* While Officer A.W. was positioned at the front of the Archway, Mr. Jersey "grabbed Officer A.W.'s baton with one hand and reached towards Officer A.W.'s face with his other hand," grappling over the baton for several seconds and knocked Officer A.W. to the ground. *Id.* Mr. Jersey then grabbed another baton and used it to strike other officers in the Archway. *See id.* While other assaults were occurring, Mr. Jersey picked up Officer A.W.'s helmet and put it on his own head; Jersey left Washington, D.C., with Officer A.W.'s helmet, another officer's helmet, and an officer's badge; Jersey displayed one of those helmets behind the bar in his home. *See id.* Prior to January 6, 2021, Mr. Jersey exchanged Facebook messages that indicated that he anticipated that violence would occur and that he would have a weapon with him. Mr. Jersey, accordingly, brought a large, gnarled stick. *See id.*

In addition to his conduct on January 6, Mr. Jersey's criminal history demonstrates a troubling relationship with weapons and a tendency to resort to violence; he has a conviction stemming from a domestic dispute and he was arrested for (but not ultimately charged with) possessing a firearm with serial number that had been altered after a rifle was recovered following

a dispute between Mr. Jersey and the mother of one (1) of his children. *See id.* Mr. Dempsey's alleged history of violence pales in comparison.

Mason Courson pled to one (1) count of Sections 111(a) and (b), 2. *See United States v. Courson*, 1:21-cr-00035-RC-8. He was sentenced to fifty-seven (57) months' imprisonment for his conduct on January 6, 2021. *See id.* On January 6, Mr. Courson was an initial member of the mob that forcibly entered the Tunnel Archway. *See id.* Over the course of several minutes, Mr. Courson made his way deeper into the Tunnel and, along with others, forcefully pushed and shoved the crowd towards the line of officers stationed in the Tunnel. *See id.* As he was pushed out of the Tunnel, Mr. Courson reached towards officers and grabbed at their equipment, including their protective gear. *See id.* The officers were eventually able to push Mr. Courson and others out of the Tunnel. *See id.* Once officers pushed Mr. Courson out of the Tunnel, Mr. Courson armed himself with a police baton on the steps outside the Tunnel. *See id.* About an hour later, Mr. Courson and numerous others attacked a line of officers positioned in the Archway. *See id.* In the scuffle, an officer was dragged down a set of stairs, where Mr. Courson struck the officer with the baton, injuring the officer. *See id.* When the officer attempted to ascend the steps back to the police line, Mr. Courson and others pushed him back down the steps and prevented him from re-joining the line. *See id.* Mr. Courson then ascended the steps to the Archway and attempted to grab another officer who was still on the ground fending off attacks. Mr. Courson kept the baton, as if it were a trophy in which he should take great pride. *See id.*

### Dangerous Weapon Enhancement

While Mr. Dempsey does not mean to suggest that the dangerous weapon enhancement does not apply, he would ask that the Court consider these cases when fashioning a sentence, as

these cases warrant a downward variance or, alternatively, the enhancement should not be given any weight.

Some courts have declined to apply the dangerous weapon enhancement provided in U.S.S.G. § 2A2.2(b)(2)(B) where the defendant used a flagpole, *see United States v. Hernandez*, No. 1:22-cr-42-CRC, or similar object, *see United States v. Wilson*, No. 1:21-cr-345-RCL (declining to apply the enhancement where the defendant struck two (2) officers with a PVC pipe), to effectuate the charged assault. To compare, in Mr. Dempsey's case, he used a hallow aluminum crutch that he did not bring with him on January 6, 2021. *See* PSR at ¶ 54.

Relatedly, in *United States v. Stager*, No. 1:21-cr-35-RC-2[41], and *United States v. Courson*, No. 1:21-cr-35-RC-8, Judge Contreras determined that a plea that includes a count of Section 111(a) and (b) and the enhancement provisions provided for in Mr. Dempsey's plea.

## VI.    CONCLUSION

In light of the above, David Nicholas Dempsey, by and through undersigned counsel, respectfully requests that the Court impose a sentence of 78 months' imprisonment.

---

[41] During sentencing, Judge Contreras afforded great consideration to Mr. Stager's difficult upbringings in the California foster care system and found Stager's lack of guidance in his childhood significant.

Respectfully submitted,

_____/s/_____
Amy C. Collins
D.C. Bar No. 1708316
888 17th Street, NW, Suite 1200
Washington, D.C. 20006
(228) 424-0609
amy@amyccollinslaw.com
acollins@kalbianhagerty.com
*Counsel for David Nicholas Dempsey*

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of August 2024, I have served this Memorandum in

Aid of Sentencing upon all parties in this matter through the CM/ECF system.

_____/s/_____
Amy C. Collins