



# EXHIBIT D1

















# EXHIBIT D2

# EXHIBIT D3

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Criminal Division
## Van Nuys West Dept. - 120

**XNWLA091526-01**

**March 15, 2024**

**The People of the State of California**

**8:30 AM**

**vs.**

**DEMPSEY, DAVID NICHOLAS**

Honorable Terrance T. Lewis, Judge
T. Haywood, Judicial Assistant



I certify that this is a true and correct copy of the original **Minute order**
on file in this office consisting of **2** pages
**David W. Slayton** Executive Officer/Clerk of the
Superior Court of California, County of Los Angeles
Date: **03/15/24** By: _____, Deputy

PC459, PC487(a), PC594(a)

**NATURE OF PROCEEDINGS:** Further Proceedings

The following parties are present for the aforementioned proceeding:

No Appearances

The matter is called for Further Proceedings.

The Court reads and considers the written Petition for a Writ of Habeas Corpus filed on March 05, 2024.

Bench Warrant issued for DAVID NICHOLAS DEMPSEY is recalled by order of the Court.

The Court having read and considered the Defendant's Petition for Writ of Habeas Corpus filed on Tuesday, March 5, 2024, the petition is granted.

As to Count 001: PC459, Second Degree Felony, plea is vacated.

On Court's Motion, Count 001 as PC459, Felony 2nd Degree, in lieu of PC459, Felony 2nd Degree. Disposition as to Count 001, PC459, Felony 2nd Degree: Plea is withdrawn, Conviction is vacated, Sentence is vacated, and Action is Dismissed.

The Clerk is directed to forward a certified copy of this Minute Order to the Los Angeles County District Attorney's Office and the Probation Officer of Los Angeles County, California.

## CLERK'S CERTIFICATE OF MAILING

**XNWLA091526-01**

**March 15, 2024**

**8:30 AM**

**The People of the State of California**
**vs.**
**DEMPSEY, DAVID NICHOLAS**

I, David W. Slayton, Executive Officer/Clerk of Court of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served a copy of the above minute order of March 15, 2024 upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States Mail at the courthouse in Van Nuys, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.

Dated: March 15, 2024

By: /s/ T. Haywood
T. Haywood, Deputy Clerk

888 17th Street, NW, Suite 1200
Washington, D.C. 20006

Office of the District Attorney
Habeas Corpus Unit
6230 Sylmar Ave., Suite 201
Van Nuys, CA 91401

# EXHIBIT D4

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Criminal Division
## Burbank Dept. - 1

**BURGA086322-01**

**May 16, 2024**

**8:30 AM**

**The People of the State of California**
**vs.**
**DEMPSEY, DAVID NICHOLAS**

Honorable Carolina V. Lugo, Judge
M. G. Escobedo, Judicial Assistant

Alexis Sheehan (#14561), Court Reporter

---

PC182(a)(1), PC484e(d)

**NATURE OF PROCEEDINGS:** Application per 1170.18(f) PC

The following parties are present for the aforementioned proceeding:

     Robert Alan Cheleden, Deputy District Attorney

The Defendant is not present (non-appearance matter).

The matter is called for Application per 1170.18(f) PC.

The Court having read and considered the Defendant's Proposition 47 petition. The Court finds that the Defendant was convicted of count(s) 01 and 02, a misdemeanor under Proposition 47. The Court finds that the Defendant is eligible and suitable for relief. Pursuant to Penal Code section 1170.18(b), the Defendant's felony sentence as to count(s) 01 and 02 is recalled and set aside, and a misdemeanor sentence is imposed.

On Court's Motion, 001 as PC182(a)(1), Felony, in lieu of PC182(a)(1), Felony.

Disposition as to Count 001, PC182(a)(1), Felony: Offense Reduced

On Court's Motion, 002 as PC484e(d), Felony, in lieu of PC484e(d), Felony.

Disposition as to Count 002, PC484e(d), Felony: Offense Reduced

Formal Probation is converted to **Summary Probation** pursuant to Proposition 47.

---

## Case Information for BURGA086322-01



**Case Number**
BURGA086322-01

**Defendant ID**
01

**Filing Date**
5/11/2012

**Arrest Date**
5/9/2012

**Filing Courthouse**
Burbank Courthouse

**Case Type**
Felony

**Case Title**
The People of the State of California vs. DEMPSEY, DAVID NICHOLAS



| Charges | Proceedings | Bail | **Sentencing** |
|---------|-------------|------|----------------|

2 record(s). Type a keyword to filter.

| Count | Charge Statute | Plea | Last Disposition | Notes |
|-------|----------------|------|------------------|-------|

## Future Proceedings

> There are no future events for this case

## Past Proceedings

| Date | Time | Type | Result | Location | Department |
|------|------|------|--------|----------|------------|
| 05/16/2024 | 08:30AM | Application per 1170.18(f) PC | Held - Proceedings | Burbank | Dept. - 1 |
| 02/09/2024 | 08:30AM | Petition for Offense Reduction | Held - Proceedings | Burbank | Dept. - 1 |
| 12/28/2023 | 08:30AM | Further Proceedings | Not Held - Other Proceedings | Burbank | Dept. - 1 |
| 11/28/2023 | 08:30AM | Judicial Action | Not Held - Other Proceedings | Pasadena | Dept. - J |
| 06/06/2012 | 08:30AM | Docket Line Entry | Proceedings Heard | Burbank | Clerk's Office |
| 05/21/2012 | 08:30AM | Early Disposition Hearing | Proceedings Heard | Burbank | Dept. - 1 |
| 05/11/2012 | 08:30AM | Arraignment | Proceedings Heard | Burbank | Dept. - 1 |

## Custody Status

| Date | Type | Group Type |
|------|------|------------|

| 5/11/2012 | Remanded to Custody | By Case |
|---|---|---|

## Bonds Information

No Bonds Information.

## Sentencing

| Charge | Charge Description | Sentence Date | Judicial Officer |
|---|---|---|---|
| 001 | PC182(a)(1)-M Conspiracy to Commit Any Crime | 5/16/2024 | Lugo, Carolina V. |

**Probation**

| Charge | Charge Description | Sentence Date | Judicial Officer |
|---|---|---|---|
| 002 | PC484e(d)-M Use Access Card Account Data Without Consent | 5/16/2024 | Lugo, Carolina V. |

**Probation**

# EXHIBIT D5

# EXHIBIT D6

# EXHIBIT E1



## Residential MENTORING PROGRAM WELCOME LETTER—MENTOR

**Congratulations!**

We are pleased to inform you that you have been selected to participate in the [DC DOC CTF-on unit] Residential mentoring program, to be launched in [February 2024].

The purpose of this program is to establish a mentoring relationship that will provide you with the opportunity to realize both professional and personal development goals, as well as enable our organization to build talent internally for the next step in your incarceration journey or your transition back into society.

You will complete a mentorship training certifying you as a mentor and a credible messenger training certifying you as a credible messenger.

Participant selection was based on a variety of criteria, including:
[General interest, application/writing sample submission, behavioral and safety review/no DRs or infractions within 120 days, no separations, and participation in the panel interview. The interview and selection committee comprised a cross-section of DC Department of Corrections staff representation.]

Mentor: **David Dempsey**          Congratulations on your new position as a Residential Mentor on ▌▌▌▌

There will be an information Session before training starts.
Please come fully dressed per the DOC Resident/Inmate handbook with your name band on your arm or present. Please raise all your questions and concerns at this information session.

WELCOME!


Sincerely,


Residential Mentorship Committee

# EXHIBIT F1

## Transcript for DAVID DEMPSEY | CollaborNation®

| Training Title | Type of Event | First Access / Issue Date | Last Access / End Date | CEU | Clock Hours | Event Status | Score | Mastery Score | Cert. Given | Provider Name | Provider Address |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Anger Management | E-Learning Course | Oct 5, 2023 | Oct 26, 2023 | 0.1 | 1.00 | Passed | 100 | - | Oct 26, 2023 | CypherWorx, Inc. | 3349 Monroe Avenue, Suite 119, Rochester, NY |
| CERT Firefighter Rehab Operations | E-Learning Course | - | - | 0.1 | 1.00 | Not Attempted | - | - | No | CypherWorx, Inc. | 3349 Monroe Avenue, Suite 119, Rochester, NY |
| CERT Unit 6: Fire Safety and Utility Controls | E-Learning Course | - | - | 0.1 | 1.00 | Not Attempted | - | - | No | CypherWorx, Inc. | 3349 Monroe Avenue, Suite 119, Rochester, NY |
| Cognitive Awareness | E-Learning Course | - | - | 0.1 | 1.00 | Not Attempted | - | - | No | CypherWorx, Inc. | 3349 Monroe Avenue, Suite 119, Rochester, NY |
| Correcting Performance Problems: Addressing Behavioral Problems | E-Learning Course | Oct 26, 2023 | - | 0.08 | 0.84 | In Progress | 0 | - | No | CypherWorx, Inc. | 3349 Monroe Avenue, Suite 119, Rochester, NY |

# EXHIBIT F2



Certifies that

# DAVID DEMPSEY

has successfully completed

## Anger Management

on

October 26, 2023

CEUs Earned: 0.1

Clock Hours: 1.00



Paul W. Cypher, President & CEO,
CypherWorx, Inc.





# EXHIBIT G2

**EXCERPT OF FBI REPORT ████████'S SOCIAL MEDIA PURPORTING TO DEPICT MR. DEMPSEY**

(U//FOUO) Another video shows what appears to be David Dempsey walking past at an August 22nd QAnon rally at Hollywood and Vine; someone in the video calls out "Hi David Dempsey". In this video, Dempsey appears to be wearing similar style and design pants as those @flaggaitercophater wore on January 6, 2021 (

# EXHIBIT G5

**NEWS** · News

# Trump supporters clash with Black Lives Matter demonstrators in Tujunga

At least four people needed medical attention at the rally, outside an In-n-Out in Tujunga.



A Trump supporter, right, punches a Black Lives Matter supporter during a rally by between Black Lives Matter and Pro-Trump supporters along Foothill Blvd between the Albertsons and In-N-Out Burger in Tujunga on Friday, August 14,

2020. (Photo by Keith Birmingham, Pasadena Star-News/ SCNG)



By **DAVID ROSENFELD** | drosenfeld@scng.com | The Daily
Breeze and **KEITH BIRMINGHAM** | kbirmingham@scng.com |
San Gabriel Valley Tribune
UPDATED: August 14, 2020 at 10:34 p.m.

A verbal confrontation between Black Lives Matter demonstrators and
supporters of President Donald Trump turned into a series of physical
altercations Friday, Aug.14, leaving at least four people in need of medical
attention outside an In-n-Out drive-thru in Tujunga.

The extent of the injuries was not known, an LAPD spokesperson said. The
department also could not provide its own estimate of injuries.

The original demonstration was staged by a group called Latinos for
Trump to support churches that defied state health officer orders
restricting indoor religious services. Roughly 60 people showed up to
support the planned protest, but they were outnumbered by about 100
demonstrators who identified themselves as Black Lives Matter
supporters.

The groups traded verbal barbs for several minutes. The yelling turned to
shoving, which led to fighting in a chaotic scene between about a dozen
people around 5:30 p.m. in the 6200 block of Foothill Blvd. At least one
protester was sprayed with a chemical irritant by another.

Law enforcement, including LAPD and the Los Angeles County Sheriff's
Department, arrived soon after; paramedics also showed up and treated at
least four people at the scene.  A watch commander at the LAPD Foothills
Community Station said the incident involved "mutual combat" and none
of the participants wished to press charges. The fights were over by the
time police arrived, the spokesperson said.

By 6:30 p.m., police had controlled the area where the fight occurred and people had dispersed.

There was no information available about the people treated by paramedics.

Sign up for The Localist, our daily email newsletter with handpicked stories relevant to where you live. Subscribe here.

*Originally Published: August 14, 2020 at 7:33 p.m.*

 The Trust Project ⌄

## Around the Web

REVCONTENT

**Seniors Say This "Tubing" Mascara is a Must-have**

**A 70-year-old Engineer Designed This Seat Cushion That is Popular All Around**

# EXHIBIT G8

**From:** ███████████████████████
**Sent:** Tuesday, May 4, 2021 10:40 AM
**To:** Crutchley, Cody J. (LA) (FBI)
**Subject:** [EXTERNAL EMAIL] - FW: David Nicholas Dempsey ████████ another chemical spray attack

---

**From:** ██████████
**Sent:** Friday, March 19, 2021 5:15 PM
**To:** ████████████████
**Cc:** ████████████████
**Subject:** FW: David Nicholas Dempsey ████████████ another chemical spray attack

See below

██████

---

**From:** ████████████████
**Sent:** Wednesday, December 2, 2020 10:38 AM
**To:** ████████████████████████
**Subject:** RE: David Nicholas Dempsey ████████ another chemical spray attack

We are checking with one of the sergeants who was here on the day of that occurrence. As of right now we do not have an open investigation.

I will follow up once I have further information.

████████████████

Beverly Hills Police Department

████████████
████████

---

**From:** ████████████████
**Sent:** Tuesday, December 1, 2020 4:49 PM
**To:** ████████████████████████
**Subject:** RE: David Nicholas Dempsey ████████ another chemical spray attack

Hi ████

1

I queried our internal system using his name and then by his DOB. I was unable to locate an arrest.

 - Is the person in the video an outstanding suspect related to a using tea gas or 242?

Thanks,



**From:** Steven Katz <skatz@da.lacounty.gov>
**Sent:** Tuesday, December 1, 2020 4:09 PM
**To:** Max Subin <msubin@beverlyhills.org>
**Subject:** FW: David Nicholas Dempsey (dob 4/6/87) another chemical spray attack

<div style="background-color:yellow; text-align:center; color:red">

**CAUTION: External Sender**
Use caution when clicking links or opening attachments

</div>

Hi,  ,

The DA's Office is currently prosecuting David Nicholas Dempsey (████████████) for using tear gas during an otherwise lawful assembly at the Santa Monica Pier in October 2019.  Our case (SA101609) is post-PH, currently calendared for a pretrial conference on December 14.  I was informed this afternoon that he committed similarly conduct in Beverly Hills in August 2020.

I am writing to inquire as to whether BHPD is investigating David Dempsey for the conduct detailed in the email below.  For purposes of identification, here is link to a YouTube video that depicts the Santa Monica assault committed by Dempsey, who can be seen wearing a backward-facing pro-Trump baseball cap.  https://www.youtube.com/watch?v=FPMCkdD54VA

Please let me know at your earliest convenience.

Thanks very much, and take care.



Airport Branch Office

********** Confidentiality Notice ************
This electronic message transmission contains information from the Los Angeles County District Attorney's Office, which may be confidential or protected by the attorney-client privilege and/or the work product doctrine.  If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the content of this information is

# EXHIBIT G9

**POLICE REPORT EXCERPT: BEVERLY HILLS, CALIFORNIA**

█████ stated on Saturday 08/22/20 at approximately 1920 hours he was filming the protest in the area of Rodeo Drive and N Santa Monica Blvd. █████ stated, unprovoked one of the Suspects (either David or █████ sprayed him with bear mace causing pain and blurred vision.

█████ then showed me a short video depicting the incident. The video depicted the following:

█████ was on laying on the grass on his side in a curled up position. █████ was wearing a gray bicycle helmet and clutching on to a baseball bat and a USA flag attached to a flag pole. █████ did not mention how he got to the ground or how he came to possess the flag and bat. There were approximately twenty or more people seen in the video. The video continued to show several people pushing and shoving.

While █████ was on the ground one of the Dempes brothers (Twins) attempted to remove the bat from █████ grip. The Suspect pushed and pulled the bat back and forth, pushing the bat into █████ helmet several times. █████ appeared to keep possession of the bat and the flag. Several people surrounded █████ at which point █████ stated a man known as █████ (Suspect 3) began to kick him.

█████ did not know who was attacking him during the incident. █████ recognized the people once he saw several videos of the incident. █████ stated due to his profession (1st amendment audit, filming) he typically tries to stay away from law enforcement ,which is why he waited so long to report this incident. █████ stated he knows the names of the Suspects in the video by his own means and was not willing to tell PD how he came to know the names. █████ mentioned that the Suspects may have been involved with the capital riot incident several months

# EXHIBIT G10













# EXHIBIT G11



The individual identified as #flaggaitercophater can be seen in the image on the left above on January 6, 2021.

# EXHIBIT H1

# INCIDENT REPORT

| DR# | REPORTING OFFICER | | SUPERVISOR REVIEW | |
|---|---|---|---|---|

| DATE / TIME REPORTED | OCCURRED DATE / TIME (EARLIEST) | OCCURRED DATE / TIME (LATEST) | |
|---|---|---|---|
| 10/19/2019 1322 | 10/19/2019 1320 | 10/19/2019 1325 | |

**LOCATION OF OCCURRENCE**

| 300 SANTA MONICA PIER , SANTA MONICA, CA 90401 | RD / BEAT |
|---|---|

**SUMMARY OF HOW CRIME OCCURRED OR WAS COMMITTED**

OFFICERS RESPONDED TO A FIGHT ON THE PIER. W1 FILMED S1 PEPPER SPRAY THE CROWD AND NEVER LOST VISUAL UNTIL OFFICERS ARRIVED DETAINED S1. OFFICERS OBSERVED THE SURVEILLENCE FOOTAGE FROM W1 AND SAW S1 PEPPER SPRAY THE CROWD UNTIL OFFICERS ARRIVED.

| OFFENSE CODE | ATT / COMP | DESCRIPTION | UCR CODE | BIAS CODE |
|---|---|---|---|---|
| ASSAULT/SIMPLE | COMPLETE | SIMPLE ASSAULT | 0430 | |
| OFFENSE CODE | ATT / COMP | DESCRIPTION | UCR CODE | BIAS CODE |
| WEAPON/CARRY | COMPLETE | WEAPON CARRYING/POSSESSION OFFENSE | 1500 | |

## VICTIM INFORMATION

| REC# | NAME (Last, First, Middle) | SEX | RACE | DATE OF BIRTH | HOMELESS | MARSY LAW ADV |
|---|---|---|---|---|---|---|
| 2 | | | | | | |

| HOME ADDRESS |
|---|
| |

| EMPLOYER / SCHOOL | OCCUPATION |
|---|---|
| | |

| BUSINESS ADDRESS |
|---|
| |

| HOME PHONE | WORK PHONE | MOBILE PHONE | E-MAIL ADDRESS |
|---|---|---|---|
| | | | |

| NATURE OF INJURIES | HOSPITAL / PATIENT# | ALIAS AT HOSPITAL |
|---|---|---|
| | | |

| VEH YEAR | VEH MAKE | VEH MODEL | VEH STYLE | COLOR | LICENSE PLATE | VIN |
|---|---|---|---|---|---|---|
| | | | | | - | |

## INVOLVED PARTY INFORMATION

| REC# | TYPE | NAME (Last, First, Middle) | SEX | RACE | DATE OF BIRTH | HOMELESS |
|---|---|---|---|---|---|---|
| 1 | | | | | | |

| HOME ADDRESS |
|---|
| |

| EMPLOYER / SCHOOL | OCCUPATION |
|---|---|
| | |

| BUSINESS ADDRESS |
|---|
| |

| HOME PHONE | WORK PHONE | MOBILE PHONE | E-MAIL ADDRESS |
|---|---|---|---|
| | | | |

| VEH YEAR | VEH MAKE | VEH MODEL | VEH STYLE | COLOR | LICENSE PLATE | VIN |
|---|---|---|---|---|---|---|
| | | | | | - | |

## SUSPECT





# INCIDENT REPORT

| S-1 | NAME DEMPSEY, DAVID NICHOLAS | | SEX M | RACE W | DOB / AGE | HEIGHT | WEIGHT | HAIR BLN | EYES GRN |
|---|---|---|---|---|---|---|---|---|---|
| HAIR STYLE | HAIR TYPE | FACIAL HAIR | COMPLEXION | | MOBILE PHONE | | | PHONE 2 | |

| HOME ADDRESS | | | EMPLOYER ADDRESS | | |
|---|---|---|---|---|---|

| VEHICLE YEAR | VEHICLE MAKE | VEHICLE MODEL | VEHICLE STYLE | VEHICLE COLOR | VEHICLE LICENSE | VEH LIC STATE |
|---|---|---|---|---|---|---|

| SUSPECT ACTIONS AGAINST PERSON | WEAPON USE | PRIMARY OBJECT OF ATTACK VICTIM STRANGER TO SUSPECT |
|---|---|---|
| | PRIMARY WEAPON | SECONDARY OBJECT OF ATTACK |
| | SECONDARY WEAPON | UNDER INFLUENCE OF DRUGS/ALCOHOL UNKNOWN |

## NARRATIVE

On October 19, 2019, I (⬛⬛⬛⬛⬛⬛⬛⬛) was working in full uniformed patrol driving a marked black and white police vehicle assigned as "1L12". At approximately 1322 hours, ⬛⬛⬛⬛⬛⬛⬛ broadcasted over his police radio requesting emergency back-up from Officers in regards to a "fight" at the Pier Substation (300 Santa Monica Pier). I responded with my emergency lights and sirens (Code 3) from the Public Safety Facility (333 Olympic Dr).

Upon my arrival, I noticed a large crowd of protestors with picket signs, swarming around the front of the Pier Substation where I can see ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ detaining a subject, later identified as S1 David Dempsey, pending further investigation. I started to block off the front of the Pier Substation by having the protesters step back and away from the scene. While having people back up, I noticed multiple subjects had an orange substance on their faces as they were hunched over and pouring water on their faces. Bystanders around me pointed in the direction of where Dempsey was being detained and stated something to the effect of, "He peppered sprayed them! He peppered sprayed them!".

⬛⬛⬛⬛⬛⬛⬛⬛ was attending first aid to the victims and requested Santa Monica FD over his hand held radio. Santa Monica FD (Engine #7 ⬛⬛⬛⬛⬛) arrived on scene and treated the five victims that were effected from the pepper spray. The victims of the pepper spray were anti- Trump protestors who were eventually cleared from SMFD and did not provide further information. The victims left the scene and immediately re-joined the anti-Trump protest.

Officer ⬛⬛⬛⬛ spoke with a victim, identified as ⬛⬛⬛⬛⬛⬛ in regards to the incident. ⬛⬛⬛ was uncooperative with Officer ⬛⬛⬛ and was unable to provide information regarding the subjects effected from the pepper spray. For further information, refer to Officer ⬛⬛⬛⬛'s supplemental report.

Sgt. ⬛⬛⬛⬛ and Sgt. ⬛⬛⬛⬛⬛ were on scene.

While on scene, I saw a subject, later identified as W1 ⬛⬛⬛⬛⬛ who had a hand held video camera and was currently filming the incident. I contacted ⬛⬛⬛ and asked if he captured the incident. ⬛⬛⬛ said something to the effect of, "I saw everything!" ⬛⬛⬛ provided the following summarized statement:
⬛⬛⬛ was standing on top of the public benches that were located on the south curb line, adjacent to the Blazing Saddles Beach Rentals (320 Santa Monica Pier). In the middle of the Pier, ⬛⬛⬛⬛⬛ was filming the large group of protestors that were chanting "Impeach Trump!" while holding signs that had a picture of a peach, with the words "I'm Peach" above it. ⬛⬛⬛ was covering the event for his YouTube channel ⬛⬛⬛⬛⬛ While filming the group, ⬛⬛⬛ saw a subject, wearing a red hat, blue t-shirt, and blue jeans (Dempsey) run into the crowd and began to pepper spray the protestors. The crowd quickly dispersed as people began to run away from the cloud of pepper spray and started to push/shove each other as emotions from the protestors became more violent. Other protesters began to throw punches and tackle each other to the ground. ⬛⬛⬛ followed Dempsey southbound on the pier deck where he was in front of the Pier Substation and quickly detained from Officers. ⬛⬛⬛⬛ maintained a constant visual of Dempsey from the time he peppered sprayed the crowd, to the time he was detained from Officers. ⬛⬛⬛⬛ had nothing further to add.

I reviewed the surveillance footage recorded by ⬛⬛⬛ in the field and saw Dempsey, wearing a red hat, blue t-shirt, and blue pants, point a large can of pepper spray in the direction of the protestors, and sprayed the crowd that emitted a large orange cloud.

Officer ⬛⬛⬛⬛⬛ recorded the footage from her department issued camera and later booked it as evidence.

Printed for ⬛⬛⬛⬛⬛⬛ ⬛⬛⬛ 5/14/20

███████ stated he would later submit the surveillance footage via email, however, at the time of this report it has not been received.

Officer ███████ discovered a black and white, "Frontiersman" Bear attack Deterrent, approximately 8 inches in height, with 9.2 ounces of deterrent content, behind Dempsey when he was originally detained. In black/bold lettering, it says on the can, "To deter bears from attacking humans." Officer ███████ took photographs of the "Frontiersman" bear attack deterrent and later submitted as evidence.

Based on the overall circumstances, the spontaneous statements from bystanders, and from the continuous observation of ███████ watching Dempsey committing the act, I formed the opinion Dempsey was the suspect that peppered sprayed the crowd of protestors with the "Frontiersman" Bear attack deterrent. Dempsey was placed under arrest for 244 PC and 22810(e)(1) PC- Possession of tear gas weapons.

Officer's ███████ and ███████ transported Dempsey to the Santa Monica Jail without further incident. Officer ███████ took stand up photographs of Dempsey in his clothing and later submitted the photographs as evidence.

Officer ███████ booked Dempsey's red hat, blue t-shirt, and blue jeans as evidence. Dempsey's clothing was booked in the property cage due to the residue of capsaicin on his clothing, per Sgt. ███████ request.

At the Public Safety Facility, I conducted a computer inquiry on Dempsey and revealed he was previously arrested for the following:
Minor possession of spray paint, vandalism, robbery, burglary, assault with a deadly weapon, manufacture of a deadly weapon, conspiracy to commit a crime, parole violation, receive stolen property, possession of a controlled substance, transportation of a controlled substance, evading a police officer.

███████████████████████████████████████████████████████████████████

At the Santa Monica Jail, I read Dempsey his Miranda Rights verbatim from my department issued handbook at 1519 hours in holding cell ███. Dempsey understood his rights and did not want to speak about the incident.

Based on Dempsey's previous felony assault conviction and violating his probation status, Dempsey was booked for the following:
- 22810(g)(1) PC- Use of tear gas other than self defense
- 244 PC- Assault with Caustic Chemicals

███████████████

Due to the overall circumstances, I respectfully request a stay away/court order banning Dempsey to be within 100 yards of the Santa Monica Pier.

My Body Worn Camera was activated during the investigation.

# EXHIBIT H2

## DECLARATION OF MICHAEL J. MALAK

I, ███████████, declare as follows:

1.      I am a criminal defense attorney who represented David Nicholas Dempsey early on in case number SA1014609-01 in Los Angeles County Superior Court, Airport Division. My California bar number is ██████, and I am a member in good standing.

2.      The Federal Bureau of Investigation ("FBI") contacted me during my representation of Mr. Dempsey and expressed interest in speaking to Mr. Dempsey.

3.      When sharing the FBI's desire to speak with Mr. Dempsey, I advised Mr. Dempsey that I believed it would be helpful to speak with them, which is contrary to my normal inclination to protect clients from inadvertently improvident statements unless the matter requires disclosure or is in the interests of national security. My decision was, in part, based on the fact that I believed Mr. Dempsey was the victim during this altercation and that Mr. Dempsey did not have much ideological attachment to former President Donald J. Trump or his policies. Mr. Dempsey agreed to speak with them.

4.      The FBI requested to speak with Mr. Dempsey prior to what I recall was Mr. Dempsey's second court appearance in this case.

5.      On the day of what I recall was Mr. Dempsey's second court appearance in this case, two (2) FBI agents (Dustin Drace and another individual whose name I cannot recall) met me in the corridor adjacent to the arraignment court at the Airport Branch of the L.A. Superior Court and introduced themselves to me.  I in turn introduced them to the group of around twenty (20) who were there to support Dempsey. In that group was is brother ██████, who was not detained at the pier, and several others who also had been there.  I invited the agents to speak to any of them

and that it was not necessary that I be present during any interviews. Just prior to that, I told the supporters that any facts they could provide might help David.

6.      Prior to the hearing, I communicated to the bailiff and the judge that the FBI was in the courthouse.

7.      Also prior to the hearing, the agents tried to speak with Mr. Dempsey in my presence. At first, the agents attempted to speak with Mr. Dempsey in the courtroom; but the sheriffs did not allow such an interaction. Subsequently, the agents entered the holding area and tried to speak with Mr. Dempsey, which I had advised Mr. Dempsey against since it was a relatively open area where other defendants could observe and hear their conversation. The FBI then tried to speak with Mr. Dempsey in a private setting; however, the sheriffs would not allow them to do so.

7.      During the hearing, the agents were cordial and polite to everyone, and they sat in a directly behind the Dempsey supporters. Supporters of Mr. Dempsey were, likewise, cordial, and polite, and there was no animosity.

8.      An attorney with the Public Defender's Office was appointed at the hearing following my withdrawal. My withdrawal related to the amount of resources I had at the time versus the resources required to adequately prepare for a trial in Mr. Dempsey's case; it was not related to differences of opinion as to strategy or otherwise.

9.      I saw the FBI speak with Mr. Dempsey's new attorney after the hearing. Specifically, once I had withdrawn as Mr. Dempsey's counsel, I accompanied the FBI to the Public Defender's Office upstairs to introduce them to Mr. Dempsey's new attorney, among other things. The Deputy Public Defender we spoke with had the gravitas of an authority figure.

10.      During the case transition, I communicated to Mr. Dempsey's new attorney that the FBI had contacted Mr. Dempsey previously. I also submitted a lengthy letter to the head of the

local Public Defender's Office detailing why Mr. Dempsey should not be held to account in this case.[1] He told me he appreciated the work and would handle the case personally based on what he had read.

11.     The charges in this case pertained to an allegation that Mr. Dempsey used bear spray against individuals at the Santa Monica Pier.

a.     I thought the nature of the charges brought against Mr. Dempsey was odd given that the allegations involved bear spray, a product designed to be used against bears, not people, as it stated on the can in this case.

b.     I researched the proper jurisdiction for this case, which, from my recollection, was not Santa Monica (or, at least, it was arguable). My recollection is that the pier is under L.A. County Coast Guard jurisdiction. Ancillary jurisdiction comes from the pier citizen authority. The shore is under the control of the county L.A. County Harbor Dept. SMD jurisdiction ends where the street meets the green beltway leading up to the sand. No one in authority was there that day.

c.     As I further stated in my letter to the Public Defender, I do not believe that Mr. Dempsey was guilty of the charged offenses. And, based on the evidence in this case, I would have taken the case to trial given the sincere likelihood of success and my belief in the justice of Mr. Dempsey's action as self-defense.

---

[1] In the letter, I explained the following, among other things: Mr. Dempsey is a good man with a quotient of human kindness that belied his status. He will vigorously defend against those who seek to inhibit others from expressing their views, no matter the view. He is not indiscriminately violent and believes rules apply to physical contests.

12.     My recollection of the events that led to the charges in this case are, in relevant part, as follows:

a.      I recall that a permit was acquired for protestors to march through downtown Santa Monica beginning at the beaches.

b.      Antifa protestors significantly outnumbered Mr. Dempsey and his cohort. Regardless, Mr. Dempsey and his cohort marched on the edge of the Antifa protestors. Antifa members were angry Mr. Dempsey's small group marched around the perimeter of the encampment where they were preparing to march through Santa Monica. Mr. Dempsey and his small group of peers were protesting Antifa's habitual and ritualistic burning of American flags. After they circled the encampment once or twice the lead Antifa, a former Marine, ordered his people to attack the Mr. Dempsey group and they gave chase as Mr. Dempsey and his people ran to the ostensible safety of a police station on the pier, not knowing that it was effectively a shell of a building that was unoccupied and had nonfunctional surveillance cameras.[2] During the chase, a large number of Antifa members specifically tried to thwart the retreat by laying down on the ground and grabbing the retreaters' ankles.

c.      While on the pier, I believe Mr. Dempsey was hit in the head; I do not believe this assault and battery was caught on camera. I do specifically recall, however, that Mr. Dempsey's friend was pushed to the ground while on the pier.

---

[2] Though the SMPD had depicted it on the news as a working facility it was, in fact, nothing more than a set for a televise promo designed to show the police at work protecting the pier which they do not as art of their general authority. Pier security is run by a citizen's board that had been debating security at the facility for nearly two years prior. Their effectiveness is evidenced by the fact that none on the 54 security cameras on the pier worked.

This is when Mr. Dempsey used the bear spray. Mr. Dempsey sprayed individuals in the crowd out of fear that his friend would be kicked in the face/head or otherwise seriously injured. Mr. Dempsey had been roughed up and had taken in more spray than probably anyone else there, and became unable to always distinguish friend from foe when confronted by large numbers of running people, including Antifa which had melded into the public; so, his use of the bear spray[3] was done in a way to prevent people from approaching him or his friend, to break up the violence, and/or to incapacitate violent aggressors.

d.      A large man who had been part of the original attack was sprayed in the face while down, previously, because he had retreated and then rejoined the action more than once. Mr. Dempsey's second spray was an attempt to prevent that from happening again. I believe he was on the ground because he was so large that one (1) of his punches toppled him.

e.      Mr. Dempsey had bear spray on hand specifically because Antifa was known to bring and use bear spray to protests and counter protests. I believe Mr. Dempsey was provoked; among other things, Antifa certainly would have known that he was carrying bear spray, as bear spray canisters are quite large.

f.      Mr. Dempsey expressed to me that he did not set out to engage in violence that day, but he and his friends found themselves outnumbered when at least one (1) member of Antifa instigated violence against them.

---

[3] Bear spray is legal to carry and use in California for anyone over the age of eighteen (18). Further, bear spray, which is made to be used against bears, specifically explains on the canister how and where to spray a bear.

g.      During my investigation for purposes of building a defense, I found that other sources corroborated Mr. Dempsey's story and that the government's case relied on untrue and otherwise noncredible statements from various individuals. For instance, one complaining purported witness provided officers a false name, false address, and false phone number after giving her statement.

h.      During my investigation into this case,  I also confirmed that there was a general doxing effort against Mr. Dempsey by Antifa.

i.      I also discovered during my investigation into this case that the video relied on by the government did not represent the entirety of the day's events[4] and that, although a witness claimed he was present during the entirety of the day's events, it was not possible based on the content of his statement to law enforcement and other factors.

13.    Mr. Dempsey was surprised when he was arrested and had expressed thankfulness to the officers who finally showed up after a half hour. The patrol schedule for passes of the pier was not being observed that day according to my calculations and the event, therefore, continued longer than it would have had the police followed protocol. The police chief later resigned, I believe because of this incident and concern the City might face liability for officer negligence that day.

---

[4] I have a B.A. and an M.A. in film and television writing and production from Loyola Marymount and worked as a civilian contractor to the U.S. Navy at Lockheed Aircraft documenting flight tests of experimental aircraft. The footage relied upon by the government was edited several times, shots were out of sequence, and exonerating materials conveniently deleted or not filmed. It was not of a quality that should be admitted into evidence.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct, or if alleged on information and belief, that I believe it to be true in witness of which is my signature affixed this 30th day of May 2024, at ███████████

# EXHIBIT H3

10  in the supervision of line attorneys.  While the *Dempsey* case was in pretrial status and through the

11  ultimate resolution of the case on May 17, 2021, I made frequent personal appearances on the case

12  and served as lead defense lawyer representing our client, Mr. Dempsey.

13      3.  Prior to preparing this declaration, I reviewed email communications I exchanged on

14  the *Dempsey* case, and I also reviewed attorney notes contained within the trial file.  My summary

15  of communications and events on the case is based upon the memorialized communications that I

16  had on the matter as well as my memory, to the best of my ability.

17      4.  As a part of my duties as lead counsel for Mr. Dempsey, I reviewed his case file to

18  assess the case and negotiate offers of settlement between with the prosecution.

19      5.  In mid-June of 2020, I requested that the Head Deputy of the Airport Branch Office

20  of the Los Angeles District Attorney ("LADA"), Head Deputy ████████████ review the

21  *Dempsey* file for a potential offer.

22      6.  In my request to ██████ I asked that he consider extending an offer which would

23  allow Mr. Dempsey the opportunity to obtain a misdemeanor conviction upon the completion of

24  additional terms, including 120 days of county jail with credit for time already served.  ████ had

25  previously extended a similar offer of settlement to defense counsel for Petitioner's co-defendant,

26  ████████.

27      7.  To my recollection, the *Dempsey* case arose from an anti-Trump rally in Santa

28  Monica, which occurred on October 19, 2019.  Mr. Dempsey was captured on video spraying a can

1

DECLARATION OF GREGORY MCCAMBRIDGE

---

1  of bear spray into the crowd.  It was my belief after reviewing my client's case, investigating the

2  incident underlying his charges, and discussing the case with him, that my client had not brought

3  bear spray to the event with the intent to harm anyone.  To the contrary, I believed that Mr. Dempsey

4  had legitimate concerns about his safety based on prior interactions with some opposing faction

5  members at various pro-Trump and anti-Trump gatherings, one of which had apparently recently

6  assaulted a police officer.

7      8.  When I requested an offer from ██████ in June of 2020, I informed him that it was

8  my belief that my client was amenable to a plea based upon numerous conversations I had with Mr.

9  Dempsey leading up to the date of my request.  However, I relayed to ██████ that I did not feel my

10  client would plead to a felony, unless he had the opportunity to later convert it to a misdemeanor.  I

11  indicated that I felt he would accept an offer which included 120 days in county jail, which was the

12  equivalent of a time-served offer, and which had been previously conveyed to Mr. Dempsey's co-

13  defendant.

11. On February 4, 2021, I responded to ▮▮▮▮▮ and disclosed to ▮▮ that I had also been in receipt of various videos where my client had been supposedly identified as an assailant at various gatherings. However, based on the communications I had with my client, I took the position that the individual who had purportedly been identified to be my client in the videos was not him, but that it was possibly his identical twin brother. I further indicated to ▮▮▮▮▮ that I was suspicious of any information that came through social media which could not be otherwise verified. Further, I summarized for ▮▮▮▮▮ my prior disposition efforts with ▮▮▮▮▮ and let ▮▮ know that after it became apparent the two sides could not come to a resolution of my client's case which would be agreeable to both sides, I had proceeded to prepare the case for trial. I also informed ▮▮▮▮ ▮▮▮ that I had agreed to waive preliminary hearing on the case because I did not feel it was necessary to bring numerous witnesses to court during the pandemic. Finally, I informed ▮▮ that I would relay any modified offer to my client, but that I felt that any offer involving additional custody time would not be accepted. I represented that I thought my client would be inclined to accept a probationary offer.

# TABLE A1

| Name | Resolution | Key Facts | Charge(s) | Term Imposed – Months | Term Govt. Requested | Guidelines | Other Notes |
|------|-----------|-----------|-----------|-----------------------|----------------------|------------|-------------|
| **Mark Leffingwell** 1:21-cr-5-ABJ-1 | Guilty Plea | Leffingwell entered the Capitol at the Senate wing doors and chanted at officers standing before him to "join us"; in response to officers pushing back Leffingwell and the rest of the crowd, Leffingwell punched 2 officers a total of 3 times | 111(a) | **6** | 27 | 24-30 (Plea Agreement) | |
| **Grayson Sherrill** 1:21-cr-282-TSC-1 | Guilty Plea | When an officer was separated from the CDU line and was being attacked by another individual, Sherrill violently swung and struck the officer with a metal pole; Sherrill then made his way into the Capitol building with the metal pole; Sherrill banged on a door with the metal pole, joined a mob of individuals that overtook a vastly outnumbered police line in the Crypt, chanted "NANCY! NANCY!" as he approached House Speaker Nancy Pelosi's office; after he left the building, Sherrill climbed on a government vehicle and watched the continued chaos as officers tried to reclaim the Capitol; after January 6, 2021, Sherrill deleted videos from his cell phone that he took at the Capitol | 111(a) | **7** | 41 | 37-46 (Plea Agreement) | Plea agreement included dangerous weapon enhancement |
| **Troy Sargent** 1:21-cr-258-TFH-1 | Guilty Plea - without Plea Agreement | Sargent struck an officer with his open hand 1 time and attempted to do so a second time (instead, he struck a member of the crowd); Sargent told officers "fuck you guys, you guys are either with them or with us and repeatedly berated officers"; Sargent later told someone he punched a cop 3 times on the visor; Sargent later told someone else that he "Duff that cop out twice"; in a Facebook message to group of approximately 50 people, sent later on January 6, Sargent wrote "After I seen them [the police] throwing them flash grenades into the crowd I had to get off the ladder and go get me some"; Sargent also later sent a direct message to someone saying, "I got two hits in on the same | 231(a)(3) 111(a)(1) 1752(a)(1) 1752(a)(2) 1752(a)(4) 5104(e)(2)(F) | **14** | 27 | 24-30 (Govt. Memo.) | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | rookie cop and then he maced me," and, "yeah every time he came in his visor was all full of [mace so] I knew [he] couldn't see s*** so I just jumped out from behind somebody punched him as hard as I could [right] in his [visor]"; after his arrest, Sargent lied to the FBI about his actions | | | | | |
| **Joshua Hernandez**<br>**1:22-cr-42-CRC-1** | Guilty Plea | Hernandez climbed through the window at the Senate Wing Door; Hernandez entered the Speaker's Conference Room and Senate Gallery; Hernandez hit a door in the hallway with his flagpole; Hernandez attempted to enter where congressional staff were barricaded in an office; Hernandez assaulted a police officer with his flagpole by hitting him in the head | 231(a)(3)<br>111(a) | **24** | | 24 to 30 (Plea Agreement) | Court declined to apply the dangerous weapon enhancement for Hernandez's use of a flagpole to strike an officer in the head |
| **Ricky Willden**<br>**1:21-cr-423-RC-1** | Guilty Plea | Willden assaulted numerous officers with a chemical irritant while he wore goggles that he had brought with him; Willden then threw the chemical irritant canister at officers; Willden entered the Capitol; after January 6, Willden deleted Facebook messages and videos; Willden is a member of the Proud Boys | 111(a) | **24** | 30 | 24-30 (PSR) | At the time of his sentencing, Willden had a pending charge for felony assault of his spouse with a deadly weapon and had been using illegal substances while on release<br><br>Willden did not receive the dangerous weapon enhancement |
| **Kevin Creek**<br>**1:21-cr-645-DLF-1** | Guilty Plea | Creek brought mace and a knife to the Capitol; Creek pushed through the barricade and grabbed Officer J.C.M., driving him back forcefully several feet and striking him in the face shield before letting him go; Creek shoved Officer R.S.E. to the ground and kicked him; Creek picked up a ratchet strap (a thick strap with heavy metal buckles) and threw it at officers | 111(a) | **27** | 27 | 24-30 (Plea Agreement) | Dangerous weapon enhancement not applied |
| **David Judd**<br>**1:21-cr-40-TNM-3** | Stipulated Trial | Judd led, coordinated, and otherwise participated in efforts to breach the police line and enter the West Tunnel; Judd passed items into the tunnel to be | 111(b)<br>1512(c)(2), 2 | **32** | 90 | 78-97 (PSR) | Govt. asked to apply 1-level upward departure |

| | | used as weapons; Judd threw a firecracker into the West Tunnel | | | | 87-108 (Govt. Memo., after departures) | under terrorism enhancement

Although it provided for a 3-level reduction for Acceptance of Responsibility in its Memo., at sentencing, the Govt. argued against the reduction because, following the stipulated trial, Judd refuted facts agreed to in the Statement of Offense for the stipulated trial

Govt. characterized his conduct as "some of the most aggravating conduct that we've seen on January 6th"

The Court found the firecracker to be a dangerous weapon and that Judd intended to cause bodily injury by throwing the firecracker

The Court disagreed with the Guidelines' range proposed by Probation (78-97 months) and the Govt. and found a range of 37-46 months |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | The Court then varied downward to impose a sentence of 32 months, finding the "advisory guideline produces an advisory sentence that is overly harsh" |
| **Matthew Miller 1:21-cr-75-RDM-1** | Guilty Plea | Miller threw an object towards the Capitol; Miller used a temporary barrier to scale the Capitol; Miller helped others scale the Capitol walls and other architectural obstacles; Miller encouraged individuals to push towards the tunnel entrance; Miller threw objects at officers (e.g., beer cans, batteries); Miller used a fire extinguisher to spray into the tunnel against more than a dozen officers as others were assaulting the officers | 1512(c)(2) 111(a) | **33** | 51 | 41-51 (Plea Agreement) | |
| **Brian Mock 1:21-cr-444-JEB-1** | Trial | | 1512(c), 2 231(a)(3) 111(a) 111(a) 111(a) 111(a) 641 1752(a)(1) 1752(a)(2) 1752(a)(4) 5104(e)(2)(F) | **33** | 109 | | The Court ruled at trial that Mock's flagpole, which the Court concluded was made of plastic or a similar material, was not a "deadly or dangerous weapon" for purposes of 111(b) or 1752(b)(1)(A) |
| **Alan Byerly 1:21-cr-527-RDM-1** | Guilty Plea | Byerly purchased a stun gun prior to January 6, 2021; Byerly brought stun gun to Capitol; Byerly dragged and shoved a reporter; Byerly used stun gun against at least 2 officers; Byerly hit and pushed officers; Byerly took an officer's baton; Byerly assaulted a group of officers using an enormous all metal Trump billboard with sharp edges that was capable of splitting someone's head open as a battering ram; viciously assaulted a | 111(a) 113(a)(4) | **34** | 46 | 37-46 (Plea Agreement) | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | member of the press, dragging him up and down the staircase | | | | |
| **Logan Barnhart 1:21-cr-35-RC-6** | Guilty Plea | As Whitton was attacking an officer, Barnhart climbed over a banister and went up a set of steps towards the officer in the Tunnel Archway; Whitton grabbed the officer first by his baton and then by the helmet and the neck of his ballistic vest; as he did this, Barnhart grabbed the officer's neck and torso and dragged him in a prone position from the police line, out of the Archway, and down a set of stairs; several minutes later, Barnhart returned to the Archway, where others were assaulting the line of officers by slamming riot shields into them, striking them, and throwing objects at them; there, Barnhart joined others in charging against the police line and pushed other people from behind, supporting them and propelling them forward into the line of officers; Barnhart then approached the line of officers wielding a flagpole and used it to strike the officers | 111(b), 2 | **36** | 63 | 51-63 (PSR) | Plea Agreement did not include dangerous weapon enhancement even though Barnhart used a flagpole to try to strike officers<br><br>Judge Contreras noted Barnhart's criminal record suggested some level of aggressive disputes and in at least one instance the presence of a firearm during that dispute<br><br>Judge Contreras noted that, because of Barnhart's history of violence against law enforcement and past aggressive acts (at least one in which a firearm was present), the Court was concerned that Barnhart could reoffend if sufficiently angered (thus, potentially posing an ongoing risk to the public)<br><br>Judge Contreras observed that Barnhart grew up in an intact |

| | | | | | | | household, in a supportive community where all his material needs were met |
|---|---|---|---|---|---|---|---|
| | | | | | | | Judge Contreras observed that Barnhart had no history of drug abuse or physical abuse in the home |
| **Nicholas Brockhoff** **1:21-cr-524-CKK-1** | Guilty Plea | Brockhoff threw an object from the West Terrace towards officers; Brockhoff discharged the contents of fire extinguishers on multiple occasions and from at least 2 different locations, both elevated positions; while very close to the Lower West Terrace Tunnel, Brockhoff obtained an officer's helmet, which he wore like a trophy that afternoon; Brockhoff entered a Senate Conference Room through a broken window and then forcibly entered another room in the Capitol by kicking the door and directing others to do so; while in one of the rooms, Brockhoff tore open a box and riffled through papers | 111(b) | **36** | 51 | 46-57 (Plea Agreement) | |
| **Aiden Bilyard** **1:22-cr-34-RBW-1** | Guilty Plea | Bilyard used a metal bat to shatter the lower glass portion of a window; Bilyard encouraged others to crawl through and enter the building using the breach point he created, and was the first individual to crawl through the window into a Capitol conference room; Bilyard sprayed "Home Defense Pepper Gel" at a group of officers (L.H. instantly recognized the orange substance as a capsaicin-based product but described it as being far stronger than any chemical munition he had previously been exposed to. L.H.'s exposure to chemical spray on January 6, 2021 caused him extreme pain and incapacitated him); Bilyard took the same set of stairs towards the LWT tunnel as the retreating officers; Bilyard showed no remorse after; when his | 111(b) | **40** | 47 | 46-57 (PSR) | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | mother contacted him after he brought back a canister of pepper gel from the riot, he joked in a text message that he "[h]ad to bring something back"; Bilyard lied to FBI agents during an interview, claiming that he only participated in lawful activities while at the Capitol | | | | | |
| **Scott Fairlamb 1:21-cr-120-RCL-1** | Guilty Plea | Fairlamb climbed West Terrace scaffolding; Fairlamb pushed through a police line and metal barricades and obtained a police baton; Fairlamb recorded a video about intent to storm the Capitol; Fairlamb entered the Capitol with the baton; Fairlamb entered the Senate Wing 1 minute after it was breached, screaming at the officers, armed with a police baton which he brandished; Fairlamb after exiting, he followed a police line and cut off an officer, who he shoved into crowd members and punched in the face; after January 6, he both lied about and bragged about his activities | 1512(c)(2) 111(a) | **41** | 44 | 41-51 (Plea Agreement) | |
| **Greg Rubenacker 1:21-cr-193-BAH-1** | Guilty Plea | Rubenacker was one of the first people in the Capitol; Rubenacker entered the Capitol twice; Rubenacker swung a plastic bottle at an officer's head and sprayed water from it across multiple officers; chased an officer through the Capitol, berating him and other officers | 231(a)(3) 1512(c)(2) 111(a) 1752(a)(1) 1752(a)(2) 1752(a)(4) 5104(e)(2)(D) 5104(e)(2)(E) 5104(e)(2)(F) 5104(e)(2)(G) | **41** | 46 | 41-51 (PSR) | |
| **Gregory Nix 1:21-cr-678-BAH-1** | Guilty Plea | Nix entered the Capitol; Nix attempted to breach the East House Doors by banging the end of a flagpole against the door; Nix later used a baton to bang against the East House Doors; Nix verbally engaged with officers; Nix used a flagpole to hit an officer in the head and thrusted and threw the flagpole at that officer; in a text message, Nix wrote that he had "no problem with tar and   feathering" when the individual he was conversing with commented January 6 may get violent | 111(b) | **42** | 70 | 63-78 (Plea Agreement) | |

| Howard Richardson 1:21-cr-721-CKK-1 | Guilty Plea | Richardson brought a long, metal flagpole and used it to strike an officer 3 times, only stopping after it broke on the third hit; less than 2 minutes later, Richardson helped use an enormous metal Trump sign as a battering ram against officers; Richardson made false representations to the Court during his plea hearing; after his plea but before sentencing, Richardson was arrested again for aggravated assault and lied to the local police about his conduct | 111(a) | **46** | 46 | 37-46 (Plea Agreement) | On January 6, 2021, Richardson was on bail for Illegal Possession of a Firearm |
|---|---|---|---|---|---|---|---|
| Devlyn Thompson 1:21-cr-461-RCL-1 | Guilty Plea | Thompson struck an officer with a baton at the Capitol entrance; Thompson became angry by observing law enforcement interactions; and responded aggressively; Thompson yelled at officers, pointed out individual officers, and yelled at the law enforcement officers who were blocking his path; Thompson pointed at one officer and yelled, "where's your boy at?," "you hiding him," "you wanna fight, lets fight! One on one."; at least one other member of the crowd tried to calm Thompson down; after the police line at the bottom of the Terrace was overcome, Thompson climbed a balustrade and joined a crowd on the inaugural stage; Thompson joined dozens of others in the Lower West Terrace tunnel who were actively assaulting officers For approximately the next 13 minutes, Thompson was in the tunnel zone and was actively assisting, aiding, and abetting the mob that was assaulting officers and trying to break through the police line to gain access to the Capitol; Thompson helped members of the mob take multiple riot shields from the officers officers blocking the doorway to the Capitol; as Thompson was bringing forward the shields, members of the crowd yelled for them to "Use the shields! [against law enforcement officers]," and for the rioters to then, "Lock your shields!" in an effort to thwart officers' attempts to ward off the assault; | 111(b) | **46** | 48 | 46-57 (Plea Agreement) | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Thompson joined in effort by the mob to jointly push together against the front-line officers in an effort to force their way through the police; Thompson helped others throw a large audio speaker toward the police line; Thompson found a metal baton in the tunnel and decided to arm himself as he continued his approach; Thompson struck one time at Sgt. W.B. (who was helping a member of the crowd) with the baton; Thompson returned to the mouth of the tunnel as an engaged observer; Thompson was among the first crowd member to arrive on the inaugural stage and he was one of the last to leave as he occupied the inaugural stage until shortly after 5 p.m. when heavily armored Virginia State Police Officers arrived and deployed ordinance that forced the mob from the stage | | | | | |
| **Nicholas Languerand 1:21-cr-353-JDB-1** | Guilty Plea | Languerand utilized many objects to harm officers, including throwing a piece of wood, throwing a heavy black speaker, throwing multiple sticks, and throwing a large traffic cone; Languerand used a riot shield against officers; Languerand later bragged about and offered justifications for his violent acts; when he was arrested, Languerand had an extensive arsenal, writings deeply critical and menacing of the FBI, and photos of the Proud Boys, Three Percenters, Nazi iconography, etc.; Languerand posted online that he had carried a firearm with him to the Capitol | 111(a) 111(b) | **44** | 51 | 46-57 (PSR) | Languerand's criminal history included prior assaultive and threatening conduct |
| **Christian Manley 1:21-cr-691-TSC-1** | Guilty Plea | Manley brought 2 cans of bear deterrent/pepper spray, a collapsible police baton, and handcuffs; Manley wore a flak jacket; from inside the archway, Manley sprayed the bear deterrent/pepper spray towards officers defending the Tunnel; after emptying the canister of bear deterrent/pepper spray, Manley threw the canister towards officers; from the rear of the archway, Manley assisted others in removing police shields which were taken | 111(b) | **50** | 57 | 51-63 (Plea Agreement) | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | from officers and passed outside the tunnel; Manley passed at least 3 riot shields from inside the tunnel; Manley again sprayed officers with bear deterrent/pepper spray while others throw objects at the officers; Manley also threw that empty bear deterrent/pepper spray canister at officers; while in the Tunnel, Manley threw a pipe and another object at officers and further assisted in passing riot shields; in the Tunnel, Manley pushed a door against officers; Manley encouraged others to enter the Tunnel | | | | | |
| **Duke Wilson 1:21-cr-345-RCL-1** | Guilty Plea | Wilson picked up PVC pipe and struck at least 2 officers in the tunnel before throwing the pipe at the crowd of officers; Wilson attempted to pull away an officer's shield; Wilson entered the Tunnel and tried to pull open the door to the Capitol; Wilson attempted to pull away an officer's shield; Wilson engaged in hand-to-hand combat with a number of officers—punching, shoving, and kicking them | 1512(c)(2) 111(a) | **51** | 46 | 41-51 (Plea Agreement) | Dangerous weapon enhancement not applied |
| **Justin Jersey 1:21-35-RC-9** | Guilty Plea | Jersey charged at the line of officers protecting the entrance to the Tunnel; this set into motion a large-scale assault on multiple officers, including direct violence from Jersey; while Officer A.W. was positioned at the front of the Archway, Jersey grabbed Officer A.W.'s baton with one hand and reached towards Officer A.W.'s face with the other hand, grappling over the baton for several seconds, and knocked Officer A.W. to the ground; Jersey then grabbed another baton and used it to strike other officers in the Archway; while other assaults were occurring, Jersey picked up Officer A.W.'s helmet and put it on his own head; Jersey left D.C. with Officer A.W.'s helmet, another officer's helmet, and an officer's badge; Jersey displayed one of those helmets behind the bar in his home; prior to January 6, 2021, Jersey exchanged Facebook messages that indicated that he | 111(b), 2 | **51** | 63 | 51-63 (PSR and Plea Agreement) | Jersey has a conviction stemming from a domestic dispute that became violent. He was arrested for (but not ultimately charged with) possessing a firearm with serial number that had been altered after a rifle was recovered following a dispute between Jersey and the mother of one of his children (Govt.'s Sentencing Memo., ECF 275 at 20). |

| | | anticipated that violence would occur and that he would have a weapon with him; Jersey, accordingly, brought a large, gnarled stick | | | | | |
|---|---|---|---|---|---|---|---|
| **Lucas Denney** 1:22-cr-70-RDM-1 | Guilty Plea - without Plea Agreement | Denney brought pepper spray; Denney deployed pepper spray at officers on multiple occasions; Denney threw the pepper spray canister at officers; Denney struck officers with a pole; Denney brandished a baton; Denney pushed a riot shield into officers; Denney swung his fist at an officer and grabbed the officer in an attempt to pull him down the stairs; Denney make multiple attempts to pull the barricades from officers and kicked it into officers; Denney wore full battle attire; Denney lied to the FBI agents about his involvement at January 6 and deleted information from a social media account; Denney was associated with the Proud Boys and Three Percenters; before January 6, Denney recruited people to his militia group who would be willing to engage in violence on January 6; prior to January 6, Denney solicited donations to pay for protective gear and pepper spray; Denney sought out battles at BLM Plaza the night of January 5, 2021; specifically came to wage violence | 111(b) | **52** | Middle of Guidelines | 87-108 | |
| **Geoffrey Sills** 1:21-cr-40-TNM-6 | Stipulated Trial | Sills went to the Capitol to protest Congress' certification of the Electoral College; prior to January 6, 2021, Sills made multiple purchases at stores which sell body armor, weapons, gas masks, and other combat equipment; Sills joined the line of rioters that pushed the police back off their line; Sills then threw several pole-like objects at the officers as they retreated, while filming the events and posting them to Instagram; Sills intended to stop or prevent Congress from certifying the Electoral College vote results; when officers retreated from the West Front up to the Lower West Terrace, Sills followed the officers up to the Terrace and into a tunnel created by the | 2111, 2 1512(c)(2), 2 111(b) | **52** | 108 | 97-121 (Govt. Memo.) | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | inauguration stage; Sills attempted to enter the glass door to the Capitol building labeled "Members Entrance Only"; Sills forcefully wrested away an officer's baton from C.W., who was defending the entrance door to the U.S. Capitol; a few minutes later, defendant Sills exited the tunnel holding an extended baton; as Sills exited the tunnel into, Sills lifted the baton above his head in what appears to be an effort to signal and galvanize the crowd; Sills re-entered the tunnel, and moved towards the police line at the door; Sills then pointed a flashing strobe light at the police line, disorienting officers; over the course of 6 minutes, Sills used the extended baton to repeatedly strike at officers on the police line; 1 of those strikes by defendant Sills struck Officer V.B.'s left arm while Officer V.B. was struggling with another rioter. Officer V.B. sustained multiple bruises from strikes on various parts of his body from the assaults he suffered on January 6; Officer V.B. recalled being struck on the head at 1 point by the baton wielded by Sills; Sills hit Officer C.W., the same individual from whom Sills stole the baton minutes before; Sills exited the tunnel with the extended baton over his head; Sills created an account with Zello, a "push-to-talk" walkie talkie application on January 6; around January 7, Sills deleted his Instagram account, where he posted video clips of him at the Capitol on January 6; in Sills's home were tactical style gloves with knuckle protection, black googles, a black flashlight with strobe function, a black gas mask, and a black riot-style baton, consistent with the one stolen from Officer C.W. | | | | | |
| **Robert Sanford 1:21-cr-86-PLF-1** | Guilty Plea | Sanford threw a fire extinguisher at a group of officers, striking 3 officers in the head, 1 of which had to go to the hospital for an examination; Sanford threw a traffic cone at officers | 111(b) | **52** | 71 | 63-78 (Plea Agreement) | |

| Mitchell Gardner<br>1:21-cr-622-APM-1 | Guilty Plea | While at the Lower West Terrace, Gardner shouted, "drag them out," "pull the cops out [of the Lower West Terrace Tunnel]," "fight for Trump," and "break the fucking window"; Gardner used a red canister in a black case to discharge the contents of a lachrymal agent spray at officers in the Lower West Terrace Tunnel; Gardner encouraged others to break a window of the Capitol; Gardner entered the Capitol through that window; once inside, Gardner took items from a conference room that could be used as weapons (e.g., table legs, lamps) and passed them out to the crowd who were assaulting the law enforcement at the tunnel | 231(a)(3) 1512(c)(2), 2 111(b) | **55** | 71 | 46-57 (PSR) | |
| Mason Courson<br>1:21-cr-35-RC-8 | Guilty Plea | Courson was an initial member of the mob that forcibly entered the Tunnel Archway; over the course of several minutes, Courson made his way deeper into the Tunnel and, along with others, forcefully pushed and shoved the crowd towards the line of officers stationed in the Tunnel; as he was pushed out of the Tunnel, Courson reached towards officers and grabbed at their equipment, including their protective gear; once officers pushed Courson out of the Tunnel, Courson armed himself with a police baton on the steps outside the Tunnel; about an hour later, Courson and numerous others attacked a line of officers positioned in the Archway; in the scuffle, an officer was dragged down a set of stairs, where Courson struck the officer with the baton, injuring the officer; when the officer attempted to ascend the steps back to the police line, Courson and others pushed him back down the steps and prevented him from re-joining the line; Courson then ascended the steps to the Archway and attempted to grab another officer who was still on the ground fending off attacks; Courson kept the baton, as if it were a trophy in which he should take great pride; Courson stated that he | 111(b), 2 | **57** | 87 | 70-87 (PSR) | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | believed that the officers were "traitors" on January 6, 2021 | | | | |
| **Mark Mazza** **1:21-cr-736-JEB-1** | Guilty Plea | Mazza brought 2 loaded handguns with him to the Capitol; Mazza pushed against the officers in the tunnel; Mazza berated and assaulted officers with a stolen police baton; Mazza remained armed on the Capitol grounds for several hours; "with full force," Mazza struck an officer's hand with his hand; afterwards, Mazza engaged in numerous acts of obstruction, including filing a false police report about how he lost 1 of his guns, filing off the serial number of the stolen police baton, and providing false information to Capitol Police | 111(b) D.C. Code 4504 | **60** | 78 | 57-71 (Govt. Memo., for 111(b))  8-24 (Govt. Memo., for D.C. Code) |
| **Ronald Sandlin** **1:21-cr-88-DLF-1** | Guilty Plea | Sandlin substantially planned with his co-conspirators their participation; Sandlin brought a car full of weapons, including knives, bear spray and a pistol; Sandlin directly assaulted at least 2 capitol police officers, attempting to rip off one officer's helmet and taking a swing at another officer's head; Sandlin assisted in the assault of at least 4 others; Sandlin later celebrated his participation and tried to profit off of it and obstructed the investigation | 1512(k) 111(a)(1), 2 | **63** | 63 | 63-78 (Govt. Memo.) |
| **Mark Ponder** **1:21-cr-259-TSC-1** | Guilty Plea | Ponder assaulted 3 officers on the western portion of Capitol grounds, as explained below; Ponder assaulted 1 officer with a long thin pole that broke on contact with the officer's riot shield held over his head; Ponder fled back into the crowd; Ponder rearmed himself with a thicker, sturdier pole and repeatedly struck another officer; Ponder fled back into the crowd; approximately 10 minutes later, Ponder swung that same pole like a baseball bat at Officer JC, striking him in the left shoulder; soon after, Ponder joined a crowd facing off against a line of officers; as these officers advanced to move the crowd, Ponder "wildly swung the pole" at the advancing police line, striking an officer in the left shoulder; as he was being detained, Ponder shouted | 111(b) | **63** | 60 | 57-71 (Plea Agreement) |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | to hold the line and not to give up; Ponder also told officers detaining him that when the country is being attacked like this we have a right to fight, which is what the Second Amendment was built on; e Ponder was arrested but then released with instructions to leave when no transport was available; Ponder, instead, returned to the Lower West Terrace where he used a police shield against the officers; Ponder remained on Capitol grounds until at least 5 pm | | | | | |
| **Robert Palmer 1:21-cr-328-TSC-1** | Guilty Plea | Palmer threw a wood plank at officers; Palmer deployed the contents of a fire extinguisher directly into the Tunnel; Palmer threw the empty extinguisher at officers; Palmer attacked officers with a traffic cone, a piece of scaffolding, and a second fire extinguisher; on the Upper West Plaza, Palmer approached a line of officers, yelling, and threw a pole at them like a spear; screamed obscenities at officers when engaging with them | 111(b) | **63** | 63 | 63-78 | |
| **Marcus Maly 1:21-cr-178-APM** | Trial | | 231(a)(3) 111(b) 1752(a)(1) 1752(a)(2) 5104(e)(2)(D) | **72** | 188 | 151-188 | The Gov't argued he had a "decades long criminal history, most of which did not generate criminal history points" |
| **Peter Schwartz 21-cr-178-APM** | Trial | On January 6, Schwartz brought a wooden tire knocker with him and otherwise clearly intended to engage in violence; Schwartz threw the "first chair" at the line of officers, creating an opening in the police line in the northwest corner of the terrace that enabled hundreds of rioters to flood the LWT as overwhelmed officers were forced to retreat; Schwartz stole chemical munitions, including pepper spray, that had been left behind by the fleeing officers and used that pepper spray as a weapon to attack those same officers as they desperately tried to escape the growing and increasingly violent mob; Schwartz made his way | 111(b) 111(b) 111(b), 2 231(a)(3) 1512(c)(2), 2 1752(a)(1), (b)(1)(A) 1752(a)(2), (b)(1)(A) 1752(a)(4), (b)(1)(A) 5104(e)(2)(D) | **168** | 294 | 262-327 (PSR and Govt. Memo.) | Schwartz had a criminal history score of 25 for his extensive criminal history; his criminal history included 38 convictions (excluding cases that were later dismissed, *nolle prosed*, or for which Schwartz received the benefit of a deferred prosecution); at the |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | up to the inaugural stage and entered the tunnel; inside the tunnel, Schwartz worked with 2 codefendants to again spray the line of officers inside with pepper spray; Schwartz ultimately engaged in four separate assaultive events, each against a group of officers; after leaving Capitol grounds, Schwartz bragged to multiple people about his participation in the violence that day, including as it related to stealing police munitions and throwing the "first chair"; Schwartz stated that he viewed himself as being at "war" on January 6: "What happened yesterday was the opening of a war. I was there and whether people will acknowledge it or not we are now at war." | 5104(e)(2)(F) | | | | time, Schwartz had an ongoing three-decade history of assault, violence, and weapons (several these cases involved assaulting or threatening officers or other authority figures and 2 related to possessing a handgun after being convicted of a felony); on January 6, Schwartz was on probation in at least 1 other case involving both assaultive conduct and illegal firearms possession; Schwartz failed to show any remorse for his actions, giving repeated interviews from the D.C. Jail claiming that he was a completely innocent victim of a biased prosecution (because of his political leanings) and did nothing wrong |
| **Kyle Fitzsimons 1:21-CR-158-RC** | Trial | | | | 87 | 188 | |
| **Jessica Watkins 1:22-cr-15-APM-4** | | | | | | | |
| **Patrick McCaughey 1:21-cr-40-TNM** | | | | | 90 | | |
| **Kelly Meggs** | | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **1:22-cr-15-APM-2** | | | | | | | |
| **McCaughey 1:21-CR-40-TNM** | | | | **90** | 188 | | |
| **Joseph Padilla 1:21-CR-214-JDB** | Trial | | | **78** | 171 | | |
| **Thomas Smith 1:21-CR-599-RBG** | | | | **108** | 168 | | |
| **Cappuccio 1:21-CR-00040-TNM** | Trial | | | **85** | 121 | | |
| **David Gietzen 1:21-cr-116-CJN** | Trial | | | **72** | 121 | | |